UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

BOURNE CO.,                                    :

              Plaintiff,                          :

        -against-                              :

TWENTIETH CENTURY FOX FILM          :
CORPORATION, FOX BROADCASTING
COMPANY, TWENTIETH CENTURY FOX   :      07 Civ. 8580 (DAB)
TELEVISION, INC., TWENTIETH
CENTURY FOX HOME                          :
ENTERTAINMENT, INC., FUZZY DOOR
PRODUCTIONS, INC., THE CARTOON       :
NETWORK, INC., SETH MCFARLANE,
WALTER MURPHY,                             :

           Defendants.                      :

---------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LOEB & LOEB LLP
Jonathan Zavin (JZ-1846)
Jacques Rimokh (JR-0745)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ....................................................................................3

      A.      "When You Wish Upon a Star" from *Pinocchio* ..................................3

      B.      The Family Guy TV Series and "When You Wish Upon A Weinstein" Episode............................................................................................................3

      C.      The Family Guy Song ...........................................................................6

ARGUMENT .........................................................................................................8

I.     THE FAMILY GUY SONG IS A PROTECTED FAIR USE OF WISH UPON A STAR .......................................................................................................8

II.    THE FIRST FACTOR WEIGHS DECISIVELY IN FAVOR OF FAIR USE BECAUSE THE FAMILY GUY SONG IS, QUITE CLEARLY, A "TRANSFORMATIVE" PARODY OF WISH UPON A STAR...................................10

      A.      The Family Guy Song Is an Obvious Parody of Wish Upon A Star .................11

      B.      The Transformative, Parodic Nature of The Family Guy Song Strongly Outweighs Any Potential Commercial Nature of the Work ...............................16

III.   THE SECOND FACTOR, WHILE SLIGHTLY FAVORING PLAINTIFF'S "CREATIVE" SONG, IS NOT SIGNIFICANT IN PARODY CASES ........................17

IV.   THE AMOUNT TAKEN FROM WISH UPON A STAR WAS REASONABLE IN LIGHT OF THE FAMILY GUY SONG'S PARODIC PURPOSES AND EFFECT......................................................................................18

V.    THE "TRANSFORMATIVE" FAMILY GUY SONG DOES NOT, AND CANNOT, HARM THE MARKET FOR WISH UPON A STAR .................................22

VI.   THE AGGREGATE FAIR USE FACTOR ANALYSIS ..................................23

CONCLUSION.......................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abilene Music, Inc. v. Sony Music Entm't, Inc.,*
    320 F. Supp.2d 84 (S.D.N.Y. 2003)................................................................. Passim

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)........................................................................ Passim

*Bourne Co. v. Walt Disney Co.,*
    No. 91 Civ. 0344 (LLS), 1992 WL 170686 (S.D.N.Y. July 1, 1992)........................................3

*Bourne v. Walt Disney Co.,*
    68 F.3d 621 (2d Cir. 1995).........................................................................3, 12

*Burnett v. Twentieth Century Fox Film Corp.,*
    491 F.Supp.2d 962 (C.D. Cal. 2007) ...............................................................2, 24

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994).............................................................................. Passim

*Elsmere Music, Inc. v. Nat'l Broad. Co.,*
    623 F.2d 252 (2d Cir. 1980)........................................................................ 20-21

*Leibovitz v. Paramount Pictures Corp.,*
    137 F.3d 109 (2d Cir. 1998)....................................................................... Passim

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.,*
    No. 00 Civ. 6068 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ...................... 9-10, 14, 20

*Nihon Keizai Shimbun v. Comline Business Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999).............................................................................8

STATUTES

17 U.S.C. § 107(4) ......................................................................................22

## PRELIMINARY STATEMENT

The animated comedic TV series *Family Guy* is well-known for its frequent, irreverent parodies of pop-culture icons. The subject half-hour episode, with the tongue-in-cheek title "When You Wish Upon A Weinstein" (the "Episode") is an "*All In The Family*-like" parable attacking racial stereotypes. The Episode tells the story of the bafoonish father, Peter Griffin, and his "dream" of finding a Jew to help solve his financial woes (and, later, trying to convert his less-than-bright son Chris to Judaism so he will become smart and successful). The scene at issue opens with Peter looking out the window, up at a starry night in much the same way as the toymaker Gepetto does in Walt Disney's *Pinocchio*. To music meant to evoke and parody "When You Wish Upon A Star" from *Pinocchio*, Peter starts singing, wistfully, "Nothing else has worked so far, So I'll wish upon a star, Wondrous dancing speck of light, I need a Jew. . . . " (the "Family Guy Song").

The *Family Guy* writers thought it would be both hilarious and poignant to write a song for the Episode that parodies the "sugary sweet," iconic, "old world" song "When You Wish Upon A Star" ("Wish Upon A Star") from the 1940 Walt Disney classic film *Pinocchio*, by evoking it musically, and turning the "wholesome" message of hope from Wish Upon A Star on its head by having Peter sing about how he wishes he could find a Jew.

This is a "textbook" example of a parody-fair use protected under §107 of the Copyright Act.[1] While musically referencing Wish Upon A Star, the Family Guy Song is a new work that comments upon the original and juxtaposes the concept of the saccharine-sweet, idyllic Wish Upon A Star with the absurd, and, indeed, perverse, idea of "wishing" for something

---

[1] For purposes of this motion only, Defendants' motion assumes that Plaintiff could establish a prima facie claim that the Family Guy Song infringes the copyright in Wish Upon A Star; but asserts that, nevertheless, the infringement claim fails because any alleged use is a protected fair use.

