Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                      )
BOURNE CO.,                           )
                                      )
            Plaintiff,                )
                                      )
      -against-                       )
                                      )
TWENTIETH CENTURY FOX FILM CORPORATION, )
FOX BROADCASTING COMPANY, TWENTIETH   )
CENTURY FOX TELEVISION, INC., TWENTIETH )
CENTURY FOX HOME ENTERTAINMENT, INC., )
FUZZY DOOR PRODUCTIONS, INC., THE     )
CARTOON NETWORK, INC., SETH MACFARLANE, )
and WALTER MURPHY,                    )
                                      )
            Defendants.               )
                                      )
Case No. 07 Civ. 8580 (DAB)           )
_____)

         Deposition of JEREMIAH HORAN, pursuant
    to Rule 30(b)(6) Notice, held at the offices
    of Loeb & Loeb, 345 Park Avenue, New York, New
    York, on Friday, February 29, 2008, commencing
    at 9:57 a.m., before James W. Johnson,
    Registered Professional Reporter and a Notary
    Public of the State of New York.

Page 18

Horan

Q. Did you talk to anyone who personally had knowledge of a request having been made?

A. I have to answer that by saying that I spoke to anyone who might possibly have any knowledge of it and found that no one did have any recollection.

Q. Is it fair to say, then, that you don't know what the request was?

MR. FAKLER: Objection to form.

Q. If a request was made you don't know what the request was?

A. At the time we were looking I did not know. Since then I have seen the interoffice memo that was presented from, that was circulated at Fox. It says it was denied.

Q. Well, other than any knowledge you may have from that memo, of what that memo says, do you know specifically what the request was, what type of use was requested?

A. Since we had no record of the request, no, I would not know. Only from that Fox --

Q. And do you know the basis of the denial?

A. I'm sorry, I don't even know that there was a denial, since I have not seen any record.

Page 19

Horan

Q. So I may be beating a dead horse here, but if there was a request and if there was a denial it's fair to say that Bourne doesn't know the basis for the denial?

A. Well, I'm -- yeah, I guess that would be right.

Q. When did you first become involved in this matter?

A. In approximately March of 2007.

Q. And what was your involvement?

A. When we learned of the use, my first involvement was I viewed it on YouTube and was asked for my comments by the owner.

Q. And how did you first learn of its use?

A. One of the employees advised us that they had seen it on television, on YouTube, and that's when we began looking into it.

Q. And you said that was in March 2007?

A. That's correct.

Q. How do you know the date?

A. How do I know the date?

Q. Mm hmm.

MR. FAKLER: Objection to form, misstates his former testimony.

Page 20

Horan

A. That is my recollection of the time it happened. It was in March. I can't tell you exactly.

Q. Let me clarify the question.

Are there any documents that you know of that reflect the fact that Bourne made this use in March 2007?

A. Not that I'm aware of.

Q. Well, what was the name of the employee who brought this to your attention?

A. Jonathan Stone.

Q. Okay. What did you do following this being brought to your attention?

A. We first checked our computer files, and then our hard copy files, to find if we had in fact issued a license, since we knew that it had been originally run prior to 2007, to see if we had in fact, someone had in fact issued a license.

And then we did some checking to see, we went on the Internet to check to see, to verify the fact that it had been run and so on, and we had discussions in the office about what action we should take, and we consulted our attorney.

Q. Without telling me what your discussions

Page 21

Horan

with your attorney were, could you just tell me which attorney you consulted.

A. Thomas Levy.

Q. Did there come a time when Mr. Levy made a claim on behalf of Bourne against Fox?

A. Yes, he did. He sent a letter to Fox.

Q. Do you know when that was sent?

A. It was sent sometime in June of 2007.

MR. ZAVIN: I'm afraid I don't have other copies of this. Could we mark this as Exhibit 2.

(Horan Exhibit 2, Letter dated June 21, 2007 from Thomas Levy to Twentieth Century Fox Film Corporation, marked for identification.)