"fantastical" based upon an ignorant racial stereotype of Jews. The parody goes even further (or deeper) by using for its attack on racial stereotypes of Jewish people the iconic song most associated with Walt Disney, who, despite his well-maintained "wholesome" image, was widely-reputed to be anti-Semitic.[2]

The parodic nature of the Family Guy Song is, of course, apparent from merely watching the Episode. Pursuant to the Supreme Court's landmark parody-fair use decision in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), however, the fact that the Family Guy Song is a true parody of Wish Upon A Star, and one that did not borrow more from the original than was reasonable in light of its parodic character, is established beyond a doubt because, as Plaintiff and both its "experts" have admitted, the Family Guy Song cannot possibly serve as a market substitute for Wish Upon A Star. This lack of any "market harm" is also evident from the fact that Plaintiff, a major music publishing company, claims it did not even learn about the Family Guy Song until almost four years after it was first nationally telecast and released nationwide on home video.

A finding of fair use here furthers the goals of copyright by fostering the creation of a new and different work that comments on and transforms an iconic classic, without in any way harming the market for the original. Defendants are entitled to summary judgment dismissing the complaint in its entirety on the grounds of the fair use defense.

---

[2] This case is not the first case to be brought against *Family Guy* by a person who was not happy with her parodic portrayal and treatment at the hands of the *Family Guy* writing staff. In *Burnett v. Twentieth Century Fox Film Corp.*, 491 F.Supp.2d 962 (C.D. Cal. 2007), the celebrity Carol Burnett brought an action for, among other things, copyright infringement based upon *Family Guy's* portrayal of an animated character resembling her famous "Charwoman" character from *The Carol Burnett Show* mopping the floor next to several "blow up dolls" in a porn shop. The court in *Burnett* dismissed plaintiff's claims on the grounds that the use was a protected parody-fair use as a matter of law. *Id.* at 971-72.

**STATEMENT OF FACTS**

**A.   "When You Wish Upon a Star" from *Pinocchio***

Wish Upon A Star is a popular song written by Ned Washington and Leigh Harline and introduced in the 1940 Walt Disney movie *Pinocchio*,[3] where it is sung by Cliff Edwards in the character of Jiminy Cricket, over the opening credits and again in the final scene of the film. (Cmpl't ¶ 20). The song won the Academy Award for Best Original Song that year (*Id.*), and for more than sixty years Walt Disney and his company have taken substantial steps to make Wish Upon A Star its theme song, and to associate the song with Walt Disney in the public mind. *See, e.g., Bourne Co. v. Walt Disney Co.*, No. 91 Civ. 0344 (LLS), 1992 WL 170686 (S.D.N.Y. July 1, 1992), at *6; *see also* (Pltf's Admission No. 5).[4] The Song was used in the opening sequences of the Disney anthology television series, "The Wonderful World of Disney" (which, for years, Walt Disney personally introduced), in Walt Disney Pictures' opening logos, and in television advertisements for its Disneyland theme park. *See Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995); *see also* (Pltf's Admission No. 3).   Indeed, the song is an integral part of Walt Disney's and the Walt Disney Company's personality and reputation. *See Bourne Co.*, 1992 WL 170686, at *8.

**B.   The Family Guy TV Series and "When You Wish Upon A Weinstein" Episode**

*Family Guy* is a half-hour, animated, comedy television series, created by Seth MacFarlane, and televised on primetime and late-night cable television. (MacFarlane Dec. ¶ 2).[5]

---

[3] A copy of Walt Disney's *Pinocchio* on DVD is attached to the accompanying declaration of Seth MacFarlane as Exhibit B.

[4] Plaintiff's Responses to Defendant Twentieth Century Fox Film Corporation's First Request for Admissions, dated February 27, 2008, is attached to the accompanying declaration of Jacques Rimokh ("Rimokh Dec.") as Exhibit A.

[5] Defendants submit the Declarations of Seth MacFarlane ("MacFarlane Dec."), Ricky Blitt ("Blitt Dec."), David Zuckerman ("Zuckerman Dec."), and Lawrence Ferrara ("Ferrara Dec.") in support of their motion for summary judgment.

The series was first televised in 1999 and is now in its seventh season.[6] (*Id.*). The show often parodies icons from popular culture through the exploits of the Griffin family (father Peter, mother Lois, son Chris, matricidal baby son Stewie, daughter Meg, and talking dog Brian) that lives in the fictional town of Quahog, Rhode Island. (*Id.*). *Family Guy* is known for its frequent parodies of popular TV shows, movies, songs and celebrities. (*Id.*). The show routinely puts cartoon versions of celebrities and famous characters in awkward and ridiculous situations in order to lampoon and parody those figures and to poke fun at society's general fascination with celebrity and pop culture. (*Id.*). The show is also known for parodying obscure movies, TV shows or other cultural phenomena from the past. (*Id.*). The series follows a pattern of irreverent, iconoclastic plotlines, cutting-edge dialogue, and wildly non sequitur pop-cultural references. (*Id.*).

The *Family Guy* episode titled "When You Wish Upon A Weinstein" was produced in 2000.[7] (Cmplt. ¶ 3). The Episode is centered around the father, Peter, and his inability to manage his family's finances. (*Id.*). This is exemplified in the beginning of the Episode when Peter is convinced by a traveling salesman to purchase volcano insurance. (MacFarlane Dec.¶ 6). After hearing his friends talk about how men with Jewish-sounding names have helped them achieve financial success, Peter decides that he needs a Jew to help him with his finances. (*Id.*). After a Jew "miraculously" appears and helps him with his financial problems, Peter follows his

---

[6] The series was actually canceled after its second season, but was revived due to fan response and the retail success of the series episodes on DVD. (MacFarlane Dec. ¶ 2, n. 1). The series was then canceled a second time in 2002, but was again brought back due to viewer demand in 2005. (MacFarlane Dec. ¶ 2, n. 1).

[7] A copy of the home video release version of the Episode is attached to the accompanying declaration of Seth MacFarlane as Exhibit A. Due to issues raised by the Broadcast Standards (also referred to in some companies as the Standards and Practices) department, which determines for each broadcaster what content is or is not appropriate based upon their own respective guidelines, an alternate version of the Family Guy Song was included in certain telecasts of the Episode. The only difference is that in the alternate version the lyric "Even though they killed my Lord" is replaced with "I don't think they killed my Lord."

racial stereotypes to an even more ridiculous end by taking his son Chris to get a "quickie" Bar Mitzvah in Las Vegas so that he will become Jewish and be smart and successful. (*Id.*). In a scene that parodies the famous ending scene from the 1960s film "The Graduate," Lois rushes in to stop Chris, and explains to Peter the error of his ways. (*Id.*). At the end, Peter says to Lois: "I see what you're saying. The Jewish are just like us. No better, no worse." (*Id.*).