Q. Mr. Horan, I'm just showing you a letter from Mr. Levy dated June 21st, 2007 that's been marked as Exhibit 2.

Is this the letter that you're referring to that was sent on your behalf?

A. That's correct.

Q. To the best of your knowledge, was there any claim made against Fox prior to this letter being sent on June 21st, 2007?

A. No, there was no -- not to, not to my

Page 22

```
 1            Horan
 2   knowledge.
 3        MR. ZAVIN: And just again for
 4     clarification of the record, that letter is
 5     Bates stamped Bourne 0001 through 0002.
 6     Q.  Mr. Horan, can you explain to me why,
 7   having discovered this in March of 2007, Bourne
 8   made no claim or didn't bring this to the attention
 9   of Fox until June 21st, 2007.
10     A.  As I said, we were researching to make
11   sure that we in fact had not issued any licenses or
12   had not received any kind of requests for licenses,
13   and discussed possible actions to take directly,
14   and we decided at that point that we would consult
15   Mr. Levy.
16     Q.  Prior to March 2007 had anyone
17   communicated any complaint to Bourne with respect
18   to this use of "When You Wish Upon A Star?"
19     A.  No.
20     Q.  Had any licensee or potential licensee
21   of "When You Wish Upon A Star" communicated any
22   complaint or brought this use to the attention of
23   Bourne?
24     A.  No.
25     Q.  Had any licensee prior to March 2007
```

Page 23

```
 1            Horan
 2   said they weren't going to license "When You Wish
 3   Upon A Star" because of the use in "Family Guy?"
 4     A.  No.
 5     Q.  Has Bourne ever granted a license to
 6   parody "When You Wish Upon A Star?"
 7     A.  No.
 8     Q.  Is that -- has anyone ever asked for a
 9   license to parody "When You Wish Upon A Star?"
10     A.  Not to my knowledge.
11     Q.  But it's fair to say you don't know
12   whether the request that Fox made was to parody
13   "When You Wish Upon A Star?"
14     A.  I'm sorry, but I don't, I don't know
15   that, I never saw the original request from Fox, so
16   I don't know what it says.
17     Q.  Right, and Bourne doesn't know what it
18   says?
19     A.  Right, so we can't say that, I can't say
20   that, if, that Fox was the first one. I cannot say
21   that.
22     Q.  But you just don't know either way?
23     A.  Either way, correct.
24     Q.  Why was the decision made to make a
25   claim against Fox with respect to this, the use by
```

Page 24

```
 1            Horan
 2   Fox in "Family Guy?"
 3     A.  The decision was made because as a music
 4   publisher we have a right and an obligation to
 5   protect our copyrights, and we felt that this use
 6   was an invalid use, was an unlicensed use, and
 7   therefore we had a right and an obligation to make
 8   a claim.
 9     Q.  Was that the sole reason?
10     A.  Yes.
11        (Horan Exhibit 3, Complaint and Jury
12     Demand, marked for identification.)
13     Q.  From 1999 to the present, when you were
14   doing your second stint at Bourne --
15     A.  Yes?
16     Q.  -- do you know how many copyright suits
17   Bourne commenced to protect its copyrights?
18        MR. FAKLER: Object on the ground it's
19     outside the scope of the 30(b)(6) notice.
20        MR. ZAVIN: Objection is noted.
21     A.  I know specifically of two that did not
22   go to trial, that complaints were made for invalid
23   use of Bourne copyright songs.
24     Q.  Do you know what songs were involved?
25     A.  Yes.
```