The overall theme of the Episode is that Peter's beliefs based upon racial stereotypes, even potentially "positive" ones, are ridiculous and that no group of people is any better or worse than another based upon their race or cultural heritage. (MacFarlane Dec. ¶ 7; Blitt Dec. ¶ 3). Just one of the comedic values present is that although this an obvious concept, it was not obvious to Peter. In the end, Peter had to learn this obvious lesson and the Episode illustrates Peter's ignorance. (MacFarlane Dec. ¶ 7). Before Peter learns this lesson he sings "I Need A Jew," which evokes and parodies Wish Upon A Star. (Zuckerman Dec. ¶ 5). In the Family Guy Song, Peter makes a magical wish "upon a star" for a Jew to come and help solve his financial problems. (*Id.*).

Fox Broadcasting initially decided not to air the Episode as part of season two, after it had completed postproduction, due to concerns at that time about the potentially controversial religious content of the Episode. (MacFarlane Dec. ¶ 5). The Episode, including the Family Guy Song, was first distributed on home video by Fox Home Entertainment on or about September 9, 2003 as part of the *Family Guy* "Volume 2, Season 3" DVD box set, which has remained on sale since that time. (Cmpl't ¶ 28). The Episode was first telecast on The Cartoon Network Inc.'s Adult Swim programming service on November 9, 2003 (Cmpl't ¶ 27) and was repeatedly telecast thereafter. (MacFarlane Dec. ¶ 5). The Episode was ultimately televised by Fox Broadcasting on December 10, 2004. (MacFarlane Dec. ¶ 5). The Episode was also

distributed on DVD by Fox Home Entertainment on or about December 14, 2004 as part of the "Family Guy-The Freakin' Sweet Collection" DVD, which has also been on sale since that time. (Cmpl't ¶ 28).

### C.  The Family Guy Song

The Family Guy Song was purposely created in a manner intended to evoke Wish Upon A Star for parodic purposes.  (MacFarlane Dec. ¶¶ 8, 13; Zuckerman Dec. ¶ 6).  Defendants initially sought a license from Plaintiff to use music from Wish Upon A Star in their parody song. (MacFarlane Dec. ¶ 12).  A copy of the proposed parody lyrics was sent to Plaintiff as part of the request.  Plaintiff refused to issue a license for the proposed use.  (*Id.*).  Defendants continued with their creation and use of Family Guy Song, without Plaintiff's approval, because they were comfortable that they were creating a fair use parody of Wish Upon A Star.[8] (MacFarlane Dec. ¶ 13).  For example, among other transformative changes, the creators changed the melody of the Family Guy Song to evoke – rather than be the same as – the melody of Wish Upon a Star. (*E.g.*, MacFarlane Dec. ¶ 13).

The Family Guy Song was intended to, and obviously does, parody Wish Upon A Star in several ways.  (Zuckerman Dec. ¶ 6).  First, the writers intended to evoke and parody the "saccharine sweet," "innocent" and "wholesome" worldview presented in and represented by Wish Upon A Star, by having Peter "wish upon a star" in a decidedly impure and unsavory manner based on his ignorant stereotypes.  (MacFarlane Dec. ¶ 8; Zuckerman Dec. ¶ 6; Blitt Dec. ¶¶ 5, 6).  The Episode visually carries through and furthers the parody by placing Peter in a pose that emulates that of the toymaker Gepetto in *Pinocchio*, sitting by the window sill gazing up at sparkling stars, wishing for a "real boy," as the music for Wish Upon A Star plays in the

---

[8] As the Supreme Court made clear in *Campbell*: "If the use is otherwise fair, then no permission need be sought or granted.  Thus, being denied permission to use a work does not weigh against a finding of fair use." *Id.*, 510 U.S. at 585 n. 18.

background. (*See Pinocchio* at time code 13:10 – 13:20; Episode at time code 6:00 – 6:20.); (*see* copies of video screen captures depicting these referenced scenes, MacFarlane Dec. ¶ 8, Exhibit C). In further parodying the fantasy world of *Pinocchio* and Wish Upon A Star, the Episode inserts and juxtaposes Peter's ridiculous racial stereotypes into the fantasy world by, among other things, depicting the Jews as magical creatures that come to Peter in the form of a magical spaceship that turns into a flying dreidel. (MacFarlane Dec. ¶ 9).

Second, the writers were well-aware of Walt Disney's public reputation as an Anti-Semite. (MacFarlane Dec. ¶ 10; Zuckerman Dec. ¶ 6). The writers believed that by evoking Wish Upon A Star, the song most associated with Walt Disney and his company, in their parody song where Peter wishes for a Jew to help him, they could comment on the song while simultaneously making a sharp point about Walt Disney's reputed anti-Semitism. (Zuckerman Dec. ¶ 6; MacFarlane Dec. ¶ 10).

The Family Guy Song has never been sold on its own (MacFarlane Dec. ¶ 15), apart from the Episode. By the Plaintiff's own admission, the Family Guy Song has not caused any market harm to "When You Wish Upon the Star." (Bourne Dep. 25-26, 27-30, 37-38, 60).[9] Indeed, it is ridiculous to even assert that the Family Guy Song could be a substitute for Wish Upon a Star. (Bourne Dep. 25-26, 27-30, 37-38, 60). This is further confirmed by the fact that Plaintiff, a major music publisher, claims that it did not even learn about the Episode and the Family Guy Song until almost four years after its repeated nationwide telecasts (more than 35 times) and release on home video. (Bourne Dep. 19-21). Similarly, there is no evidence whatsoever that the Family Guy Song has harmed the market for Wish Upon a Star. (Bourne Dep. 40).