Page 25

```
 1            Horan
 2     Q.  Which songs were they?
 3     A.  One was "Whistle While You Work," and
 4   one was "Hi Ho." The other was "Hi Ho."
 5     Q.  Who were these claims made against?
 6     A.  "Whistle While You Work" was made
 7   against the Ying Yang Twins and their record
 8   company, the name of which I cannot remember, and
 9   the other was, the other suit was against Alfred
10   Publishing.
11     Q.  Were uses made of either of these songs
12   claimed to be parodies?
13     A.  No.
14     Q.  Do you know what market substitution is?
15     A.  Yes.
16     Q.  In your view, what is market
17   substitution?
18     A.  In the case of in the music industry,
19   the use of one song for another song or a similar
20   song, substituting one song for another, for
21   whatever use is being made.
22     Q.  So that is it fair to say a potential
23   licensee, you know, wants song A, but instead of
24   using song A it uses song B?
25     A.  That's correct.
```

Page 26

1  Horan
2  Q. Does Bourne have evidence of "I Needed
3  You" substituting in the market for "When You Wish
4  Upon A Star?"
5  A. Well, we have the immediate evidence
6  that we don't have a synchronization license or fee
7  for the use on "Family Guy." Nor do we have
8  performance income from that use, but then also, as
9  stated in Ms. Siroka's report, we don't always,
10 people don't tell us why they don't use a song, but
11 these things do affect a potential user's decision
12 to use the song.
13 Q. Let me clarify the question.
14    Does Bourne have any evidence that any
15 potential licenser, putting Fox aside for the
16 moment, that "Family Guy" any other potential user
17 or licenser or purchaser of songs has chosen to
18 purchase "I Needed You" instead of purchasing or
19 licensing "When You Wish Upon A Star?"
20 A. No, we do not.
21    (Horan Exhibit 4, Responses to
22    Defendant's First Request for Admissions,
23    marked for identification.)
24 Q. I'm showing you a document that's been
25 marked as Exhibit 4, which I will represent to you

Page 27

1  Horan
2  is the responses to requests for admissions that we
3  received from Bourne, and the first question is, do
4  you recognize it?
5  A. Yes.
6  Q. You've seen it before?
7  A. Yes, I have.
8  Q. Did you participate in its preparation?
9  A. Yes, I did.
10 Q. Okay, could you tell me the basis of the
11 denial for request for admission number 10 on
12 page 5, and just so the record is clear, the
13 request for admission reads, "Admit that," quote,
14 "'I Needed You,'" end quote, "has not served as a
15 substitute in the market for the song," the song
16 being "When You Wish Upon A Star," and what is the
17 basis for the denial of that request for admission?
18 A. Because we were not aware of any use
19 does not necessarily mean to us that it has not
20 been used.
21 Q. In your opinion, would any licenser who
22 wants to use "When You Wish Upon A Star" think that
23 "I Needed You" is an acceptable substitute?
24    MR. FAKLER: Objection to the request
25    for an opinion, a lay opinion.

Page 28

1  Horan
2  A. In my opinion, no.
3  Q. So could you explain to me the basis for
4  the denial of request for admission number 11,
5  which states, "Admit that," quote, "'I Needed
6  You,'" end quote, "cannot serve as a substitute in
7  the market for the song."
8  A. Again, I, I don't know that -- we don't,
9  Bourne Company doesn't know that somebody, what
10 somebody could do, so therefore we deny it. We
11 can't say specifically that it cannot serve as a
12 substitute in the marketplace for the song.
13 Q. But it's your opinion that it cannot? I
14 think you just testified to that.
15    MR. FAKLER: Objection, asking for a lay
16    opinion.
17 A. Again, my personal opinion is that it
18 cannot.
19 Q. And then let's go to request for
20 admission number 12, which says, "Admit that
21 plaintiff," or Bourne, "is not aware of any
22 instances where a consumer or other potential user
23 or licensee of this song has purchased, used or
24 licensed 'I Needed You' instead of the song."
25    What is the basis of the denial of that