---

[9] Bourne's deposition testimony is attached as Exhibit E to the accompanying declaration of Jacques Rimokh.

**ARGUMENT**

## I.    THE FAMILY GUY SONG IS A PROTECTED FAIR USE OF WISH UPON A STAR

The fair use doctrine is an "equitable rule of reason" that creates an exception to the copyright monopoly and "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577. "The affirmative defense of fair use fosters artistic dialogue and influence within the copyright regime by protecting authors' rights [to] build upon and transform existing works without having to purchase a license to do so. The concept of fair use has existed '[f]rom the infancy of copyright protection,' and 'has been thought necessary to fulfill copyright's very purpose' of promoting artistic creation, as borrowing from and commenting upon existing works is a fundamental part of the process of inventing new works." *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp.2d 84, 88 (S.D.N.Y. 2003) (*quoting Campbell*, 510 U.S. at 575). The fair use doctrine is the means by which copyright law is reconciled with and accommodates First Amendment rights of free expression. *See, e.g., Nihon Keizai Shimbun v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74 (2d Cir. 1999) ("First Amendment concerns are protected by and coextensive with the fair use doctrine.").

This defense is codified in Section 107 of the Copyright Act, entitled "Limitations on Exclusive Rights: Fair Use," which provides for an exception to liability for unauthorized use of a copyrighted work. Section 107 sets out four illustrative factors to be used by the courts in determining whether a work constitutes a "fair use." These are:

    (1)    the <u>purpose and character of the use</u>, including whether such use is of a commercial nature or is for nonprofit educational purposes;

    (2)    <u>the nature of the copyrighted work;</u>

(3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)    the effect of the use upon the potential market for or value of the copyrighted work.

Courts are commanded to explore all of these factors together and the results weighed together, in light of the purposes of copyright. *Campbell*, 510 U.S. at 578. As the Second Circuit recently reiterated, "[t]he ultimate test of fair use . . . is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 141 (2d Cir. 1998)).

There can be no question that permitting the creation of the Family Guy Song serves the goals of copyright by providing the public with a whole new work with a dramatically different, humorous and insightful message than the innocent, idyllic original from a bygone era that it evokes and contrasts. Such a use falls squarely within the scope of "transformative" works held to be "fair" in *Campbell* and numerous decisions in this Circuit – all of which determined fair use on summary judgment.[10] *See, e.g., Blanch*, 467 F.3d at 253 (use of copyrighted fashion photograph in collage painting commenting "on the social and aesthetic consequences of mass media" held to be fair use); *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998) (use of virtually entire photograph of pregnant celebrity Demi Moore from cover of *Vanity Fair* magazine, except substituting in head of comedic actor Leslie Neilsen, in advertising poster for motion picture held to be protected parody-fair use); *MasterCard Int'l Inc. v. Nader 2000*

---

[10] "Although fair use is a mixed question of law and fact, this court has on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact." *Blanch*, 467 F.3d at 250 (quotations omitted).

*Primary Comm., Inc.*, No. 00 Civ. 6068 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) (use of portions of MasterCard's "Priceless" advertisements in political advertisement for candidate Ralph Nader held to be parody-fair use); *Abilene*, 320 F. Supp. 2d 84 (use of well-known first three lines from song *What a Wonderful World* in rap artist Ghostface Killah's song *The Forest* held to be protected as parody-fair use). These closely analogous cases are determinative here.

## II.    THE FIRST FACTOR WEIGHS DECISIVELY IN FAVOR OF FAIR USE BECAUSE THE FAMILY GUY SONG IS, QUITE CLEARLY, A "TRANSFORMATIVE" PARODY OF WISH UPON A STAR

In *Blanch*, the Second Circuit summarized the proper analysis for this first fair use factor:

We have, post-*Campbell*, addressed and applied this first factor many times. In *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001), we described it this way:

The heart of the fair use inquiry is into the first specified statutory factor identified as "the purpose and character of the use." 17 U.S.C. § 107(1). This formulation, as the Supreme Court observed in *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164, draws on Justice Story's famous reference in *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4901), to "the nature and objects of the selections made." As the *Campbell* Court explained,

The central purpose of this investigation is to see, in Justice Story's words, whether ***the new work merely "supersedes the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . ., in other words, whether and to what extent the new work is "transformative."*** Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. ***Such transformative works thus lie at the heart of the fair use doctrine's guarantee of breathing space*** . . . . *Campbell*, 510 U.S. at 579 (emphasis added [in *On Davis* ] ) (alteration in original) (citations omitted).

If "'the secondary use adds value to the original-if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings-this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Castle Rock Entm't*, 150 F.3d at 142 (quoting *Leval*, supra, at 1111; brackets in *Castle Rock* ).

*Blanch*, 467 F.3d, at 251-52 (emphasis added).

The *Campbell* Court also confirmed, as has long been the law in this Circuit, that "parody," like other forms of comment or criticism, has "an obvious claim to transformative value" and is among the uses granted protection under the fair use doctrine. *Campbell*, 510 U.S. at 578-79; *Leibovitz*, 137 F. 3d at 112.

## A.  The Family Guy Song Is an Obvious Parody of Wish Upon A Star

The *Campbell* Court stated the applicable rule for parody as follows: "For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.  *Campbell*, 510 U.S. at 580.  The comment must have some 'critical bearing on the substance or style of the original composition.'" *Leibovitz*, 137 F.3d at 113 (quoting *Campbell*, at 582).

"The relevant inquiry [when fair use is raised in defense of parody] is whether a parodic character may *reasonably be perceived*." *Leibovitz*, 137 F.3d at 113 (quoting *Campbell*, at 582.) (emphasis added).

> Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use.  As Justice Holmes explained, '[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside the narrowest and most obvious limits. . .'

*Campbell*, 510 U.S. at 582 (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)).