Page 29

1  Horan
2  request for admission?
3  A. Again, we are not aware of any, but we
4  don't know, so we can't admit that, we cannot say
5  that there is an instance or not.
6  Q. Mr. Horan, I suggest that you read that
7  request for admission carefully, because I believe
8  that it asks, admit that you are not aware of any
9  instances of substitution, and yet you denied that,
10 which is denying -- it implies to me that you are
11 aware of instances of market substitution.
12    Can you explain to me what the basis of
13 the denial for that request for admission was.
14 A. No, I cannot in that case.
15 Q. Do you agree with me that Bourne does,
16 is not aware of any instance where a consumer or
17 other potential user or licensee of the song has
18 purchased, used or licensed "I Needed You" instead
19 of the song?
20    MR. FAKLER: Objection, misstates his
21    prior testimony.
22    MR. ZAVIN: I, I was asking him whether
23    he agreed with that statement.
24 Q. You can answer the question.
25 A. Would you repeat the question.

8 (Pages 26 to 29)

Page 30

```
                    Horan
 1
 2    Q.   That Bourne is not aware of any
 3  instances where a consumer or any other potential
 4  user or licensee for the song has purchased, used
 5  or licensed "I Needed You" instead of the song.
 6    A.   Correct, we are not aware.
 7    Q.   Now, other than Ms. Siroka's opinion --
 8  put that aside for the moment -- does Bourne have
 9  any evidence that the song "I Needed You" as it
10  appears in "Family Guy" has harmed the market for
11  "When You Wish Upon A Star?"
12    A.   As I said, the, the fact that it was
13  used without a license in "Family Guy" is, is -- no
14  synch license, no performance license, has harmed
15  our market.
16    Q.   Putting aside any royalty you were
17  deprived of by Fox, Fox's use, putting aside
18  Ms. Siroka's report, do you have any evidence
19  whatsoever that the song "I Needed You" as it
20  appears in "Family Guy" has harmed the market for
21  "When You Wish Upon A Star?"
22    A.   No.
23    Q.   When did you first contact -- and when I
24  say "you" I mean Bourne -- first contact
25  Ms. Siroka?
```

Page 31

```
                    Horan
 1
 2    A.   We contacted -- we didn't have direct
 3  contact with her.  She was contacted by our
 4  attorneys.
 5    Q.   Do you know when?
 6    A.   I don't know the exact date.  It was
 7  within the last month.
 8    Q.   Okay, that is actually what I wanted to
 9  know, so I'm going to show you a document that's
10  been marked as Exhibit 3 in this proceeding, which
11  I will represent to you is the complaint that was
12  served against the defendants.
13         Do you recognize that document?
14    A.   Yes, I do.
15    Q.   Did you see it at the time it was
16  drafted?
17    A.   Yes.
18    Q.   So is it fair to say that you saw it
19  before it was served?
20    A.   Yes.
21    Q.   And the complaint is dated October 3rd,
22  2007; is that correct?
23    A.   October 3rd?
24    Q.   If you'll look at the page 11 --
25    A.   Yes.
```

Page 32

```
                    Horan
 1
 2    Q.   -- does that conform with your personal
 3  knowledge that the complaint was prepared and/or
 4  served approximately on October 3rd?
 5    A.   Yes.
 6    Q.   And is that, and is -- am I correct that
 7  that is well before there was any contact made with
 8  Ms. Siroka or any report received from Ms. Siroka?
 9    A.   Yes.
10    Q.   In that case, sir, could you tell me the
11  basis in paragraph five for the statement that
12  defendants -- and I'm quoting now -- quote,
13  "Defendants' infringing activities have also caused
14  substantial and irreparable harm to Bourne."
15    A.   Would you repeat the question, please.
16    Q.   Could you tell me the basis of the
17  statement in the complaint in paragraph five where
18  it is asserted that, quote, "Defendants' infringing
19  activities have also caused substantial and
20  irreparable harm to Bourne."
21    A.   We feel that this use without a license,
22  and with the nature of the lyrics that were used,
23  will be harmful to Bourne for two reasons; first,
24  that it would appear that Bourne did not protect
25  its copyrights, in that it was, a use such as this
```