Whatever else may be said about the humor of the Family Guy Song, one thing is for certain, its "parodic character may reasonably be perceived."  There can also be no question that this parodic character is referential to – indeed is directed at – the "saccharine sweet," incredibly "wholesome'" worldview and the innocently hopeful, though naïve, message of Wish Upon A Star that you can get "anything your heart desires" by simply wishing upon a star.  (MacFarlane

Dec. ¶ 8).  The Family Guy Song turns the sweetness of this idyllic message on its head by having Peter ignorantly sing about stereotypes of Jewish people, while at the same time earnestly, and innocently, wishing for a Jew, as if they were some kind of mystical beings who, naturally, could help him solve his financial problems.  (Zuckerman Dec. ¶ 5, 6).

Moreover, the Family Guy Song's parody of Wish Upon A Star works on multiple levels, one of which is to lampoon the "purity" and "wholesome" values expressed in Wish Upon A Star, the song most closely associated with Walt Disney, who, despite being widely-beloved for his wholesome creations, also was widely-reputed to be anti-Semitic.  (MacFarlane Dec. ¶ 10; Zuckerman Dec. ¶ 6).  Wish Upon A Star is not simply one of the many well-known songs that appeared in Walt Disney films.  It has, for more than fifty years, been the theme song for Walt Disney himself and the company he created and ran.  (Pltf's Admission No. 5).  No other song has been more closely associated with Walt Disney.[11]

Nor, arguably, has any one person fostered and, indeed, attained, an image of good "old world" innocence, purity and "wholesomeness" more than Walt Disney.  Yet, against this backdrop, there was always, and still is, a persistent, widespread belief that he was anti-Semitic.  (*See* literary excerpts, Rimokh Dec. ¶¶ 3 – 5, Exhibits B – D).  The creators of the Family Guy Song thought it would be the perfect, cutting commentary to use the iconic song most closely-associated with Walt Disney, Wish Upon A Star, in a parodic reverie where the main character "wishes upon a star" for, of all things, a Jew.[12]

---

[11] For example, it was used in the opening sequences of the Disney anthology television series, "The Wonderful World of Disney" (which, for years, Walt Disney personally introduced), in Walt Disney Pictures' opening logos, and in television advertisements for its Disneyland theme park. *See Bourne*, 68 F.3d 621; (*see also* Pltf's Admission No. 3).

[12] The Family Guy Song in the Episode is not the only time that the Family Guy writers lampooned Walt Disney based on his reputation as an anti-Semite.  (MacFarlane Dec. ¶ 11).  In a 2005 *Family Guy* movie, "Family Guy presents Stewie Griffin: The Untold Story" (attached as Exhibit D to MacFarlane Dec.), released in September 2005, one of the brief cutaway scenes (a trademark comedic

The parody of Wish Upon A Star in the Family Guy Song is even more apparent and

"targeted" than the works found to be protected parodies in *Campbell* and *Leibovitz*. The Court

in *Campbell* had no trouble finding that 2 Live Crew's "Pretty Woman" was a parody of Roy

Orbison's original. After stating that 2 Live Crew's song "could be perceived as commenting on

the original or criticizing it, to some degree," the Court described the parodic nature as follows:

> 2 Live Crew juxtaposes the romantic musings of a man whose fantasy comes true,
> with degrading taunts, a bawdy demand for sex, and a sigh of relief from paternal
> responsibility. The later words can be taken as a comment on the naiveté of the
> original of an earlier day, as a rejection of its sentiment that ignores the ugliness
> of street life and the debasement that it signifies. It is this joinder of reference and
> ridicule that marks off the author's choice of parody from the other types of
> comment and criticism that traditionally have had a claim to fair use protection as
> transformative works.

*Campbell*, 510 U.S. at 583.

In *Leibovitz*, the claimed parody was an advertising poster for the comedy film "Naked

Gun 33 1/3." The ad was a virtually identical reproduction of Annie Leibovitz's photograph of a

pregnant, naked Demi Moore that was featured on the cover of *Vanity Fair*. The only alteration

is that the head and face of comedic actor Leslie Nielson was transplanted in the place of Demi

Moore's. The Second Circuit explained the parodic element:

> Because the smirking face of Nielsen contrasts so strikingly with the serious
> expression on the face of Moore, the ad may reasonably be perceived as
> commenting on the seriousness, even the pretentiousness, of the original. . . .

---

"device" used throughout the *Family Guy* series) depicts Walt Disney opening and arising from his
cryogenic tube after his long, frozen sleep (another persistent widespread rumor about Disney was that he
had himself cryogenically frozen at death), and has the following exchange with the scientist that
defrosted him:

> Scientist: [Scientist unfreezes Walt's body] Welcome Back, Mr. Disney.
>
> Walt Disney: Are the Jews gone yet?
>
> Scientist: Uhh, no...
>
> Walt Disney: Put me back in!
>
> [Slams the cryogen chamber shut].

(MacFarlane Dec. ¶ 11, Exhibit D (at time code 56:28 – 56:39), *see also* Exhibit E).

Apart from ridiculing pretentiousness, the ad might also be reasonably perceived as interpreting the Leibovitz photograph to extol the beauty of the pregnant female body, and, rather unchivalrously, to express disagreement with this message.

*Leibovitz*, 137 F.3d at 114-15 (footnote omitted).

As with 2 Live Crew's "Pretty Woman" song and the Naked Gun ad in *Leibovitz*, there can be no question that the Family Guy Song, at the least, "can reasonably be perceived as commenting" on the iconic Wish Upon A Star. Indeed, the Family Guy Song and its use in the Episode clearly "adds value" by "creating new information, new aesthetics, and new understandings" to the elements used to conjure up Wish Upon A Star.

Moreover, the *Campbell* Court makes clear that even a parody that more loosely targets an original than did 2 Live Crew's song (or for that matter the Family Guy Song) may still qualify as parody. The Court stated that,

> . . . when there is *little or no risk of market substitution*, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from an original, or other factors, *taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use*. . . .