Page 33

```
                    Horan
 1
 2  was made without our consent; and secondly, that,
 3  with the nature of the use of a classic like "When
 4  You Wish Upon A Star," we felt that it could harm
 5  the potential market for the use in commercials and
 6  in other films.
 7    Q.   But isn't it fair to say, I think as you
 8  previously testified, you didn't have any evidence
 9  that any such harm had occurred?
10       MR. FAKLER:  Objection, vague as to what
11    you mean by "evidence."  You mean admissible
12    evidence?
13       MR. ZAVIN:  No.  In the common layman's
14    terms.
15    Q.   Did you have any evidence in October
16  2007 that there has been any actual harm to the
17  composition?
18    A.   The evidence we have is that we have,
19  I've got 25 years' experience in the business, the
20  owner of the company's been in business for a long
21  time, and if a song is used, although we cannot
22  give you dollars-and-cents figures, how a song is
23  used in one instance can and has affected how the
24  song is used in future instances, and we feel that
25  this is a case, exactly this kind of a case now.
```

Global Deposition Services
212-867-7766

Page 34

1  Horan
2  Q. Are you aware that the song was used in,
3  starting in, publicly in November 2003 on "Family
4  Guy," that it was both broadcast and distributed on
5  DVD since November of 2003?
6  A. We are now aware of that fact, yes.
7  Q. And were you aware of that fact in
8  October 2007 when you filed this complaint?
9  A. Yes, we were.
10 Q. Do you have any evidence that between
11 October -- I'm sorry -- between November 2003 and
12 October 2007 that the existence of "I Needed You"
13 as performed on "Family Guy" harmed the market for
14 "When You Wish Upon A Star?"
15 A. Again, it -- other than "Family Guy,"
16 the synching and the fees that we should have
17 gotten from, we feel we should have gotten from
18 "Family Guy," we don't, but, as pointed out in
19 Ms. Siroka's report and from my experience, that
20 people do -- we would never know if people don't
21 use our song for whatever reason.
22     They don't come to us and say, we're not
23 going to use this song because of this or that. We
24 don't know that, but it's --
25 Q. Have you made any effort --

Page 35

1  Horan
2  MR. FAKLER: Can he finish his answer.
3  Q. Go ahead. Please.
4  A. No, I've finished.
5  Q. Have you made any effort whatsoever to
6  determine whether there's anyone out there that
7  hasn't used "When You Wish Upon A Star" because of
8  the song "I Needed You?"
9  A. No, we haven't, because we don't know,
10 we wouldn't know how to go about doing so.
11 Q. Well, have you asked any advertising
12 agencies?
13 A. No, we have not.
14 Q. Have you asked any networks?
15 A. No, we have not.
16 Q. Have you asked Disney?
17 A. No, we have not.
18 Q. Have you had any communications with
19 Disney about the song "I Needed You?"
20 A. No, we have not.
21 Q. Based on -- is it fair to say that
22 Disney is one of the major licensers of "When You
23 Wish Upon A Star?"
24 A. Disney is a licenser. I don't know if
25 we consider it major. We license regularly.

Page 36

1  Horan
2  MR. ZAVIN: Let's mark this as
3  Defendants' Exhibit 5.
4     (Horan Exhibit 5, List of Licenses,
5  marked for identification.)
6  Q. Showing you a document that's been
7  marked as Defendants' Exhibit 5 which was produced
8  to us by Bourne, it's Bates stamped 0145 through
9  0147. Do you recognize this document?
10 A. Yes, I do.
11 Q. What is it?
12 A. It's a listing of licenses that have
13 been issued for "When You Wish Upon A Star" in 2003
14 through 2008.
15 Q. Okay. I haven't added them up, and, you
16 know, we can certainly do it, but it appears to me
17 that maybe a third of the licenses or 25 percent of
18 all of these licenses are to Disney. I mean, it is
19 what it is. I'm not trying to --
20 A. Oh, okay.
21 Q. -- trick you into giving, agreeing with
22 a false number, but it is, certainly a substantial
23 number of the licenses appear to be with Disney.
24     Do you agree with that?
25 MR. FAKLER: Objection to form, vague as