*Campbell*, 510 U.S. at 580-81, n. 14 (emphasis added). *See also MasterCard*, 2004 WL 434404, at *12-13. Plaintiff has admitted that the Family Guy Song cannot serve as a market substitute for Wish Upon A Star; and that, despite the Episode being widely distributed on DVD and repeatedly telecast on national cable TV for over 4 years, there is no evidence whatsoever of any market substitution (*see* Point IV below).

Of course, while the Family Guy Song is a parody that "comments upon" Wish Upon A Star, such targeted commentary on the copyrighted work is not required to be considered a protected, transformative fair use. *See Blanch*, 467 F.3d at 254-55. In addressing the distinction between "parody" and "satire," the Second Circuit held that "satire" was certainly also subject to

14

fair use protection, provided there is "justification for the very act of borrowing." *Id.* at 255 (quoting *Campbell*, 510 U.S. at 580-81). Satire is defined "as a work 'in which prevalent follies or vices are assailed with ridicule,' 14 Oxford English Dictionary, . . . at 500, or are 'attacked through irony, derision, or wit,' American Heritage Dictionary . . . at 1604." *Id.* at 255 (quoting *Campbell*, 510 U.S. at 581, n. 15).

The *Blanch* court explained the distinction between the two categories of works, parody and satire, and that both are protected by fair use. *Id.* In finding that defendant Koons's collage painting used plaintiff's photograph as part of a satire of life, and, therefore, was a transformative fair use, the Second Circuit held:

> We have applied *Campbell* in too many non-parody cases to require citation for the proposition that the broad principles of *Campbell* are not limited to cases involving parody. But the satire/parody distinction may nevertheless be relevant to the application of these principles. As the *Campbell* Court observed, "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Campbell*, at 580-81.
>
> . . . The question is whether Koons had a genuine creative rationale for borrowing Blanch's image, rather than using it merely "to get attention or to avoid the drudgery in working up something fresh." *Id.* at 580. ***Although it seems clear enough to us that Koons's use of a slick fashion photograph enables him to satirize life as it appears when seen through the prism of slick fashion photography***, we need not depend on our own poorly honed artistic sensibilities. Koons explained, without contradiction, why he used Blanch's image . . . We conclude that Koons thus established a "justif[ication for] the very act of [his] borrowing." *Campbell*, 510 U.S. at 581, 114 S.Ct. 1164. Whether or not Koons could have created "Niagara" without reference to "Silk Sandals," we have been given no reason to question his statement that the use of an existing image advanced his artistic purposes.

*Blanch*, 467 F.3d at 255 (emphasis added).

Thus, even if the Family Guy Song had not commented upon Wish Upon A Star (which it does), but simply "borrowed" from Wish Upon A Star and transformed it as part of the Episode's

satire of Peter's misled racially-based stereotypes and Walt Disney's reputed anti-Semitism, it still is a manifestly transformative fair use. *See Id.*

### B. The Transformative, Parodic Nature of The *Family Guy* Song Strongly Outweighs Any Potential Commercial Nature of the Work

In addition to the transformative, parodic nature of the work, in determining the first factor, courts must also consider and balance the extent to which the secondary use is "commercial." *See Blanch*, 467 F.3d at 253; *Leibovitz*, 137 F.3d at 115. The Second Circuit makes clear, however, that:

> The Supreme Court in *Campbell* rejected the notion that the commercial nature of [a] use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research . . . 'are generally conducted for profit,'" *Campbell*, 510 U.S. at 584 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 592 (1985)) (Brennan, J., dissenting), and that Congress "could not have intended" a rule that commercial uses are presumptively unfair. *Id.* The commercial objective of the secondary work is only a subfactor within the first factor. "The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579.

*Blanch*, 467 F.3d at 254 (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477-78 (2d Cir. 2004)).

While the *Family Guy* Song has "commercial" objective to the extent that it was part of a "for profit" TV series, the Song is far less "commercial" than virtually all of the parodic or satiric uses found by the courts to be "fair use." The *Family Guy* Song is only one brief parody song used in the middle of a TV episode. Unlike the songs found to be fair uses in *Campbell* or *Abilene Music*, the *Family Guy* Song is not and has never been made available for sale as a distinct work. (MacFarlane Dec. ¶ 15). Nor, of course, is the use here nearly as "commercial" as the promotional use of the Demi Moore photo in the advertisement for Paramount's movie that was found to be a fair use in *Leibovitz*. *Leibovitz*, 137 F.3d at 115.

Moreover, the Family Guy Song is a highly transformative parody. This outweighs any tangential commercial aspect of the Song. *See, e.g., Blanch*, 467 F.3d at 254 ("But here, since the new work is substantially transformative, the significance of other factors, including commercialism, are of less significance. We therefore discount the secondary commercial nature of the use.") (quotations and brackets omitted); *Leibovitz*, 137 F.3d at 115 ("On balance, the strong parodic nature of the ad tips the first factor significantly toward fair use, even after making some discount for the fact that it promotes a commercial product.").

Accordingly, the first fair use factor weighs greatly in favor of fair use.

## III.   THE SECOND FACTOR, WHILE SLIGHTLY FAVORING PLAINTIFF'S "CREATIVE" SONG, IS NOT SIGNIFICANT IN PARODY CASES

The second fair use factor, which focuses upon the nature of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Wish Upon A Star is, undoubtedly, a "creative" work. However, this fact is not to be accorded much weight where, as here, the defendants make a parodic use of the work. As the Supreme Court explained in *Campbell*, the fact that the original is a creative work "within the core of the copyright's protective purposes . . . is not much help in this case, or ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Campbell*, 510 U.S. at 586 (citations omitted). The Second Circuit has adopted this principle and repeatedly accorded little weight to the "creative" nature of a plaintiff's work in cases of parodic and other transformative uses. *See Blanch*, 467 F. 3d at 257; *Leibovitz*, 137 F.3d at 113; *Abilene Music*, 320 F. Supp. 2d at 92.

This second factor weighs, if at all, only slightly against a finding of fair use here.