Page 37

1  Horan
2  to "substantial."
3  A. Yes, I'll agree with that.
4  Q. And do you have any reason to think that
5  Disney's licensing of the song has diminished
6  because of "I Needed You?"
7  A. I don't think so, but they're -- the
8  reason that the main license we do with Disney is
9  the recurring, What's Next, Super Bowl, World
10 Series spots that they do, and that -- so it's a
11 repeat of basically the same use in most of these
12 cases.
13 Q. But their use of the song hasn't
14 diminished, then?
15 A. No.
16 Q. Okay. Now, let me ask a question.
17     In preparing for this deposition did you
18 look to see whether the number of licenses granted
19 from 2003 to 2007 or '08, the present, was
20 substantially less per year than the number of
21 licenses granted prior to 2003?
22 MR. FAKLER: I'm sorry, Jonathan, did
23 you ask about a particular type of licenses?
24 MR. ZAVIN: For "When You Wish Upon A
25 Star."

10 (Pages 34 to 37)

**Page 38**

```
 1           Horan
 2      MR. FAKLER: For synchronization
 3   licenses?
 4      MR. ZAVIN: All types of licenses.
 5      MR. FAKLER: I'm going to object to the
 6   extent you're asking about other than
 7   synchronization licenses, the audiovisual
 8   rights, it's outside the scope of the
 9   30(b)(6).
10   A.   And we didn't -- would you repeat the
11   question.
12      (Record read.)
13   A.   No, we did not.
14   Q.   In the document request to Bourne we
15   requested -- I'll paraphrase it -- "All documents
16   evidencing harm in the market substitution or harm
17   to 'When You Wish Upon A Star.'" To the best of my
18   knowledge, we haven't received any such documents.
19      Do you know whether there are any
20   documents that Bourne has evidencing any harm of
21   any kind to "When You Wish Upon A Star" because of
22   "I Needed You?"
23   A.   No. I do not know of any such
24   documents.
25   Q.   Other than your opinion, your personal
```

**Page 39**

```
 1           Horan
 2   opinion, and Ms. Siroka's opinion, for whatever
 3   it's worth, does Bourne have any evidence
 4   whatsoever that it has been irreparably harmed
 5   by -- or the market for "When You Wish Upon A Star"
 6   has been irreparably harmed by "I Needed You?"
 7      MR. FAKLER: Objection to form to the
 8   extent it calls for a legal conclusion.
 9   Q.   You can answer.
10   A.   No, we do not.
11   Q.   Do you have any reason to believe that
12   the number of licenses and license requests from
13   2003 through to 2007 has diminished compared to the
14   period before 2003?
15      MR. FAKLER: Objection to the extent it
16   calls for testimony other than synchronization
17   licenses.
18      MR. ZAVIN: Okay.
19   Q.   Let's restrict it to synchronization
20   licenses for the moment.
21      Do you have any reason to believe that
22   the number of synchronization licenses granted or
23   the requests for synchronization licenses has
24   diminished from 2003 to 2007?
25   A.   No.
```