IV.    **THE AMOUNT TAKEN FROM WISH UPON A STAR WAS REASONABLE IN LIGHT OF THE FAMILY GUY SONG'S PARODIC PURPOSES AND EFFECT**

*Campbell* explains the governing standard for this third factor in the parody context:

> Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. . . . When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable. *See, e.g., Elsmere Music Inc. v. Nat'l Broad. Co.,* 623 F.2d 252, 253, n.1 (2d Cir. 1980); *Fisher v. Dees,* 794 F.2d, at 438-439. ***What makes for this recognition is quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know.*** Once enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the song's overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original. But using some characteristic features cannot be avoided.

*Campbell*, 510 U.S. at 588 (emphasis added). Thus, the ultimate question in determining this factor is whether the amount taken from the original, both quantitatively and qualitatively, was "'reasonable in relation to the purpose of the copying.'" *Blanch*, 467 F.3d at 257 (quoting *Campbell*, 510 U.S. at 586.).

Defendants are entitled to summary judgment on their fair use defense because, even viewing Plaintiff's expert's allegations of similarities between Wish Upon A Star and Family Guy Song in a light most favorable to Plaintiff, the amount taken in the Family Guy Song was still manifestly reasonable in light of the Song's strong parodic purpose and character.

With the exception of the single phrase "so I'll wish upon a star" in the second portion of the first line in Family Guy Song, Plaintiff does not claim that the Family Guy Song has taken the lyrics of Wish Upon A Star. In fact, it is obvious that the parody lyrics are dramatically different.

The parties have submitted the opinions of their respective expert musicologists regarding the similarities and differences in the music between the Family Guy Song and Wish Upon A Star. However, in the first instance, if the Court simply listens to the two works it will

be apparent that, while portions of the Family Guy Song certainly evoke or "remind one" of Wish Upon A Star, it sounds like a distinctly different song. One could never listen to the Family Guy Song and mistake it for Wish Upon A Star. This is because, in lay mans terms, simply not that much was "taken" from Wish Upon A Star.

Plaintiff's musicologist, Wilbur, testified, and Defendants do not dispute, that the Family Guy Song uses the first four notes of the seven-note "musical hook" from Wish Upon A Star. (Wilbur Dep. 52-53).[13] The musical hook is "the most memorable part of a song." (*Id.*). The musical hook in Wish Upon A Star is comprised of the seven-note phrase that accompanies the lyric "when you wish up-on a star." (*Id.*). Thus, the four notes from the phrase that correlate to "when you wish up" are emulated in the Family Guy Song, for example, in the notes that accompany the lyric "noth-ing else has." (Wilbur Dep. 134-135). It is the inclusion and repetition of this four-note portion of the "musical hook" from Wish Upon A Star that is primarily responsible for evoking Wish Upon A Star in the listener's mind. (Wilbur Dep. 52-53).

Wilbur testifies that the Family Guy Song sounds very similar to, and has copied a large amount from, Wish Upon A Star, however, she (and Plaintiff itself) admits that Family Guy Song does not take so much as to raise even the possibility of it serving as a market substitute for Wish Upon A Star.[14] (Wilbur Dep. 84-85; Bourne Dep. 25-26, 27-30, 37-38, 60; Saroka Dep.

---

[13] Wilbur's deposition testimony is attached as Exhibit F to the accompanying declaration of Jacques Rimokh.

[14] This is because, as further explained by Defendants' expert musicologist, Professor Lawrence Ferrara, Ph.D, Professor and Director of The Steinhardt School, Music and Performing Arts Professions, at NYU, the works are materially different (many of Wilbur's asserted similarities are based on incorrect comparisons or incorrect musical analysis) and that in comparison to Wish Upon A Star, the musical composition in the Family Guy Song is substantially transformed and changed into new musical expression that pokes fun at Wish Upon A Star. (Ferrara Dec. ¶¶ 3, 11).

19-20).[15]  That alone is sufficient to conclude that the quality and amount taken from Wish Upon

A Star was reasonable in light of the Family Guy Song's transformative purpose and character.

As the Second Circuit held in *Leibovitz,* where virtually the entire copyrighted work was

copied in the parodic advertisement:

> The copying of these [copyrightable] elements, carried out to an extreme degree
> by the technique of digital computer enhancement, ***took more of the Leibovitz
> photograph than was minimally necessary to conjure it up,*** but *Campbell*
> instructs that a parodist's copying of more of an original than is necessary to
> conjure it up will not necessarily tip the third factor against fair use. *Campbell*,
> 510 U.S. at 588, 114 S.Ct. at 1176.  On the contrary, "[o]nce enough has been
> taken to assure identification," *id.*, as plainly occurred here, the reasonableness of
> taking additional aspects of the original depends on the extent to which the
> "overriding purpose and character" of the copy "is to parody the original," *id.*, and
> "the likelihood that the parody may serve as a market substitute for the original,"
> *id.* ***That approach leaves the third factor with little, if any, weight against fair
> use so long as the first and fourth factors favor the parodist. Since those factors
> favor fair use in this case, the third factor does not help Leibovitz, even though
> the degree of copying of protectable elements was extensive.***

*Leibovitz,* 137 F.3d at 116 (emphasis added); *see MasterCard,* 2004 WL 434404, at *14-*15

(applying same analysis and finding that parody ad did not take more than was reasonable from

Mastercard advertisement).

Moreover, Plaintiff's (Wilbur's) position is also faulty because it disregards the well-

established rule, reiterated by the Second Circuit in *Leibovitz,* that:

> "the parody must be able to 'conjure up' ***at least*** enough of the original to make
> the object of its critical wit recognizable." *Campbell*, 510 U.S. at 588, 114 S.Ct.
> at 1176, (emphasis added).  In thus departing from prior decisions indicating that
> a parody entitled to the fair use defense could take no more than an amount
> sufficient to "conjure up" the original, . . . *Campbell* explicitly cited our use of the
> "at least" formulation in *Elsmere Music,* 623 F.2d, at 253, n.1. *See Campbell,* 510
> U.S. at 588, 114 S.Ct. at 1176.