**Page 40**

```
 1           Horan
 2   Q.   As a matter of fact, page -- in Bourne's
 3   complaint in this action, in paragraph 21 Bourne
 4   asserts, and I quote, "'When You Wish Upon A Star'"
 5   has only grown in popularity since it was
 6   introduced in 1940."
 7      Do you see that in the complaint?
 8   A.   Yes, I do.
 9   Q.   Is that a true statement?
10   A.   Yes, it is.
11   Q.   And popularity has not been diminishing
12   since 2003, has it?
13   A.   We have no evidence of that fact, no.
14   Q.   Bourne has in this lawsuit given as a,
15   or has produced to defendants the expert report of
16   Sandy Wilbur. Are you aware of that?
17   A.   Yes, I am.
18   Q.   Do you know when Sandy Wilbur was
19   retained by Bourne or Bourne's attorneys on
20   Bourne's behalf?
21   A.   I do not know that exact date or the
22   approximate date, no.
23   Q.   Well, was it within the last month or
24   two?
25   A.   As far as I know, yes.
```

**Page 41**

```
 1           Horan
 2   Q.   Let me ask specifically, was it prior to
 3   October 3rd, 2007?
 4      MR. FAKLER: Objection. This again is
 5   outside the scope of 30(b)(6). He's just said
 6   they, the company was not involved in her
 7   retention; he's speaking solely based on
 8   personal recollection, if he knows at all.
 9   Q.   Okay, if you know.
10   A.   As far as I know, no.
11   Q.   I'm sorry, I don't -- I've lost track of
12   what the "no" means.
13   A.   You had asked if it was prior to
14   October.
15   Q.   Right.
16   A.   And I said, no, as far as I know, it was
17   not.
18   Q.   Did Bourne seek, prior to bringing this
19   litigation did Bourne seek the advice of any
20   musicologist with respect to how similar or
21   dissimilar "When You Wish Upon A Star" was from the
22   song "I Needed You?"
23   A.   Yes, we did. We have an in-house editor
24   who works for one of our subsidiaries,
25   International Music Company, and he did an analysis
```

Page 58

1 Horan
2 this on the grounds that it's outside the
3 scope of the 30(b)(6) notice.
4     MR. ZAVIN: Well, it isn't.
5     MR. FAKLER: How is it within, how is
6 the public association of Walt Disney on this
7 notice? Can you show it to me.
8 DI Q. Mr. Horan, did you ever watch in the
9 1950s the television program "The Wonderful World
10 Of Disney?"
11     MR. FAKLER: I'm going to instruct the
12 witness not to answer. This is way outside of
13 anything on this list.
14 Q. Mr. Horan, are you following the
15 instruction of your counsel?
16 A. Yes, I am.
17     MR. ZAVIN: I have no further questions.
18     MR. FAKLER: Can we take 10.
19     MR. ZAVIN: Sure.
20     MR. FAKLER: Thanks.
21     (Recess taken.)
22     MR. FAKLER: First I'd just on the
23 record like to request that Mr. Horan have the
24 opportunity to review and correct any final
25 transcript of the deposition.

Page 59

1 Horan
2     MR. ZAVIN: Agreed.
3     MR. FAKLER: And so -- thanks, and I
4 have just a little bit of cross here, so to
5 speak.
6 EXAMINATION BY MR. FAKLER:
7 Q. Mr. Horan, having answered a series of
8 questions, is there anything in your testimony that
9 you feel the need, looking back on it, to amplify
10 or clarify?
11 A. Yeah, there were a couple of questions
12 regarding market substitution and harm to the
13 market. In a couple of instances I gave an answer
14 of, if asked if there was any harm I said -- and I
15 guess just an answer -- no, but in those instances
16 I should, should have said that, brought up the
17 loss of revenue from the "Family Guy" use that does
18 affect Bourne Company.
19     And then there was also a question about
20 the, whether or not I was aware of whether or not
21 the, a request from Fox had come in for the use,
22 and I said I was not aware whether or not it came
23 in or what was, whether it was denied or how it was
24 denied.
25     That should be clarified to state that