*Leibovitz,* 137 F.3d at 114.  The referenced "formulation" from *Elsmere Music* provides that:

---

[15]  Karyn Soroka's deposition testimony is attached as Exhibit G to the accompanying declaration
of Jacques Rimokh.

> [T]he concept of "conjuring up" an original came into the copyright law *not as a limitation* on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. A parody is entitled at least to "conjure up" the original. Even more extensive use would still be fair use, provided the parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary.

*Elsmere Music*, 623 F.2d at 253, n.1 (emphasis added).

In opining that the Family Guy Song could have "conjured up" Wish Upon A Star by just using a few notes (Wilbur Dep. 53, 68-69, 129-132, 135) and that the Song "took too much," Wilbur ignores, or was unaware of (Wilbur Dep. 146), this key principle that a parodist is generally allowed to take more of a work than might otherwise be allowed. *See, e.g., Campbell*, 510 U.S. at 588 (quoted above).

Wilbur's assessment that the Family Guy Song "incorporates more of Wish Upon A Star than was necessary to reference that Song" also deliberately disregards the obvious transformative elements of the Family Guy Song and the material differences between the works. (Wilbur Dep. 105-106). Indeed, Wilbur deliberately omitted key portions of the Family Guy Song from her analysis because they were too different from Wish Upon A Star. Wilbur also completely omits any consideration of the impact of the critical fourth fair use factor, market substitution, from her "opinion" that too much was taken. This is likely because, regardless of the amount she believes was taken from Wish Upon A Star, she concedes that the Family Guy Song <u>cannot</u> serve as a market substitute for Wish Upon A Star; an opinion also shared by Plaintiff and Plaintiff's music licensing expert. (Wilbur Dep. 89-90; Saroka Dep. 18-20; Bourne Dep. 25-29).

Accordingly, the amount of the protectable elements of Wish Upon A Star used in the Family Guy Song was permissible in light of its obvious parodic character and purpose, its

completely transformative nature, and the conceded fact that it has not served and is not likely to ever serve as a market substitute for Wish Upon A Star. This third factor weighs in favor of fair use.

## V.  THE "TRANSFORMATIVE" FAMILY GUY SONG DOES NOT, AND CANNOT, HARM THE MARKET FOR WISH UPON A STAR

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). *Campbell* instructs that the *only* harm that is cognizable under this analysis is the harm of "market substitution" for the original work or for derivative works. *Campbell*, 510 U.S. at 590-92. In the context of parody or other types of commentary or criticism, other "harm" to the market for the work, such as the fact that the work may now be less popular or less attractive as a result of it being parodied or subject to criticism has no bearing on the fair use analysis. *Id*. The Second Circuit confirms that:

> "In considering the fourth factor, [the court's] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." *NXIVM Corp.*, 364 F.3d at 481-82. "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592.

*Blanch*, 467 F.3d at 258.

The analysis of this factor here is clear-cut. Plaintiff admits that it has *no* evidence that the Family Guy Song caused any market harm and that the Family Guy Song *cannot* serve as a substitute in the market for Wish Upon A Star.[16] (Bourne Dep. 25-26, 27-30, 60). Plaintiff's

---

[16] Plaintiff's only assertion of market harm is that Defendants did not obtain a license for their alleged use and, therefore, Plaintiff has been deprived of licensing income. (Bourne Dep. 26, 30). The Second Circuit, of course, expressly rejected this same claim in *Leibovitz*. *Leibovitz*, 137 F.3d. at 116-17 ("[Plaintiff's] only argument for actual market harm is that the defendant has deprived her of a licensing fee by using the work as an advertisement. But she is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody.").

"experts" also both concur that no one wanting to use or license Wish Upon A Star would or could use the Family Guy Song as a substitute. (Soroka 19-20; Wilbur 89-90).

The admitted utter absence of any possibility of market substitution results from, and evidences, beyond any doubt, the fact that the Family Guy Song is truly a transformative work. This conclusion is further confirmed by the fact that Plaintiff, a major music publisher, claims it did not even learn about the Episode and the Family Guy Song until almost four years after its repeated nationwide telecast and release on home video. (Bourne Dep. 19-21).

Nothing else needs to be said or examined because, by Plaintiff's own admission, there is no market harm. Thus, this fourth factor weighs *decisively* in favor of fair use. *See, e.g., Blanch*, 467 F.3d at 258 (fourth factor weighed "greatly" in favor of fair use where plaintiff admitted that secondary work had no deleterious effects on the market for her work); *Leibovitz*, 137 F. 3d at 116-117; *Abilene*, 320 F. Supp.2d at 94.

## VI.    THE AGGREGATE FAIR USE FACTOR ANALYSIS

Not surprisingly, given the readily apparent parodic nature of the Family Guy Song, every factor, except the second factor (which is not given much significance in transformative fair use cases), weighs decisively in favor of a finding of fair use here. The purposes of copyright law, to foster the creation of new works and the public benefit embodied in the fair use doctrine of guaranteeing a certain "breathing space" for the fostering of artistic creativity and social criticism, are unquestionably well-served by finding fair use here. In the vein of true parody, the Family Guy Song borrows recognizable elements from a culturally iconic work in order to create a new work that both builds upon and targets the original work, the controversial public mega-personality most closely associated with the work, and also is used as a part of biting satire attacking racial stereotypes.

The Family Guy Song is a "textbook" example of a protected fair use. *See, e.g., Burnett,* 491 F.Supp.2d 962. Plaintiff's infringement complaint must, therefore, be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, as well as those presented in the accompanying declarations and exhibits, Defendants respectfully submit that they are entitled to summary judgment dismissing the complaint in its entirety because the Family Guy Song is a protected parody–fair use under Section 107 of the Copyright Act.

Dated: New York, New York
      April 18, 2008

LOEB & LOEB LLP

By: _____

Jonathan Zavin (JZ–1846)
Jacques Rimokh (JR–0745)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

Attorneys for Defendants