Page 60

1 Horan
2 in 1998, until 2005 in fact, the only person who
3 would have denied or handled a telephone call
4 requesting a use would have been Beebe Bourne, who
5 has since passed away, B-E-E-B-E Bourne, who died
6 in 2005.
7     MR. FAKLER: That's all I have.
8     MR. ZAVIN: Okay, just very simple.
9 EXAMINATION BY MR. ZAVIN:
10 Q. I just -- I understand that Beebe Bourne
11 died, but your answer remains correct that Bourne
12 as a company does not have any record of the
13 request, a request coming in or what the nature of
14 the request was or why it was denied if it was
15 denied; is that correct?
16 A. That is correct.
17 Q. Okay. And just with respect to your
18 first clarification, is it, does the rest of your
19 answer remain the same, that you, other than the
20 loss of whatever revenue that they might have
21 expected to receive by Fox from the use, Bourne has
22 no evidence of market harm or market substitution?
23 A. That is correct.
24     MR. ZAVIN: Okay, I have no further
25 questions, except I reserve the right to

Page 61

1 Horan
2 reopen this should the court move favorably,
3 that the witness was improperly instructed not
4 to answer certain questions or certain lines
5 of questions.
6     (Time noted: 11:45 a.m.)

7
8
9 _____
    JEREMIAH HORAN
10
11 Sworn and subscribed to
12 before me this ____ day
13 of _____ 2008.
14
15 _____
16 NOTARY PUBLIC

16 (Pages 58 to 61)

Global Deposition Services
212-867-7766

Page 62

```
 1
 2            CERTIFICATE
 3
 4   STATE OF NEW YORK )
 5              ) Ss
 6   COUNTY OF NEW YORK )
 7
 8        I, JAMES W. JOHNSON, a Registered
 9   Professional Reporter and Notary Public within
10   and for the State of New York, do hereby
11   certify:
12        That JEREMIAH HORAN, the witness whose
13   deposition is hereinbefore set forth, was duly
14   sworn by me and that such deposition is a true
15   record of the testimony given by such witness.
16        I further certify that I am not related
17   to any of the parties to this action by blood
18   or marriage and that I am in no way interested
19   in the outcome of this matter.
20        IN WITNESS WHEREOF I have hereunto set
21   my hand this 2nd day of March 2008.
22
23        _____
            JAMES W. JOHNSON
24          Registration #01J05000925
            Commission Expires 9/4/2010
25
```

Page 63

```
 1
 2
 3   --------------------I N D E X--------------------
 4   WITNESS          EXAMINATION BY        PAGE
 5   Jeremiah Horan    Mr. Zavin          4, 60
 6                     Mr. Fakler         59
 7
 8
 9   --------------------INSTRUCTIONS--------------------
10   PAGES   48, 50, 58
11
12
13   --------------------EXHIBITS--------------------
14   HORAN                               PAGE
15    1    30(b)(6) Notice of Bourne Co.    5
16    2    Ltr 6/21/07 from Thomas Levy    21
17    3    Complaint and Jury Demand       24
18    4    Responses to Request for Admissions  26
19    5    List of Licenses                36
20    6    Responses to Request for the
21         Production of Documents         42
22
23
24
25
```

Page 64

```
 1
 2            ERRATA SHEET
 3   NAME OF CASE:  Bourne Co. v. 20th Century Fox, etc.
 4   DATE OF DEPOSITION:  Friday, February 29, 2008
 5   WITNESS:  Jeremiah Horan
 6
 7   PAGE  LINE     FROM              TO
 8   ____  ____  _____      _____
 9   ____  ____  _____      _____
10   ____  ____  _____      _____
11   ____  ____  _____      _____
12   ____  ____  _____      _____
13   ____  ____  _____      _____
14   ____  ____  _____      _____
15   ____  ____  _____      _____
16   ____  ____  _____      _____
17   ____  ____  _____      _____
18   ____  ____  _____      _____
19   ____
20              _____
21              JEREMIAH HORAN
22   Witness and sworn to before me
23   this ____ day of _____, 2008.
24   _____   _____
25   (Notary Public)     My Commission Expires:
```

17 (Pages 62 to 64)

Global Deposition Services
212-867-7766