Ross Charap  (RC-2584)
Paul M. Fakler  (PF-0249)
Julie Stark  (JS-8925)
Amanda J. Schaffer  (AS-2004)
MOSES & SINGER LLP
405 Lexington Avenue
New York, New York 10174-1299
Tel.: 212-554-7800
Fax: 212-554-7700
pfakler@mosessinger.com
*Attorneys for Plaintiff, Bourne Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                                               :
BOURNE CO.,                                                    :
                                                               :
                        Plaintiff,                            :
                                                               :        07 Civ.  8580 (DAB)
          - against -                                         :
                                                               :
TWENTIETH CENTURY FOX FILM                                     :
CORPORATION, FOX BROADCASTING                                  :
COMPANY, TWENTIETH CENTURY FOX                                 :
TELEVISION, INC., TWENTIETH CENTURY                            :
FOX HOME ENTERTAINMENT, INC., FUZZY                            :
DOOR PRODUCTIONS, INC., THE CARTOON                            :
NETWORK, INC., SETH MACFARLANE,                                :
WALTER MURPHY,                                                 :
                                                               :
                        Defendants.                           :
---------------------------------------------------------------- X


**PLAINTIFF'S COMBINED MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON LIABILITY AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FAIR USE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... i

INTRODUCTORY STATEMENT............................................................................ 1

FACTS ........................................................................................................................ 2

ARGUMENT .............................................................................................................. 6

I.      BOURNE HAS ESTABLISHED DEFENDANTS' INFRINGEMENT AS A
       MATTER OF LAW AND IS ENTITLED TO SUMMARY JUDGMENT ON
       LIABILITY ....................................................................................................... 6

     A.    The Summary Judgment Standard ..................................................... 6

     B.    Prima Facie Infringement ................................................................... 6

          1.    Applicable legal standard ..................................................... 6

          2.    Copyright Ownership ............................................................ 7

          3.    Unauthorized Copying ......................................................... 7

     C.    Fair Use .............................................................................................. 7

          1.    Applicable legal standard ..................................................... 7

          2.    The purpose and character of the use.................................... 8

               a.    I Need a Jew is not a parody .................................... 9

                    (1)    The parody / satire distinction ........................ 9

                    (2)    Jew does not ridicule or criticize Star............ 12

                        (a)    Mere juxtaposition alone is not ridicule ............. 13

                        (b)    Defendants' allegation that Walt Disney was
                                    an anti-Semite does not render Jew critical
                                    of Star ................................................................. 17

                        (c)    Defendants' witnesses admit that Jew does
                                      not negatively comment on or ridicule Star......... 20

               b.    I Need a Jew is not otherwise transformative .............. 21

                c.    Even if there were some minor parodic or transformative
                      component to I Need a Jew, the dominant purpose is satiric
                      and non-transformative................................................ 23

                d.    Defendants' use is commercial ................................. 24

          3.    The nature of the copyrighted work..................................... 24

          4.    The amount and substantiality of the portion used in relation to the
               copyrighted work as a whole................................................ 24

## TABLE OF CONTENTS
(continued)

**Page**

a.  The composer of I Need a Jew admits that the final version of I Need a Jew took more of When You Wish Upon a Star than was necessary to create an effective parody ...................... 25

b.  Bourne's musicologist corroborates Murphy's testimony and independently establishes that far more was taken than was reasonably necessary ........................................................ 26

c.  Defendants have introduced no admissible evidence on the third factor................................................................................. 28

5.  The effect of the use upon the potential market for or the value of the copyrighted work ............................................................... 30

a.  Widespread uses similar to I Need a Jew would harm established and potential markets for derivative works using When You Wish Upon a Star ........................................... 30

6.  Balancing the fair use factors ................................................ 35

D.  Statute of Limitations, Waiver and Laches........................................ 35

II.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR FAIR USE DEFENSE ................................................................. 37

A.  The Purpose and Character of the Use ............................................. 37

B.  The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole.......................................................... 37

C.  The Effect of the Use on the Potential Market For or the Value of the Copyrighted Work........................................................................... 38

CONCLUSION ......................................................................................... 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abiline Music, Inc. v. Sony Music Entertainment, Inc.,
    320 F. Supp. 2d 84 (S.D.N.Y. 2003) ...................................................................16, 23

Ackoff-Ortega v. Windswept Pac. Entertainment Co.,
    120 F. Supp. 2d 273 (S.D.N.Y. 2000) ...................................................................... 36

American Geophysical Union v. Texaco, Inc.,
    60 F.3d 913 (2d Cir. 1995) ....................................................................... 9, 30, 31, 35

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ...................................................................................................... 6

Blanch v. Koons,
    467 F.3d 244 (2d Cir. 2006) ................................................................................12, 21

Bourne Co. v. Walt Disney Co.,
    No. 91-0344, 1992 WL. 170686 (S.D.N.Y. July 1, 1992) ............................................ 19

Brumley v. Pfizer, Inc.,
    200 F.R.D. 596 (S.D. Tex. 2001) .............................................................................. 29

Campbell v. Acuff-Rose Music,
    510 U.S. 569 (1994) ............................................................................................passim

Castle Rock Entertainment v. Carol Publ'g Group,
    150 F.3d 132 (2d Cir. 1998) ...............................................................................24, 33, 35

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ...................................................................................................... 6

Chicago Board of Education v. Substance, Inc.,
    354 F.3d 624 (7th Cir. 2003) .................................................................................. 8, 28

Christian Dior-New York, Inc. v. Koret, Inc.,
    792 F.2d 34 (2d Cir. 1986) ...................................................................................... 36

Coastal Fuels, Inc. v. Caribbean Petroleum Corp.,
    175 F.3d 18 (1st Cir. 1999) ...................................................................................... 29

Davis v. United States,
    No. 97-2265, 1999 U.S. App. LEXIS 2654 (2d Cir. Feb. 19, 1999) .............................. 19

# TABLE OF AUTHORITIES

**Page**

Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,
   109 F.3d 1394 (9th Cir. 1997) .................................................................... 11, 14, 23, 33

Gallo v. Prudential Residential Services, Ltd. Pshp.,
   22 F.3d 1219 (2d Cir. 1994) ..................................................................................... 6

Harper & Row Publrs, v. Nation Enterprises,
   471 U.S. 539 (1985) ........................................................................................... 8, 24, 29

Ideal Toy Corp. v. Fab-Lu Ltd.,
   360 F.2d 1021 (2d Cir. 1966) ..................................................................................... 7

Ivani Contr. Corp. v. City of New York,
   103 F.3d 257 (2d Cir. 1997) ..................................................................................... 36

Leibovitz v. Paramount Pictures Corp.,
   137 F.3d 109 (2d Cir. 1998) ................................................................................. 13, 15

MCA, Inc. v. Wilson,
   677 F.2d 180 (2d Cir. 1981) ................................................................................. 10, 23

MacKay v. Easton,
   86 U.S. 619 (1873) ................................................................................................... 19

Matasushita Electric Industrial Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986) ................................................................................................... 6

Mendenhall v. Cedarapids,
   5 F.3d 1557 (Fed. Cir. 1993) ..................................................................................... 19

Metropolitan-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,
   900 F. Supp. 1287 (C.D. Cal. 1995) ......................................................................... 33

In re Motel 6 Securities Litigation,
   161 F. Supp. 2d 227 (S.D.N.Y. 2001) ....................................................................... 29

New Era Publrs. International v. Henry Holt & Co.,
   873 F.2d 576 (2d Cir. 1989) ..................................................................................... 36

Penguin Books USA, Inc. v. New Christian Church of Full Endeavor, Ltd.,
   No. 96-4126, 2000 WL. 1028634 (S.D.N.Y. July 25, 2000) ......................................... 36

# TABLE OF AUTHORITIES

**Page**

Price v. Fox Entertainment Group, Inc.,
    No. 05-5259 2007 WL. 241387 (S.D.N.Y. Jan. 26, 2007) ........................................37, 36

Rogers v. Koons,
    960 F.2d 301 (2d Cir. 1992) ...................................................................................... 7

Rubens v. Mason,
    387 F.3d 183 (2d Cir. 2004) .................................................................................... 19

Sheldon v. Metro-Goldwyn Pictures Corp.,
    81 F.2d 49, 56 (2d Cir. 1936)) ................................................................................. 35

Stone v. Williams,
    970 F.2d 1043 (2d Cir. 1992) .................................................................................. 35

Tin Pan Apple, Inc., v. Miller Brewing Co., Inc.,
    1994 No. 88-4085, WL 6230 (S.D.N.Y. Feb. 24, 1994).................................................. 6

Twin Peaks Products, v. Publ'ns International, Ltd.,
    996 F.2d 1366 (2d Cir. 1993) ...............................................................................passim

Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,
    342 F.3d 191 (3d Cir. 2003) .................................................................................... 32

Walt Disney Products v. Air Pirates,
    581 F.2d 751 (9th Cir. 1978)................................................................................... 25

# FEDERAL STATUTES

17 U.S.C. § 107 (2005)....................................................................................... 8, 30

# FEDERAL RULE

Fed. R. Civ. P. 56(c) ............................................................................................. 6

# SECONDARY AUTHORITIES

4 WILLIAM F. PATRY, PATRY ON COPYRIGHT LAW § 10:90 (2008)............................................. 13

4 WILLIAM F. PATRY, PATRY ON COPYRIGHT LAW § 10:93 (2008) ........................................... 18

## INTRODUCTORY STATEMENT

This case presents the paradigmatic example of the distinction between transformative parody and non-transformative satire.  Parody, as defined by the Supreme Court in the fair use context, is transformative because it uses the original work for the purpose of criticizing and ridiculing the original work, and in doing so sheds new light on the original through that use.  Satire, the use of the original for humorous effect to criticize or ridicule a target other than the original, is generally not transformative because it sheds no such light on the original.  Instead, satire merely uses public recognition of the contrast between the old and new works for its entertainment value or to get attention for the derivative work.  The undisputed evidence shows that Defendants' song, "I Need a Jew" ("Jew"), is a non-transformative satire, because it uses the music from Plaintiff Bourne Co.'s ("Bourne's") beloved classic "When You Wish Upon a Star" ("Star"), not to criticize or ridicule Star or the themes of wholesomeness and sweetness associated with Star, but rather to contrast those themes with the true and only target of the song's criticism and ridicule: bigotry in the form of Jewish stereotypes.  Mere ironic contrast, without criticism or ridicule, is neither parodic nor transformative, eliminating any substantial fair use justification for Defendants' infringement.

Moreover, even where there is some parodic purpose to a use, the strength of that purpose must be compared to the other, non-parodic purposes of the use.  This relative strength must be weighed against the other fair use factors, such as the amount taken from the original and the harm to the value of and market for the original.  In this case, Defendants copied far more than was reasonably necessary to evoke Star, even if Jew were a pure parody.  Not only could Defendants have taken less; Jew's composer, Walter Murphy, created an earlier version of Jew that was substantially less similar to Star and which he admits was sufficient to accomplish the allegedly "parodic" purpose of Jew.  Notably, Defendants do not introduce any testimony from Murphy in their motion papers, or even mention his name.

Finally, Defendants have introduced no affirmative evidence of a lack of market harm, as is their burden.  Bourne has introduced unrebutted evidence that Jew's association of Star with highly offensive lyrics is likely to harm the licensing value of Star, which is typically licensed because of its

wholesome and sweet reputation. This harm is not caused by any criticism or ridicule of Star by Defendants, and is therefore properly considered in evaluating the fourth fair use factor. Bourne also has introduced unrebutted evidence that Defendant's use, and similar uses if they were to become widespread, would harm Bourne's established market for licensing comedic derivative works, such as movies and television shows. In addition to directly depriving Bourne of licensing revenues, such unlicensed uses would clearly compete with and substitute for Bourne's licensed uses to the detriment of Bourne.

On these facts, and as set forth in detail below, Bourne is entitled to a judgment of liability as a matter of law. Even if Bourne had failed to meet this burden, however, it has certainly raised sufficient questions of material fact to allow a reasonable jury to find no fair use and requires denial of Defendants' motion for summary judgment.

## FACTS

### Plaintiff's Song

As set forth in greater detail in Bourne's Rule 56.1 Statement of Undisputed Facts ("Bourne Statement"), Bourne is the sole copyright owner of Star, having purchased the song from the Walt Disney Company in 1939. (Bourne Statement ¶ 3). Over the ensuing years, Star has become a standard and has been recorded by over 100 performing artists. (Bourne Statement ¶¶ 4-5). The song is widely associated with themes of wholesomeness and sweetness, and has been licensed for hundreds of uses in movies, television programs and commercials. (Bourne Statement ¶¶ 6, 58).

### Defendants' Infringement

Defendants Twentieth Century Fox Film Corporation, Twentieth Century Fox Television, Inc., Fuzzy Door Productions, Inc., Seth MacFarlane and Walter Murphy are or were involved in the production of an animated comedy television show entitled "Family Guy." (Bourne Statement ¶ 7). In 2000, an episode entitled "When You Wish Upon a Weinstein" (the "Weinstein Episode") was written for the show, in which the main character Peter decides that he needs help with his financial problems and that the only solution is to wish for a Jewish person to help him. (Bourne Statement ¶

7).  The centerpiece of the Episode is a song Peter sings, entitled "I Need a Jew."  The lyrics to the song contain a string of Jewish stereotypes and bigoted beliefs, such as blaming the Jewish people for killing Jesus Christ.  (Bourne Statement ¶ 23).

Originally, the lyrics to Jew were written to be sung along with the exact melody of Star.  (Bourne Statement ¶ 11).  After Bourne refused to grant Fox a license to use Star in that manner, Family Guy creator, Seth MacFarlane, asked show composer, Walter Murphy, to write music similar to Star to accompany Jew's  lyrics.  (Bourne Statement ¶ 12).  Murphy complied and wrote a version of Star that was initially approved and recorded by Murphy and MacFarlane (the "Leadsheet Version").  (Bourne Statement ¶¶ 13-14).  Later, however, the Family Guy producers asked Murphy to write another version of the music that would be even closer to Star.  (Bourne Statement ¶ 14).  When Murphy was uncomfortable making the song any more similar to Star, MacFarlane sung changes to Murphy and insisted that he make the changes to bring Jew closer to Star.  (Bourne Statement ¶¶ 15-16).  Murphy admits that the Leadsheet Version was sufficient to achieve any alleged parodic purpose of Jew.  (Bourne Statement ¶ 85).  The more similar version of Jew is the one used in the Weinstein Episode.  (Bourne Statement ¶ 17).

Fox considered the Weinstein Episode, including Jew, so potentially offensive that its Standards and Practices Department refused to clear the Episode for broadcast as part of the second season of Family Guy.  (Bourne Statement ¶ 51).

In 2003, Defendant The Cartoon Network first aired the Episode as part of its late-night Adult Swim programming and has aired the Episode at least thirty-six times since then.  (Bourne Statement ¶¶ 8, 100-101).  Cartoon Network altered the song for broadcast, changing the line "Even though they killed my Lord" to "I don't think they killed my Lord."  (Bourne Statement ¶ 54).  Defendant Twentieth Century Fox Home Entertainment, Inc. released the Weinstein Episode as a special bonus feature on a DVD box set of the third season, and also on the "Freakin' Sweet Collection" DVD.  (Bourne Statement ¶ 102).  The Episode was also released on PSP format.  (Bourne Statement ¶ 103).  Defendant Fox Broadcasting Company aired the Weinstein Episode around the same time as the release of the DVD box set.  (Defendants' 56.1 Statement ¶ 13).  MacFarlane has

also performed Jew live on stage at several "Family Guy Live" shows.  (Bourne Statement ¶ 108).

<u>Bourne's Discovery of the Infringement</u>

When Bourne denies a license request, it typically monitors the requesting party for a time afterwards to make sure that party does not proceed without the license.  (Bourne Statement ¶ 111). In this case, however, the Weinstein Episode was not aired until several years after the license was denied.  (*Id.*).  Bourne did not discover the use of Star in the Weinstein Episode until March of 2007, when a Bourne employee found a clip of Jew on the YouTube website.  (Bourne Statement ¶ 112). Thereafter, Bourne spent a brief time investigating the infringement and verifying that the no license was granted.  (Bourne Statement ¶ 113).  Then it promptly instructed legal counsel to protest to Fox. (*Id.*).  Bourne attempted in good faith to negotiate a settlement with Fox for a few months, but after repeated delays by Fox Bourne filed this action in October of 2007.  (Bourne Statement ¶ 114).

<u>Jew's Satiric Purpose</u>

According to the show's producers and writer, the overall theme of the Weinstein Episode is that the main character, Peter's, bigotry and belief in Jewish stereotypes is wrongheaded.  In the end, Peter learns this lesson and that Jewish people are no better or worse than anyone else.  (Bourne Statement ¶¶ 21-22).  In furtherance of that theme, the writers had Peter sing the offensive lyrics to Jew for the purpose of criticizing Peter and ridiculing his sincere belief in those stereotypes. (Bourne Statement ¶¶ 23-26).  The song is not used to criticize, ridicule or "skewer" Star in any way. (Bourne Statement ¶¶ 27-29).

<u>Jew Copies Far More Than Necessary to Evoke Star</u>

The music for Jew copies substantially and repeatedly from Star's melodic, harmonic, lyrical and structural content.  (Bourne Statement ¶¶ 74-80, 83-84).  Many of these similarities could have been removed while still allowing Jew to evoke Star.  (Bourne Statement ¶¶ 85-88).  Jew's composer admits that an earlier version of Jew he composed, which sounded much less like Star, was sufficient to achieve any allegedly parodic purpose of Jew in the Weinstein Episode.  (Bourne Statement ¶ 85).

<u>Harm to Bourne's Derivative Licensing Market For Star</u>

Bourne is very careful to preserve Star's association with wholesome and family-friendly themes,

because the strong public association of Star with such themes increases the song's value in the licensing market.  (Bourne Statement ¶ 61).  When creators of movies, television shows, commercials and other potential licensees choose a song to use in their work, they often do so because the song evokes a particular association in the mind of the public.  (Bourne Statement ¶¶ 45-46).  Moreover, many licensees will choose not to license a song if it is or has become associated with something offensive or controversial.  (*Id.*).  Defendants' association of Star with Jew's offensive lyrics is likely to tarnish and diminish Star's wholesome reputation and cause certain licensees not to select Star for use in their programs.  (Bourne Statement ¶¶ 47, 58-60).  The more widespread such uses become, the greater the harm will be.  (Bourne Statement ¶ 73).

In addition, synchronization licenses are a crucial source of revenue for owners of musical copyrights.  (Bourne Statement ¶¶ 44, 58).  Bourne has been granting synchronization licenses for comedic uses of Star for many years.  (Bourne Statement ¶¶ 61, 63-64).  This kind of licensing market is typical, particularly for famous songs, and Bourne has licensed many of its other songs for comedic uses, including those where the use includes a humorous contrast (or "juxtaposition") of the licensed program's visuals with the lyrics or theme of Bourne's song.  (Bourne Statement ¶ 65-66).  Indeed, Bourne has even frequently licensed its songs for irreverent comedic uses on Family Guy.  (Bourne Statement ¶ 70).  If unlicensed uses similar to Defendants' were to become widespread, such uses would have a significant adverse effect on Bourne's derivative licensing market for Star.  Such unlicensed uses would, of course, deprive Bourne of substantial license fees to which it is entitled.  (Bourne Statement ¶¶ 72-73).  Moreover, such unlicensed comedy uses would compete with and substitute for the movies, television shows and other comedic uses of Bourne's licenses.  (*Id.*).

## ARGUMENT

**I.    BOURNE HAS ESTABLISHED DEFENDANTS' INFRINGEMENT AS A MATTER OF LAW AND IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY**

### A.    The Summary Judgment Standard

To prevail on summary judgment, Bourne must "show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Matasushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87(1986).  "[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

To defeat this motion for summary judgment, Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  Defendants must "set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 586.  "While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law." *Tin Pan Apple, Inc., v. Miller Brewing Co., Inc.*, 1994 No. 88-4085, WL 62360, at *2 (S.D.N.Y. Feb. 24, 1994) (Mem. Op.).  There is no issue for trial unless sufficient evidence in the record exists favoring the party opposing summary judgment to support a jury verdict in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### B.    Prima Facie Infringement

1.    Applicable legal standard

To establish a prima facie case of copyright infringement, Bourne must prove that it owns a valid copyright in Star and that the Defendants copied original elements of Star without Bourne's consent.  *Twin Peaks Prods., v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993).  Copying may be established either by proof of actual copying or by proving that Defendants had access to Star and that Star and Jew are substantially similar.  *Id.*  The test for substantial similarity is "'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'"  *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (*quoting Ideal Toy Corp. v. Fab-Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)).

2.    Copyright Ownership

Bourne is the sole owner of copyright in Star.  (Bourne Statement ¶ 3).

3.      Unauthorized Copying

Defendants do not dispute that Jew is a derivative work based upon Star.  Indeed, Defendants admit that Jew incorporates musical elements from Star and therefore sounds similar to Star. (Bourne Statement ¶ 19).  Defendants also admit that Jew was created in a manner intended to evoke Star.  (Bourne Statement ¶ 20).  MacFarlane testified that the lyrics for Jew were originally conceived and written to be sung to the precise music of Star.  (Bourne Statement ¶ 11).  He further testified that after Bourne denied Fox a license to use Star, he instructed Murphy to compose music for the lyrics of Jew that would sound like Star.  (Bourne Statement ¶ 12).  Murphy testified that he had Star in mind when he wrote the music for Jew.  (Bourne Statement ¶ 13).  Thus, Bourne has established unauthorized actual copying as a matter of law.

Bourne can also prove copying by inference because Defendants admit that MacFarlane and Murphy had access to Star prior to writing Jew and admit that the two songs sound similar.  (Bourne Statement ¶¶ 11, 13).

**C.      Fair Use**

1.      Applicable legal standard

Section 107 of the Copyright Act provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in any particular use if a fair use the factors to be considered shall include- (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (2005).  The fair use defense provided by Section 107 is an equitable rule of reason, with no generally applicable definition possible.  *Harper & Row Publrs, v. Nation Enters*, 471 U.S. 539, 560 (1985).  The inquiry must not be simplified with bright-line rules, but rather requires case by case analysis.  *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994).  "Nor may the four statutory factors be treated in isolation, one from another.  All are to be explored, and the results weighed

together, in light of the purposes of copyright." *Id.* at 578.  Defendants bear the burden of proof

because fair use is an affirmative defense.  *Id.* at 590; *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d

624, 629 (7th Cir. 2003).

   2.  The purpose and character of the use

 The first factor to be considered is "the purpose and character of the use, including whether

such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107.  This

factor requires analysis of several issues, including whether the use falls within the illustrative list of

potentially fair uses in the preamble to Section 107, such as criticism, commentary, research and

scholarship.  However, even these enumerated uses are not entitled to any presumption on the first

factor, much less on an ultimate finding of fair use.  *Harper & Row*, 471 U.S. at 561.  Another

relevant inquiry is whether the use is "transformative" in the sense that the new use adds something

new to and builds upon the copyrighted work, and serves a significantly different purpose.  *Campbell*,

510 U.S. at 579.  In evaluating the first factor, the commercial nature of the use must also be

considered, although it is not dispositive.  *Id.* at 584.  Determination of the purpose of the use "is

not an all-or-nothing matter."  *Twin Peaks* 996 F.2d at 1374.  Even where a use is determined to have

a transformative purpose, the strength of that purpose, including in comparison to other purposes

of the work, must be evaluated so that it may be weighed in connection with the other fair use

factors.  *Id.*  As explained by the Second Circuit:

> The issue is not simply whether a challenged work serves one of the non-exclusive
> purposes identified in section 107, such as comment or criticism, but whether it does
> so to an insignificant or a substantial extent.  The weight ascribed to the "purpose"
> factor involves a more refined assessment than the initial, fairly easy decision that a
> work serves a purpose illustrated by the categories listed in section 107.

*Id.*  A defendant's use may have more than one purpose, and in such cases the predominant purpose

is most relevant to the ultimate conclusion on the first factor.  *American Geophysical Union v. Texaco,

Inc.*, 60 F.3d 913, 924 (2d Cir. 1995) ("In this case, the predominant archival purpose of the copying

tips the first factor against the copier, despite the benefit of a more usable format.").

a.    I Need a Jew is not a parody

Defendants' entire fair use case is premised upon their claim that Jew is a parody of Star. That claim is based upon a fundamental misunderstanding of the legal definition of parody in the fair use context, and is undermined by the testimony of Defendants' own witnesses.

(1)    The parody / satire distinction

In *Campbell*, the Supreme Court established a clear distinction between parody and satire for the purpose of fair use analysis. *Campbell* involved a rap music artist, Luther Campbell of 2 Live Crew, who wrote a song entitled "Pretty Woman." *Campbell*, 510 U.S. at 572. Campbell's song included the opening bass line from Roy Orbison's song entitled "Oh, Pretty Woman" and the first line of lyrics from Orbison's song, but otherwise consisted of new musical and lyrical content. *Id.* at 588-89. The lyrics for Campbell's "Pretty Woman" consisted of "degrading taunts, a bawdy demand for sex, and a sigh of relief from paternal responsibility" directed at various women. *Id.* at 583, 595-96. The district court granted summary judgment for the defendants on fair use, finding that the second song was a parody of the first. *Id.* at 573. The court of appeals reversed on the ground that the commercial nature of the parodic use rendered it presumptively unfair. *Id.* at 573-74. The Supreme Court reversed the court of appeals with respect to the presumption of unfair use. *Id.* at 572. The Court did not, however, rule that Campbell's parody was a fair use. Instead, the Court remanded for further consideration of whether too much of the music was taken in light of the parodic purpose and for further consideration of market harm. *Id.* at 589, 593-94. In doing so, the Supreme Court took the opportunity to render a detailed explanation of how parody claims must be analyzed for fair use purposes.

First, the Court noted that as a general matter, parody is a form of criticism and is transformative because in criticizing the work taken, the parody sheds new light on the earlier work. *Id.* It is precisely this feature, criticism of the earlier work taken, that gives parody its transformative character. The Court defined parody as the use of an earlier work for the purpose of criticizing that earlier work, and contrasted parody with satire, where the earlier work is used for the purpose of ridiculing another target:

> For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from the existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's work. If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger. Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

*Id.* at 580-81 (citations omitted). The Court's finding that the 2 Live Crew song had the effect of holding the original up to ridicule was central and necessary to its holding that the song was a parody. *Id.* at 583 ("It is this joinder of reference and ridicule that marks off the author's choice of parody from the other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works.").

While noting that a parody may constitute fair use, the Court rejected the argument that parodies deserve any presumption of fair use, explaining that not all parodies are created equal:

> The [Copyright] Act has no hint of an evidentiary preference for parodists over their victims, and no workable presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements. Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law.

*Id.* at 581. Thus, there are strong claims to parody and weaker claims, and the strength of the parody justification must be weighed along with all of the other evidence relevant to the four factors before a fair use determination may be made.

The requirement that a parody's ridicule be aimed at the earlier work taken had already been established in the Second Circuit prior to *Campbell*. Indeed, the Supreme Court cited a Second Circuit case, *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) as precedent for its distinction between parody and satire. *Campbell*, 510 U.S. at 580. In *MCA*, the Second Circuit affirmed the district court's rejection of a fair used defense by the defendants, who took music similar to the classic song "Boogie Woogie Bugle Boy" and substituted humorous and off-color lyrics under the title "Cunnilingus Champion of Company C." *MCA*, 677 F.2d at 181-82. The court held that the

defendants' song was not a permissible parody because "Boogie Woogie Bugle Boy" was not the object of the song's commentary. *Id.* at 185 ("We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society.").

Since *Campbell*, the Supreme Court's legal distinction between parody and satire has been applied by various courts. The most directly relevant example is *Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997). In *Dr. Seuss*, the defendants published a book entitled *The Cat NOT in the Hat!*, which copied various copyrightable elements, such as characters and illustrations, from the Dr. Seuss classic *The Cat in the Hat*, and changed the original's story to a humorous commentary on the O.J. Simpson trial. *Id.* at 1396-97. Although defendants claimed that their book was intended to parody the Dr. Seuss original, the Ninth Circuit rejected the defendants' parody fair use defense because the object of the book's ridicule was the O.J. Simpson trial, not the copyrighted work that was taken:

> Although *The Cat NOT in the Hat!*, does broadly mimic Dr. Seuss' characteristic style, it does not hold *his style* up to ridicule. The stanzas have "no critical bearing on the substance or style of" *The Cat in the Hat*. Katz and Wrinn merely use the Cat's stove-pipe hat, the narrator ("Dr. Juice"), and the title (*The Cat NOT in the Hat!*) "to get attention" or maybe even "to avoid the drudgery in working up something fresh." *Acuff-Rose*, 114 S. Ct. at 1172. While Simpson is depicted 13 times in the Cat's distinctively scrunched and somewhat shabby red and white stove-pipe hat, the substance and content of *The Cat in the Hat* is not conjured up by the focus on the Brown-Goldman murders or the O.J. Simpson Trial. Because there is no effort to create a transformative work with "new expression, meaning, or message," the infringing work's commercial use further cuts against the fair use defense.

*Dr. Seuss*, 109 F.3d at 1401.

The distinction between parody and satire does not render all satires ineligible for the fair use as a matter of law. However, the creator of a satirical work must establish a significant justification for using the earlier work, by using it in a way that somehow sheds new light on the original, in order to establish a favored transformative use under the first factor. *Campbell*, 510 U.S. at 581; *Blanch v. Koons*, 467 F.3d 244, 255 (2d Cir. 2006).

(2)    Jew does not ridicule or criticize Star

The record here clearly establishes that Jew does not criticize or ridicule Star.  Rather it ridicules anti-Semitism and Jewish stereotypes.  For this reason, Jew is a classic satire, using the well-known Star as a vehicle to humorously criticize such bigotry.

It is undisputed that Jew is the centerpiece of a Family Guy episode devoted entirely to ridiculing Peter's belief in Jewish stereotypes and by the end of the Episode, even Peter learns that his beliefs are misguided and wrong.  Various of the show's creators, including the originator of the series, Seth MacFarlane, and the writer of the Episode, Ricky Blitt, identified the criticism of Peter's bigotry as the theme of the Episode.  (Bourne Statement ¶¶ 22-26).  Indeed,  MacFarlane testified that he first conceived the idea for the Episode when he realized that every time he made a significant purchase, he asked a Jewish friend to come with him to negotiate on his behalf.  (Bourne Statement ¶ 21). Not surprisingly, every witness identified by Defendants as having knowledge about the allegedly "parodic" purpose of Jew testified that Jew was meant to make fun of Peter's belief in Jewish stereotypes, in keeping with the overall theme of the Episode.  (Bourne Statement ¶¶ 24-29).  Blitt, the writer of the Episode, testified that Jew was not used to make fun of or skewer Star, but was the perfect vehicle to make fun of Peter's bigotry.  (Bourne Statement ¶ 27).  He further testified that Jew was intended to be experienced in the context of the Episode as a joke about bigotry.  (Bourne Statement ¶ 26).  There can be no question that the comedic purpose of Jew, especially within the context of the Episode, is to ridicule bigotry and Jewish stereotypes.

There is absolutely nothing about Jew that overtly comments on or criticizes the subject matter, quality or style of Star.  Notably, the Weinstein Episode has been released on DVD with a commentary track, in which Mssr MacFarlane and Blitt, and other staff who created the Episode discuss the Episode as it plays.  (Bourne Statement ¶ 30).  In this commentary, the participants frequently point out and explain various popular culture references in the Episode.   At no point in the commentary, including while Jew plays, does anyone claim that Jew comments on or criticizes Star.  (Id.).  Nor does Jew ridicule Star musically.  Although Defendants' musicologist, Dr. Ferrara, identified two musical devices that he opined were meant to "poke fun at" Star, he could not explain

why anyone would view those musical devices as funny or otherwise as commenting on Star and offered no methodological basis for his opinion. (Bourne Statement ¶ 91).   Moreover, Dr. Ferrara admitted that he did not communicate in any way with the actual composer of Jew in rendering his opinion about  Murphy's music.  (Bourne Statement ¶ 90).  Not surprisingly then, the invalidity of Dr. Ferrara's opinion is proven most strongly by Murphy himself, who could not identify any particular musical device, much less the two devices identified by Ferrara, that he used to poke fun at or otherwise musically parody Star.  (Bourne Statement ¶ 32).

(a)    Mere juxtaposition alone is not ridicule

Defendants allege that Jew parodies Star by juxtaposing the sweetness and wholesomeness of Star with Jew's crass and offensive lyrics evincing Peter's bigotry and wrongheaded belief in Jewish stereotypes.  (Bourne Statement ¶¶ 24, 28).  This argument fails, as a matter of law, for several reasons.  Simple juxtaposition by adding offensive lyrics to a classic song known for its wholesomeness does not, by itself, constitute critical commentary or ridicule of the original. *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114 (2d Cir. 1998) ("Being different from an original does not inevitably 'comment' on the original."); 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT LAW § 10:90 (2008) ("Being different from the original is not the same as commenting on it. Commenting involves some additional element of insight or different way of looking at the original. As noted above, key to *Campbell*'s distinction between parody and satire is classifying those works that comment, at least in part, on the earlier work as parody and those that do not as satire."). Indeed, almost every musical satire juxtaposes the music of a well-known, non-comedic song with unexpected new lyrics that would not typically be associated with the song.  Such a contrast may well create a humorous effect, but that humorous effect does not distinguish parody from satire: ridicule directed at the original does.  Thus, as the Supreme Court explained, reference must be joined with ridicule to constitute parody.  *Campbell*, 510 U.S. at 583.  Allowing every contrasting reference to constitute *per se* parody would entirely destroy the distinction recognized by the Supreme Court. This principle is evinced in *Dr. Seuss*, 109 F.3d 1394.  Certainly, the defendants' book in *Dr. Seuss* juxtaposed the wholesome, family-oriented nature of *The Cat in the Hat* with the gruesome and

decidedly adult subject matter of the Brown-Goldman murders and the O.J. Simpson trial, for comedic effect. Nonetheless, the Ninth Circuit correctly held that the use was not a parody because the juxtaposition was used merely to "get attention" and not to hold *The Cat in the Hat* up to ridicule. *Id.* at 1401.

Similarly, in *MCA,* the defendants took a classic and uncontroversial song from a bygone era, *Boogie Woogie Bugle Boy*, and added sexually explicit lyrics to create *The Cunnilingus Champion of Company C. MCA,* 677 F.2d at 182. The Second Circuit held that the juxtaposition was used, not to comment on the innocence or any theme of the original, but essentially to get attention or publicity for the new work. *Id.* at 185. Like those in *Dr. Seuss* and *MCA*, the Defendants here juxtaposed another party's well-known, wholesome work with new, unsavory subject matter, not to ridicule the original work, but to target another subject entirely – in this case bigotry and Jewish stereotyping. Such juxtaposition alone is not parody.

Defendants point to certain cases, which they contend support the notion that mere juxtaposition or contrast is sufficient to constitute parodic ridicule. Each of these cases is inapposite, because: 1) none of the defendants' works in those cases targeted a different, unrelated subject for ridicule, as Jew does; instead, they negatively criticized and ridiculed the original and 2) the contrasting themes of the defendants' works in those cases were held out as inherently superior to those of the originals, unlike Jew. First, Defendants point to *Campbell* and claim that the juxtaposition in Jew is the same as the use made by the defendants in that case. (Def. Brief at 13). The defendants' song in *Campbell* was nothing like Jew. "Pretty Woman" used music from the wholesome "Oh Pretty Woman" and added raunchy lyrics evincing the author's view of the reality of street life, which contrasted with the naiveté of the original lyrics about a man whose romantic fantasies come true. *Campbell*, 510 U.S. at 583. The purpose of that juxtaposition was not to ridicule the view espoused by the singer about street life, but instead was meant to promote that view as truthful, while rejecting the romantic view embodied in the original. *Id.* In Jew, unlike "Pretty Woman," the contrast between the wholesomeness of Star and the crassness of Jew is merely used for comedic effect and to increase the entertainment value of the satiric comment on the unrelated

subject of bigotry and Jewish stereotypes.

Defendants next claim that Jew is similar to the defendant's work in *Liebovitz* 137 F.3d 109. This claim also rings hollow. *Liebovitz* concerned a movie advertisement that parodied a famous nude magazine cover photograph of the then-pregnant actress Demi Moore. The movie advertisement combined a photograph of a pregnant, nude model in the same pose as Demi Moore in the magazine cover photograph, with male comedy actor Leslie Neilson's head superimposed on top of the model's body. *Id.* at 111-12. The movie advertisement in *Liebovitz* did not use the pre-existing work to ridicule a different, unrelated subject. Instead, the Second Circuit found that the silliness of the advertisement, embodied in the smirking face of Mr. Nielsen, clearly ridiculed the pretentiousness and seriousness of the original photograph. *Id.* at 114. The court also noted that the placement of Mr. Nielsen's unflattering head on the model's body could be perceived as disparaging the original photograph's celebration of the beauty of the pregnant female body. *Id.* at 115. In performing this analysis, the Second Circuit was very clear to warn that mere contrast was not sufficient in itself to render a use fair:

> In saying this, however, we have some concern about the ease with which every purported parodist could win on the first factor simply by pointing out some feature that contrasts with the original. Being different from an original does not inevitably "comment" on the original. Nevertheless, the ad is not merely different; it differs in a way that may reasonably be perceived as commenting, **through ridicule**, on what a viewer might reasonably think is the undue self importance conveyed by the subject of the Liebovitz photograph. A photographer posing a well known actress in a manner that calls to mind a well known painting must expect, or at least tolerate, a parodist's **deflating ridicule**.

*Id.* at 114-15 (emphasis added). Defendants here are making the very argument the Second Circuit warned against: they are merely pointing to the contrast between wholesomeness and offensiveness without showing any way in which Jew actually ridicules the wholesome message of Star. To the contrary, Jew is meant to ridicule the boneheaded literal message in the lyrics of Jew itself.

Defendants also cite *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp.2d 84 (S.D.N.Y. 2003). In *Abilene Music*, the defendant distributed an album containing a rap recording entitled "The Forest," which used the first three lines of the classic song "What a Wonderful World" in an

introductory passage. *Id.* at 86. "The Forest" conveyed "a dark view of the world by imagining popular cartoon characters in a 'wonderland,' engaged in acts of violence, sex, and theft." *Id.* at 87. Prior to the main body of the song, the recording has an introduction beginning with an off-key, vocal-only rendition of the first verse of "What a Wonderful World," with an altered tempo and rhythm, and with lyrics changed to include references to marijuana usage in place of the original's description of trees and flowers. *Id.* After this introduction, the song begins and there is no further reference to or use of "What a Wonderful World" for the remaining three-minutes of the song. *Id.* Although the court in *Abilene Music* noted the ironic contrast between the original song's positive worldview and "The Forest's" view of the modern world as corrupt and venal, the court also found that the changes made to the music and lyrics of the quoted portion of the original made clear the intent to mock and ridicule "What a Wonderful World." *Id.* at 90. Moreover, the subject matter of the original (an expression of how wonderful life is) was precisely what was being made fun of and criticized by the lyrics of "The Forest," which took a far more negative view of the exact same subject. This point was crucial to the court's finding the song a parody:

> While the message of *The Forest* goes beyond simply parodying *Wonderful World*, that parody is an integral part of the song's take on the world because it highlights the contrast between the two worldviews, **and expresses the rapper's belief in the realism of his own perspective**. Contrary to plaintiffs'' argument, therefore, this is not a case in which the author has taken the melody of a popular song purely for the sake of convenience, and then changed the lyrics to satirize a subject having nothing to do with the original song.

*Id.* at 91 (emphasis added). The court contrasted this parodic use with non-transformative ironic contrast, where such contrast is used satirically to criticize the subject of the new work:

> Finally, it bears emphasis that *the Forest*'s alteration of the tone, lyrics and musical features of *Wonderful World* makes clear that the song itself is a target of parodic criticism, and that the creators of *The Forest* are not merely using the original song as an ironic or satirical device to comment on what they view as a less than wonderful world. The latter kind of use, which typically requires licensing, can be illustrated by the song's use in certain films. For example, in Terry Gilliam's *12 Monkeys*, the Armstrong recording of *Wonderful World* is played over the final credits, ironically contrasted with the film's depiction of a distinctly dystopian science fiction future, and in Barry Levinson's *Good Morning, Vietnam*, the song is played on the sound track accompanying wartime violence and destruction. In these cases, the original song itself is used (essentially in its entirety) to comment on negative aspects

of the real or imagined worlds depicted by filmmakers, but the song itself is not parodied.

*Id.* at 92.  In this case, Defendants' use mirrors the non-transformative uses described in *Abilene Music*, where the optimism of the original is juxtaposed with a darker view of reality shown in the derivative work, not for the purpose of criticizing that optimistic view but merely for the irony provided by the contrast.  It was merely this ironic contrast of Jew with Star that the Episode's writer explained made Star the perfect vehicle for the ridicule of Peter's ignorant beliefs.  (Bourne Statement ¶ 27).

All of the cases cited above show that while juxtaposition and contrast may sometimes be used for parodic effect, when the contrast is used to criticize themes in the new work instead of the original such use sheds no new light on, and therefore does not transform, the original.  To qualify as parody, two works with opposing themes or views must be contrasted in a way that makes clear that the purported parodist is doing so to show that the theme or view of its new work is superior or more true to life than that of the parodied work.  This is the requisite "joinder of reference and ridicule" that the Supreme Court viewed as the distinctive characteristic of parody.  *Campbell*, 510 U.S. at 583.  Defendants here admit, however, that Jew does not favor the bigoted worldview of that song's anti-Semitic lyrics over the wholesomeness of Star, but rather is meant to expose the viewpoint of *Jew* to ridicule.  (Bourne Statement ¶ 29).

> (b)    Defendants' allegation that Walt Disney was an anti-Semite does not render Jew critical of Star

In a desperate attempt to find some after-the-fact justification for using Star without a license, Defendants claim that one of the purposes of using Star was to comment on the alleged anti-Semitism of Walt Disney, the founder of the Walt Disney Company.  This argument fails for many reasons.  As a preliminary matter, this explanation is wholly inconsistent with Defendants' primary defense: that Jew is meant to contrast with the wholesomeness, sweetness and innocence of Star.  If Star were already associated with anti-Semitism prior to Defendants' use, the song would hardly be considered an icon of wholesomeness.  Moreover, there is simply nothing in Jew, including as it appears in the Family Guy Episode, indicating that Star is in any way commenting on Mr. Disney's

alleged anti-Semitism.[1]  "Facts extrinsic to the nature of the defendant's work itself should not be considered."  4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:93 (2008).

At most this explanation alleges an intent to ridicule Walt Disney, the individual, and not the song Star.  As shown above, use of Star to ridicule something other than Star is satire, not parody.  Of course, Defendants provide no evidence that Star is in any way anti-Semitic or otherwise associated with anti-Semitism.  To the contrary, they admit that Star is widely considered to be wholesome, sweet and innocent.  (Bourne Statement ¶¶ 27-29).  MacFarlane acknowledges that for anyone to recognize Jew's purported criticism of Mr. Disney as an anti-Semite, a viewer would have to at least associate Star with Mr. Disney, in addition to being aware of the rumors from the 1940s or 1950s that Mr. Disney was an anti-Semite.  (Bourne Statement ¶ 35).  To fill this gap in their burden of proof, Defendants repeatedly allege that Star is widely associated with Mr. Disney personally, yet they provide no evidence whatsoever to support this claim.  Instead, Defendants misrepresent the record in an attempt to mislead the Court.  First, they claim that Bourne admitted that the song is associated in the mind of the public with Mr. Disney, citing Bourne's response to a request for admission.  (Def. Brief at pp. 3, 12; Def. 56.1 Statement ¶ 2).  In its actual responses, however, Bourne only admitted that Star was sometimes used as a theme song (sometimes in combination with other songs) by the Walt Disney Company and specifically refused to admit that the song was associated in the minds of the public with the Disney Company or was in any way associated with Walt Disney individually or personally, and further refused to admit that the public associates the Disney Company with Walt Disney personally.  (Pl. Responses to Request for Admissions Nos. 3, 5, 6, 9).  It is unfathomable that Defendants would mislead the Court by claiming Bourne admitted what it has specifically refused to admit: that Star is publicly associated with Mr. Disney.[2]

---

[1] Defendants point to another Family Guy program, created years after the Weinstein Episode, in which the show portrays Mr. Disney as an anti-Semite.  (Pl. Br. 12 n.12).  This example shows exactly why Jew *cannot* reasonably be perceived as criticizing Mr. Disney: in the later program, Mr. Disney, himself, is depicted making anti-Semitic comments.  In Jew, there is simply no reference, overt or otherwise, to Mr. Disney.

[2] The only other "evidence" cited by Defendants on this point is language from two judicial opinions in an unrelated case.  (Def. Brief at 3, 12; Def. 56.1 Statement ¶ 4).  In deciding a motion for summary judgment, a court may rely only

Defendants similarly provide no admissible evidence that the public actually believes Mr. Disney was an anti-Semite.  Indeed, the Fox Defendants' corporate deposition witness on this topic admitted that Fox had no evidentiary basis to support their allegation that Mr. Disney has a public reputation as an anti-Semite.  (Bourne Statement ¶ 38).  At most, Defendants have presented a handful of hearsay, consisting of two book excerpts and certain Internet postings, which largely refute the notion that Mr. Disney was an anti-Semite.  These publications suggest that rumors of Mr. Disney's anti-Semitism may have circulated in the 1940s or 1950s (and occasionally resurface on the Internet), but that these rumors were unfounded and arose as backlash from disgruntled former employees and union leaders who were upset with Mr. Disney's strong anti-union and anti-communist activities at the time.  (Rimokh Decl. Ex. B, pp. 447-458; Rimokh Decl. Ex. D, p. 2 ("[N]o one can specifically attribute bias to Disney himself . . .")).  Indeed, the very publications cited by Defendants indicate that Mr. Disney was well regarded in the Jewish community, employed many Jewish artists and other employees, supported pro-Jewish charities and was named B'nai Brith Man of the Year in 1955.  (Rimokh Decl. Ex. B,  pp. 455-56; Rimokh Decl. Ex. C, p. 236).

Finally, the record clearly indicates that Defendants' "Walt Disney defense" was made up after the fact to justify the taking, and was not the purpose of using Star.  Indeed,  MacFarlane admits that he did not consider the Walt Disney issue at the time he decided to use Star or when the lyrics were first written.  It was only later that he alleges that he recognized that the rumor of Mr. Disney's anti-Semitism might provide an additional joke to the extent anyone noticed it.  (Bourne Statement ¶ 34). Zuckerman confirms that this justification was not even discussed (if it ever was) until well after Jew was written and the Episode was in production.  (*Id.*).  Notably, when asked to list all of the ways in

---

on material that would be admissible at trial. *Rubens v. Mason*, 387 F.3d 183, 188 (2d Cir. 2004).  As a preliminary matter, these judicial opinions are not admissible evidence and constitute hearsay (or double-hearsay). *Mendenhall v. Cedarapids*, 5 F.3d 1557, 1570-1571 (Fed. Cir. 1993) (that "[t]he reports of [decisions] may be referred to as expositions of law upon the facts there disclosed, but they are not evidence of those facts in other cases." (citing *MacKay v. Easton*, 86 U.S. 619, 632,  (1873))); *see also Davis v. United States*, No. 97-2265, 1999 U.S. App. LEXIS 2654, at *2 (2d Cir. Feb. 19, 1999). Moreover, neither opinion says anything about the association of Star with Mr. Disney.  Indeed, the part of the opinion cited in Defendants' 56.1 Statement specifically as supporting this proposition merely quotes an argument from one of the parties' brief, which argument tangentially mentions the Disney Company's use of Star, and then rejects that argument. *Bourne Co. v. Walt Disney Co.*, No. 91-0344, 1992 WL 170686, at *8 (S.D.N.Y. July 1, 1992).  Although not as outrageous as misrepresenting Bourne's admissions, such citations are not evidence and cannot support Defendants' argument.

which Jew was meant to comment on Star, the writer of the Episode,  Blitt, did not even identify the issue of Walt Disney's alleged anti-Semitism.  (Bourne Statement ¶ 33).

Because it was deemed particularly offensive, the Episode went through intensive scrutiny by Fox's Standards and Practices Department, which must approve any controversial content to be aired on the network.  This process included many communications between the Family Guy creative team and Linda Shima-Tsuno, the Director of Standards and Practices, in which  Shima-Tsuno listed the most offensive content in the Episode that Fox wanted cut, and Mssr MacFarlane and Zuckerman attempted to justify keeping that content.  (Bourne Statement ¶¶ 39-40, 48).  Fox went so far as to provide copies of the script to two rabbis for their input.  (Bourne Statement ¶ 40, 49).   Shima-Tsuno testified that while the lyrics for Jew were considered to be highly offensive by everyone who reviewed them, including both rabbis, nobody from the Family Guy staff ever justified the lyrics by claiming the song was meant to ridicule Mr. Disney's alleged anti-Semitism. (Bourne Statement ¶¶ 40-42, 50-51).  Finally, at no point in the DVD commentary, including while Jew plays,  does anyone claim that Jew comments on Mr. Disney's alleged anti-Semitism or otherwise mentions Walt Disney at all.  (Bourne Statement ¶ 43).  It is telling that this alleged purpose for using Star first surfaced in the context of defending this litigation, and was never once mentioned during the lengthy standards and practices review process, or in the entire Episode commentary.

(c)     Defendants' witnesses admit that Jew does not
negatively comment on or ridicule Star

Defendants frequently assert that Jew was meant to be a "parody" of Star, but such conclusory statements are not relevant.  When pressed to explain exactly how Jew criticizes or comments on Star, it becomes clear that Defendants mistake satire for parody.  As shown above, the purpose of Jew was not to criticize Star, but rather to criticize something unrelated to Star: bigotry and Jewish stereotypes.  More important, Jew cannot possibly be considered a parody because Defendants' key witnesses admit the obvious: the song does not negatively criticize or ridicule Star.

 Blitt, the writer of the Episode, explained persuasively that the juxtaposition of Jew and Star

was used merely for the comedic shock effect of contrasting the wholesomeness of Star with the

crass bigotry of Jew, and specifically not for the purpose of making fun of or ridiculing Star:

> It's not like -- there's a type of parody that is done when you are mercilessly trying to mock. What you are doing here, it's more like you are using it in kind of a wink to evoke the other things that you are mocking with, you know, his ignorant views sung in that song.

> It's like -- you know, it's not intended to skewer the song and just say we think it's a bad song and we're making fun of it. It's the perfect song because it's of another era and it's a song about wishing, and usually you are working for world peace or the world to be perfect, and this guy is wishing for a Jew who is good with money to come into his life.

> So it's like that's the juxtaposition that makes it funny, and, you know, it's just sort of like a direct through line that when you are parodying something, you just need to put it in the perfect body or else it won't work, and that was the perfect body for us was the song.

(Bourne Statement ¶ 27). Blitt's testimony is incontrovertible -- that the target of Jew is bigotry and

anti-Semitism, and not Star. Murphy, the composer of Jew, also admitted that Jew does not

musically ridicule Star, but merely evokes it for comedic purpose. (Bourne Statement ¶ 29).

Zuckerman, the executive producer of the Episode, testified that Jew was not meant to ridicule or

negatively comment on Star. (*Id.*).

> b. I Need a Jew is not otherwise transformative

Defendants allege that *Blanch v. Koons*, 467 F.3d 244, eliminated the Supreme Court's distinction

between parody and satire and holds that "both [satire and parody] are protected by fair use" (Def.

Br. p. 15). This statement is fundamentally wrong on several levels. Even pure parody is not

automatically deemed fair use, nor is it entitled to a presumption on the first factor; it must be

evaluated with respect to the strength of the parodic justification and weighed along with all of the

other fair use considerations. *Supra* at 8-9; *Campbell*, 510 U.S at 581. Certainly, then, satire is not

entitled to such a presumption. To the contrary, the Supreme Court has explained that the claim to

fair use for satire, precisely because it does not ridicule the work from which it takes, "diminishes

accordingly (if it does not vanish)" and, therefore, a satire "requires justification for the very act of

borrowing." *Id.* at 580-81. Thus, while the Court acknowledged that a given satire may be

transformative and avail itself of the fair use defense if otherwise justified, it made clear that the fair

use burden for a satirist is much higher than that for a parodist. *Blanch* did not overrule the Supreme Court on this principle, but rather applied it in a manner wholly inapposite to Defendants' use and in fact supports Bourne's case.

In *Blanch*, the defendant copied and altered the appearance of part of a fashion photograph, consisting of the model's feet and lower legs, and included that as a fragment in a painted collage entitled "Niagara," made up of several other fragments and visual elements appropriated from various sources. *Id.* at 247. In Niagara, the legs from the plaintiff's photograph, along with three other pair of anonymous legs taken from fashion photographs, were juxtaposed against a backdrop of junk food images and landscape. *Id.* The uncontradicted evidence indicated that Niagara used the legs taken from fashion magazine photographs, in juxtaposition with the other images such as junk food, to ridicule the genre to which the photographs belong: glossy fashion magazines. *Id.* at 255. More specifically, the court noted that Niagara used the photographs to ridicule "the culture and attitudes prompted and embodied in Allure Magazine [the magazine in which Blanch's photograph had been published]." *Id.* Thus, even though the use was not technically a parody (because it did not criticize the authorship or quality of the photograph), it was very close to a parody (because it used the photograph to ridicule the style and attitudes embodied in the photograph and the magazine from which it was taken) and therefore the substantial burden facing a satirist was met.

Jew is nothing like the painting in *Blanch*. As demonstrated above, Jew does not criticize or ridicule anything remotely related to Star. Instead, it ridicules wholly unrelated subjects: anti-Semitism and Jewish stereotypes. When juxtaposition is done, not to criticize the original work taken, but merely for ironic contrast, such juxtaposition sheds no new light on and is not transformative of the original. Rather Defendants' use seeks to get attention for the new work by using a famous song and merely serves the same entertainment purpose as the original. *MCA,* 677 F.2d at 185; *Dr. Seuss*, 109 F.3d at 1401; *Abiline Music,* 320 F. Supp.2d at 92 (noting that use of song within a movie for ironic contrast with the theme of the film, without criticizing the song, is not transformative parody). Defendants have failed their burden to justify their taking of Star.

        c.      Even if there were some minor parodic or transformative component to I Need a Jew, the dominant purpose is satiric and non-transformative

In *Campbell*, the Supreme Court held that the transformative use inquiry was not an all-or-nothing proposition. Rather, the strength of the transformational quality affects the weight given to that finding in balancing the other first factor inquiries, and the other factors in determining fair use. *Campbell*, 510 U.S. at 579. Necessarily, then, there is no presumption of fair use, even for transformative uses such as parody, and the strength of a work's parodic purpose must be evaluated and balanced:

> The [Copyright] Act has no hint of an evidentiary preference for parodists over their victims, and no workable presumption for parody could take account of the fact that parody often shades into satire when society is lampooned through its creative artifacts, or that a work may contain both parodic and nonparodic elements. Accordingly, parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of copyright law.

*Id.* at 581; see also Twin Peaks Productions 996 F.2d at 1375.

As demonstrated above, Defendants have failed to meet their burden to demonstrate any parodic or transformative purpose for Jew. Instead, the evidence shows the object of Jew's ridicule is unrelated to Star, and the juxtaposition of Star's wholesome reputation with Jew's unsavory lyrics sheds no new light on Star, but is merely meant to provoke a laugh through ironic contrast, or to "get attention" in the words of *Campbell*. *Campbell*, 510 U.S. at 580. Even if, however, Defendants had demonstrated some minor parodic or transformative element of Jew related to Star, the strength of any such element is far outweighed by the nonparodic elements discussed above. Indeed, it is indisputable that the predominant purposes of Jew are wholly unrelated to commentary on Star: to provide entertainment and to ridicule bigotry and anti-Semitism.

        d.      Defendants' use is commercial

Although never dispositive, the commercial nature of Defendants' use is relevant to the first factor inquiry, and should be given weight in light of the lack of parodic or transformative purpose for Jew. *Campbell*, 510 U.S. at 579, 584-84. Notably, in this case Jew has been used not only in connection with the broadcast and DVD distribution of the Weinstein Episode, but also has been

performed on stage at live shows orchestrated by MacFarlane.    (Bourne Statement ¶ 109).

Moreover, the Weinstein Episode is prominently featured on the packaging for the DVDs including

the Episode, and the status of the Episode as having been initially banned from broadcast by Fox (in

part due to the controversial nature of Jew) is used as a selling point.  (Bourne Statement ¶ 104).

<ol start="3">
<li>The nature of the copyrighted work</li>
</ol>

The second factor, the nature of the copyrighted work, recognizes that fair use is less likely to be

found where the plaintiff's work is creative or fictional as opposed to factual.  *Campbell*, 510 U.S. 510

at 586; *Twin Peaks*, 996 F.2d at 1376.  Although this factor carries less weight against highly

transformative uses, the fictional or creative nature of Star weighs strongly in Bourne's favor in this

case because Defendants' use not transformative or "is at best minimally transformative."  *Castle*

*Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 144 (2d Cir. 1998).

<ol start="4">
<li>The amount and substantiality of the portion used in relation to the copyrighted work as a whole</li>
</ol>

Post-*Campbell*, the Second Circuit has instructed that the third factor "inquiry must focus upon

whether '[t]he extent of . . . copying' 'is consistent with or more than necessary to further 'the

purpose and character of the use.'"  *Castle Rock*, 150 F.3d at 144 (*quoting Campbell*, 510 U.S. at 586-

87).  The relevant inquiry, as set forth in the plain language of the statute, is into the amount taken in

relation to Star as a whole, not in relation to Jew, because "no plagiarist can excuse the wrong by

showing how much of his work he did not pirate."  *Harper & Row,*  471 U.S. at 566 *quoting Sheldon v.*

*Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936)).

Parodies are given a slightly relaxed standard for the third factor, in recognition that when a

parodist takes aim at a work, the need to evoke the original requires that the parodist use at least

enough to evoke that work.  *Campbell*, 510 U.S. at 588.  Fair use does not, however, entitle a parodist

to make the best parody possible if that involves copying significantly more than necessary for the

public to recognize the original as the object of the parody.  *Walt Disney Prods. v. Air Pirates*, 581 F.2d

751, 758 (9th Cir. 1978).  As shown above, Jew is not a parody and does not ridicule Star, but is a

satire and therefore enjoys no such relaxed standard.  Moreover, even if Jew had some minor,

secondary parodic purpose, *Campbell* teaches that the amount allowed beyond the minimum necessary must always be reasonable and "will depend, say, on the extent to which the song's overriding purpose and character is to parody the original . . .." *Campbell*, 510 U.S. at 588. Moreover, because the justification for allowing parodists to quote from the target of their parodies is based upon the need to evoke the original, the more famous the original, the less taking is necessary and therefore allowed. *Walt Disney Prods.* 581 F.2d at 757-58.

> a.   The composer of I Need a Jew admits that the final version of I Need a Jew took more of When You Wish Upon a Star than was necessary to create an effective parody

Surprisingly, in their summary judgment papers, Defendants submit no testimony from, or otherwise mention Defendant Walter Murphy, the composer of Jew. This glaring omission is explained by the fact that Murphy's testimony is devastating to Defendants' fair use argument. Initially, the lyrics to Jew were conceived and written to be sung to the precise music of Star. (Bourne Statement ¶ 11). Thus, the first version of Jew was musically identical to Star. It was only after Bourne denied a license for that use that MacFarlane approached Murphy and instructed him to write sound-alike music to accompany Jew's lyrics. (Bourne Statement ¶¶ 11-12). Murphy complied, and composed the next version of Jew, the Leadsheet Version, which MacFarlane initially approved and recorded with Murphy. (Bourne Statement ¶¶ 13, 14; Pl. Ex. 3).

Later, however, MacFarlane or Zuckerman instructed Murphy to create another version of Jew that would sound even more similar to Star. (Bourne Statement ¶ 14). Murphy testified that he was uncomfortable with the request, so MacFarlane made the changes himself by singing them to Murphy and directed him to alter the score:

> Q.   When you were given your instructions to write the song, were you instructed to write something that would evoke the particular melody of "When You Wish Upon A Star"?
>
> A.   Actually, after I -- afterwards. I wrote this particular version of the melody and Seth sang it. And sometime after that -- I can't remember the sequence of events exactly -- either Seth or his partner David Zuckerman mentioned to me that they would like the melody to be **even closer to the Disney song** and I said that I had to be careful because I have an agreement with Fox that I provide unique music. And so I didn't want to use any portion of the Disney song, and later on, Seth sang

another version of it, and changed a few notes here and there to make -- to make the average person realize that this was going to be a parody.

Q.   And he did he do that by making the song closer to "When You Wish Upon A Star" the melody of "When You Wish Upon A Star"?

A.   Yeah, he changed a few notes at the beginning of each verse that made it a little closer so that the -- he felt that the average audience member would realize that this is a parody.

Q.   So Seth wrote that part of the final melody as opposed to you?

A.   Yes.

(Bourne Statement ¶ 13) (emphasis added).  Tellingly, when asked whether the less similar Leadsheet Version was sufficient to achieve the allegedly parodic effect of the song,  Murphy testified that it was.  (Bourne Statement ¶ 85).  When the composer himself admits that more was taken than was necessary, over his objections, there can be no question that Defendants took more than was reasonably necessary, even if the purpose had truly been to ridicule Star.

  b.    Bourne's musicologist corroborates Murphy's testimony and independently establishes that far more was taken than was reasonably necessary

That Defendants took far too much is easily established by comparison to *Campbell*.  In that case, where the Supreme Court found a clear parodic purpose and there was no object of ridicule identified other than the plaintiff's song, the defendants used a tiny fraction of the original.  Only one, five-word line of the lyric was taken, which the Court found insubstantial and no more than necessary.  *Campbell*, 510 U.S. at 589.  The only musical element taken was the well known eight-note opening bass riff, the song's identifying signature, which was repeated at various points in the song.  *Id.*  Thus, in the defendants' rap song none of the original song's vocal melody, structure, harmony or rhythm was taken.  Even with such a slight musical taking, however, the Court did not find the amount to be reasonable under the third factor, nor did the Court find fair use.  Instead, the case was reversed and remanded for further consideration of, *inter alia*, whether taking the eight-note bass riff was too much in light of the song's parodic purpose.  *Campbell*, 510 U.S. at 589.

In this case, Defendants took substantially from every musical element of Star, as described by expert musicologist, Sandy Wilbur.  (Bourne Statement ¶¶ 74-84).  Jew begins with and repeats a

verbatim copy of most of melody's opening "hook" contained in the first two measures of Star, which is Star's "identifying signature" akin to "Pretty Woman"'s bass riff.  (Bourne Statement ¶ 74). Defendants acknowledge that this hook is the most memorable part of Star, and powerfully evokes Star.  (Def. Brief at 19).  If Defendants had limited their taking to this hook to evoke Star and then gone in another musical direction as the defendants did in *Campbell* and *Abilene Music*, perhaps they would have an argument on the third factor.  In fact, however, they have taken much more. Defendants again attempt to mislead the Court by claiming that Wilbur testified that Defendants' use of the hook is "primarily responsible for evoking [Star] in the listener's mind." (Def. Brief at 19 (citing Wilbur Dep. 52-53)).  The cited testimony says nothing of the sort, but merely contains Wilbur's statement that Jew copies the first four notes of the hook.  (Rimokh Decl. Ex. F, pp. 52-53).  Contrary to Defendants' claim, Wilbur has identified an overwhelming number of similarities between the two songs beyond Defendants' taking of what they acknowledge to be the heart of Star. Indeed, she testified that one way Defendants could have evoked Star without taking so much would have been to use the first four measures of Star and then avoid taking other components of the song. (Bourne Statement ¶ 88).

   Although the first four notes of the opening hook in each song are melodically identical and repeated throughout both songs, that does not mean that the remaining three notes of the hook are dissimilar.  While Jew alters those notes slightly, Jew's notes are in harmony with those in Star, allowing the listener to "hear" the expected notes from Star in the mind without being disturbed or surprised by a discordant note.  (Bourne Statement ¶ 76).  The entire seven-note hook is therefore similar, and is repeated throughout Jew.  (*Id.*).   The identical intervallic pattern of the first four notes of Star's hook, starting on a different note, is also repeated throughout Jew.  (Bourne Statement ¶ 75).  Indeed, most of Jew's slight melodic changes made to Star remain similar to Star, because those changes either substitute related harmony notes or merely invert the melodic contour of a musical phrase in the original.  (Bourne Statement ¶¶ 76-77).  Jew also takes almost all of the rhythm and structure of Star, which is not surprising because the lyrics were written to be sung to the exact melody of Star.  (Bourne Statement ¶¶ 77, 79-80).  The two songs end with the identical musical

phrase. (Bourne Statement ¶ 83). In addition to the obvious melodic taking, Jew takes most of Star's harmonic content. Over 75% of the chords in Jew are either identical to those in Star or share the same basic notes. (Bourne Statement ¶ 78). Both songs contain the same number of notes, and are of nearly identical duration. (Bourne Statement ¶ 80). Wilbur also identified various similarities in the rhythm and rhyme of the lyrics of Jew and Star. (Bourne Statement ¶ 79).

These undisputed similarities go far beyond those in *Campbell*, where the Court did not find that a much smaller taking was reasonable. Moreover, Wilbur testified as to numerous ways that Jew could have taken less while still evoking Star. (Bourne Statement ¶¶ 87-88). Wilbur also examined the earlier version of Jew composed by Murphy and determined that it took less from Star while evoking Star, an opinion shared by Jew's composer. (Bourne Statement ¶ 86).

It is, therefore, undisputed that Defendants took more than necessary, the applicable standard for a non-parody. Even if Jew truly were a parody instead of a satire, however, Defendants clearly took far more than was reasonable.

> c. Defendants have introduced no admissible evidence on the third factor

Defendants have completely failed their burden of proof on the third factor because they have introduced no admissible evidence of their own on this point. *Chicago Bd. Of Educ.* 354 F.3d at 629 (affirming summary judgment for plaintiff where defendant raised fair use defense but offered to evidence that it took no more than was reasonably necessary).

Although they do not rely on it in their brief or Rule 56.1 Statement, Defendants have filed a declaration from their musicologist, Dr. Ferarra, in which he in passing makes the statement that Jew did not take an unreasonable amount from Star. (Ferrara Decl. ¶¶ 4, 12). These conclusory statements are not based upon any analysis presented to the Court. More important, this opinion was not disclosed in Ferrara's expert report and would therefore be inadmissible even if it were supported by any valid analysis. *In re Motel 6 Secs. Litig.*, 161 F. Supp. 2d 227, 243 (S.D.N.Y. 2001) (excluding an expert's affidavit submitted along with motion papers, but after discovery, where the affidavit "contain[ed] evidence beyond the scope of his expert report," and discussing the self-

executing and automatic sanction of exclusion "that is designed to provide a strong inducement for disclosure of relevant material that the disclosing party expects to use as evidence."); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603 (S.D. Tex. 2001) (holding that "[a] subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report."); *Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 34 (1st Cir. 1999).

Further, Ferrara's other opinions, regarding the similarity of the songs, are not credible. He only credits the two songs as being at all similar when they are identical, ignoring many of the ways in which Jew copies Star. (Bourne Statement ¶¶ 93-94, 96). Rather than rely on Defendants' access to the actual score for Jew prepared by the song's composer, Ferrara created a highly subjective transcription of the song, in which he identifies various chords in ways calculated to make them seem different when in fact they are similar. Notably, Wilbur's chord notations often agree with Murphy's score when Ferrara's do not. (Bourne Statement ¶ 96). Ferrara exacerbates this problem by considering two chords as completely different even when the chords are related and differ only by one note. (*Id.*). Ferrara also errs by including an irrelevant Interlude composition, which has no counterpart in Star, as part of the quantitative analysis, giving the false impression that less of Star was taken. (Bourne Statement ¶ 92). This methodology is wrong on at least two counts. First, the third factor analysis is meant to compare how much of Star was taken in relation to the totality of Star, not Jew. *Harper & Row*, 471 U.S. at 566. Second, Jew's composer testified that the Interlude is actually a separate composition, and is not considered part of Jew. (Bourne Statement ¶ 82). But Ferrara would not know that because amazingly, he never once communicated with Murphy in the course of performing his musicological analysis. (Bourne Statement ¶ 90). It is similarly incomprehensible that Ferrara did not consider the similarities in the songs' respective lyrics in doing his analysis. (Bourne Statement ¶ 98). As Wilbur's undisputed testimony makes clear, there are many similarities between the rhythm and rhyme of the two sets of lyrics. (Bourne Statement ¶ 79). Finally, Dr Ferrara's actual conclusion, that there was no "wholesale taking" of Star, aside from being flat-out wrong, is also irrelevant to the third factor inquiry. A taking need not be "wholesale" (whatever that means) to be unreasonable.

5.    The effect of the use upon the potential market for or the value of the copyrighted work

The fourth factor examines the effect of the use upon the potential market for or value of Star. 17 U.S.C. § 107.  In performing this analysis, the focus is not limited to Defendants' use alone, but also inquires whether that type of use, if it should become widespread, would negatively affect the *potential* market for Star, including potential markets not only for Star itself, but also markets for the licensing of derivative works based upon Star.  *Campbell*, 510 U.S. at 592-93; *Harper & Row* 471 U.S. at 568.  Effect on derivative work licensing revenues should be considered not only for established licensing markets, but also potential markets that music publishers might generally develop or license others to develop.  *Campbell*, 510 U.S. at 592; *American Geophysical,* 60 F.3d at 929-30.  A narrow exception to the consideration of derivative markets exists for the licensing of works that are critical of the original, such as true parody, in recognition of the fact that copyright owners are not likely to ever license derivative works that criticize their originals.  *Campbell*, 510 U.S. at 592; *American Geophysical*, 60 F.3d at 930.  Even with respect to parodies, however, if there is any other purpose of the use other than pure parody, licensing markets for those purposes must be considered.  *Campbell*, 510 U.S. at 592-93.

a.    Widespread uses similar to I Need a Jew would harm established and potential markets for derivative works using When You Wish Upon a Star

Bourne has introduced substantial evidence that, if widespread, unlicensed uses of Star for use in comedic works like Defendants' would have a negative effect on Bourne's licensing revenues.  Star is a classic song.  Since it was released in the children's animated film *Pinocchio* in 1940, it has been recorded by well over 100 recording artists and has become a cultural treasure, epitomizing the wonders of childhood and the powers of love, hope and belief.  (Bourne Statement ¶¶ 4-5).  The American Film Institute recently ranked Star as seventh in its 100 Greatest Songs in Film History. (Bourne Statement ¶ 5).  Star has been consistently and widely licensed for various derivative uses since 1940, including many "synchronization" uses, where (like in the Weinstein Episode) the song is used within a movie, commercial, television show or other audiovisual work.  (Bourne Statement

¶¶ 6, 58)  Such licenses are a crucial part of the income from a song, particularly once the song becomes famous and widely associated with a particular theme, as Star has become with the themes of wholesomeness and sweetness.  (Bourne Statement ¶ 44).

Star has frequently been licensed for synchronization use in comedy programs, including when the song has been used in sketches for comedic effect.  (Bourne Statement ¶ 63).  Consequently, there is an established market for comedic synchronization uses of Star.   (Bourne Statement ¶ 64).  There is also an established market for licensed derivative works that change the lyrics of popular songs.  (Bourne Statement ¶ 67).  Although Star has not yet been licensed in this way, other songs owned by Bourne have been and Bourne would certainly license a comedic or satiric use of Star with lyric changes, in appropriate circumstances.  (Bourne Statement ¶ 69).  Defendants admit that Family Guy itself has licensed songs to make lyric changes for use in the show, proving that there is an established market for such licensing.  (Bourne Statement ¶ 68).   Notably, Bourne has licensed several other famous songs for fairly irreverent comedic uses on Family Guy.  (Bourne Statement ¶ 70).  If these types of licensees were allowed to use Star without paying a license, as Defendants did, the loss in license fees would obviously cause harm to the market for Star.  Invading the legitimate derivative work market of the original weighs heavily against a finding of fair use.  *Campbell*, 510 U.S. at 592-93 (remanding for further proceedings to determine effect on market for rap versions of original song); *Twin Peaks* 996 F.2d at 1377; *American Geophysical*, 60 F.3d at 929 ("It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work . . . and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor.") (citations omitted).  There can be no dispute that the Family Guy Episode, and widespread similar unlicensed uses, would substitute for and compete with licensed comedic programs, in addition to depriving Bourne of significant licensing revenue. (Bourne Statement ¶¶ 71-73).

In addition to the harmful effect on its derivative licensing market, Bourne has also established harm to the value of the song, which by extension causes a separate harm to Bourne's derivative licensing market.  *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 202 (3d Cir. 2003)

(examining harm to value of copyright, in addition to market harm, as directed by statute). That harm is caused by Defendants' association of Star's famous music with the highly offensive lyrics of Jew. In the music licensing market, potential licensees choose songs to license, and value those licenses, based upon the public's association of a given song with particular themes and, at least in part, on the song's reputation. (Bourne Statement ¶ 44). In particular, potential licensees often choose not to license a song that has become controversial or otherwise has negative connotations in the mind of the public. (Bourne Statement ¶¶ 45-46). Bourne introduced unrefuted expert testimony that Jew's association of Star with the lyrics and context of Jew, especially if similar uses were widespread, would likely cause Bourne to lose licensing opportunities and, therefore, revenues. (Bourne Statement ¶ 47, 59-60).

Irrespective of the comedic merits of Jew, it is unquestionable that Jew would be highly offensive to a significant number of people. Indeed, Fox's Director of Standards and Practices testified that every person asked to review the Episode during the clearance process found the song highly objectionable, including both rabbis asked to review the Episode. (Bourne Statement ¶ 40, 51). Due to the highly offensive nature of the Episode, including Jew, Fox initially refused to air the Episode and it remained unseen by the public for years. (Bourne Statement ¶¶ 52-53). When finally aired, the lyrics were changed for broadcast to change the line "Even though they killed by lord" to "I don't think they killed my lord." (Bourne Statement ¶ 55). It is worth noting that when the Episode was released on DVD, the more offensive line, blaming Jews for killing Jesus Christ, was reinstated, likely to capitalize on the controversial nature of the previously unaired Episode. (Bourne Statement ¶ 57). The damage to the value of Star from its association with Jew's lyrics, which are in no way critical of or even related to Star, must be considered in the fourth factor analysis. *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,* 900 F. Supp. 1287, 1300 (C.D. Cal. 1995) ("[I]t is likely that James Bond's association with a low-end Honda model will threaten its value in the eyes of future upscale licensees.").

Defendants have introduced no affirmative or rebuttal evidence on the fourth factor, instead relying on (1) the principle that no harm from criticism of the original is recognized, and (2)

mischaracterizations of supposed "admissions" by Bourne that there can be no market harm.  As a preliminary matter, such an approach fails to meet Defendants' evidentiary burden on summary judgment, which the Supreme Court has recognized is fatal to Defendants' fair use defense:

> Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.  In moving for summary judgment, 2 Live Crew left themselves at just such a disadvantage when they failed to address the effect of the market for rap derivatives, and confined themselves to uncontroverted submissions that there was no likely effect on the market for the original.

*Campbell*, 510 U.S. at 590;  *id.* at 593-94 (denying summary judgment for defendants and remanding for further consideration of fourth factor); *Dr. Seuss* 109 F.3d at 1403 (finding no likelihood of success on fair use defense where defendant submitted no affirmative evidence on market harm).

Even putting aside Defendants' failure to meet their evidentiary burden, both of their arguments fail.  As demonstrated above, Jew is not a parody of Star because it does not ridicule Star, but instead ridicules the principal character's bigotry and ignorance.  *Supra* at 12-21.   The exception to recognizing derivative licensing markets for parody does not apply to non-critical work, such as works of satire like Jew.  *Campbell*, 510 U.S. at 592 n.22 (basing exception on fact that copyright owners are unlikely to license criticism of their own works, but expressly refusing to extend the exception to "derivative markets for works using elements of an original as vehicles for satire or amusement, making no comment on the original or criticism of it."); *Castle Rock* 150 F.3d at 145-46 (recognizing potential derivative licensing market harm from unlicensed trivia book based upon television series, even where plaintiff had no intent to license other such books, because trivia book did not negatively comment on or criticize original, but merely paid homage to program).

Moreover, even if there were some parodic content to Jew, *Campbell* teaches that any relevant non-parodic licensing market must be considered:

> In explaining why the law recognizes no derivative market for critical works, including parody, we have, of course, been speaking of the later work as if it had nothing but a critical aspect (*i.e.*, "parody pure and simple").  But the later work may have a more complex character, with effects not only in the arena of criticism but also in protectible markets for derivative works, too.  In that sort of case, the law looks beyond criticism to the other elements of the work, as it does here.  2 Live Crew's song comprises not only parody but also rap music, and the derivative market

> for rap music is a proper focus of enquiry.  Evidence of substantial harm to it would
> weigh against a finding of fair use, because the licensing of derivatives is an
> important economic incentive to the creation of originals.

*Campbell*, 510 U.S. at 592-93 (citations omitted).  In this case, the overwhelming if not sole purpose

of Jew is entertainment, and particularly comedy.  Bourne has introduced uncontroverted evidence,

noted above, of an established market for licensing the use of Star and other similar musical

compositions in comedic audiovisual works such as Family Guy.  Market harm, if unlicensed use

were widespread, is therefore undisputed.

Defendant's allegation that Bourne has somehow admitted the lack of fourth factor harm is

flatly wrong and based upon gross mischaracterization of the record.  (Def. Brief at 22-23).  As

demonstrated above, Bourne has introduced significant evidence of harm to its derivative licensing

market that would occur from widespread uses similar to Defendants, and also to the value of Star.

The deposition testimony cited by Defendants merely acknowledges that a certain type of market

harm, direct substitution of a recording of Jew for a recording of Star, is unlikely.  Defendants'

absurdly narrow view of market harm is contrary to the statute and precedent.  Given that Jew is a

derivative work based upon Star, the most relevant market is the market for derivative works.  That

inquiry is not limited to whether someone wanting to license Star would license Jew instead, as

argued by Defendants. (Def. Brief at 23).  Rather, the question is whether widespread, unlicensed

derivative uses similar to Jew, *e.g.* comedic or satiric (and non-parodic) uses, would adversely affect

Bourne's licensing revenues.  *Campbell*, 510 U.S. at 590 ("It requires courts to consider not only the

extent of market harm caused by the particular actions of the alleged infringer, but also 'whether

unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a

substantially adverse impact on the potential market 'for the original . . . . [or] 'the market for

derivative works.'") (citations omitted); *Castle Rock*, 150 F.3d at 145-46 (finding derivative licensing

market harm); *American Geophysical*, 60 F.3d at 931 (holding plaintiff demonstrated substantial fourth

factor harm by showing that widespread use similar to defendant would cause lost licensing

revenue).  Certainly, Family Guy and other unlicensed comedy programs using Star may substitute

for and compete with the many licensed comedy programs using Star.  (Bourne Statement ¶¶ 71-73).

Moreover, the offensive nature of Jew, itself, has likely harmed the value of Star in the derivative licensing market.  (Bourne Statement ¶ 73).  Bourne has amply demonstrated fourth factor harm, as set forth above.

6.    Balancing the fair use factors

Based upon uncontested facts, Bourne has established that Jew is not a parody because it does not criticize or ridicule Star.  Even if some slight parodic purpose could be reasonably perceived (it cannot), such purpose would be slight in relation to the dominant non-transformative entertainment and satiric purposes of Jew.  When the commercial nature of Defendants' use is added to the mix, the overall first factor weighs strongly in Bourne's favor.  The second factor weighs in Bourne's favor due to the creative and fictional nature of Star.  With respect to the third factor, Jew's own composer agrees with Bourne's expert and admits that more of Star was taken than was necessary (over his objection and fear of infringement), even to achieve a parodic effect.  Not only could have Defendants taken significantly less, they did, in fact, produce an earlier version that took far less yet still conjured up Star.  The third factor therefore weighs decisively against fair use.  Finally, Bourne adduced substantial, unrebutted evidence that Jew has hurt the value of Star, and that unrestricted and widespread use similar to Jew would have a substantial adverse impact on Bourne's derivative licensing market.  The fourth factor also weighs decisively against fair use.  With all four factors weighing in its favor, Bourne is entitled to summary judgment on Defendants' fair use defense.

**D.    Statute of Limitations, Waiver and Laches**

In cases of continuing infringement, the statute of limitations in copyright infringement actions cannot bar a finding of liability until after the infringing activity ceases.  *Stone v. Williams*, 970 F.2d 1043, 1049-1050 (2d Cir. 1992).  In such continuing infringement scenarios, the statute only limits the period of damages recovery, not the right to a finding of liability.  *Id.*  Defendants therefore cannot avoid summary judgment on liability because they continue to perform, copy and distribute the infringing Episode.  Moreover, the limitations period is three years from when Bourne discovered the infringement, subject to the standard of reasonable diligence.  *Id.* at 1048; *Ackoff-Ortega v. Windswept Pac. Entm't Co.*, 120 F. Supp. 2d 273, 279-280 (S.D.N.Y. 2000).  It is undisputed

that Bourne did not discover the infringing song until March of 2007.  (Bourne Statement ¶ 112).

Bourne has a policy of looking for infringements shortly after a license is declined, but in this case

the infringing Episode was not released for several years after the license was declined.  (Bourne

Statement ¶ 111).  The Episode was first aired late at night on a minor cable network, and was only

broadcast once on Fox's network channel.   (Bourne Statement ¶ 115).  There is simply no evidence

that Bourne's delay in discovering the infringement was due to any lack of reasonable diligence.

Bourne protested to Fox promptly after discovering the infringement and filed suit shortly

thereafter.  (Bourne Statement ¶ 116).  Thus, this action was filed well within the three-year statute

of limitations.

To prevail on a waiver defense, Defendants must prove that Bourne knowingly and intentionally

relinquished its claim against Defendants.  *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F2d 34, 40

(2d Cir. 1986); *Price v. Fox Entm't Group, Inc.,* No. 05-5259 2007 WL 241387, at *4 (S.D.N.Y. Jan. 26,

2007); *Penguin Books USA, Inc. v. New Christian Church of Full Endeavor, Ltd.,* No. 96-4126, 2000 WL

1028634, at *20 (S.D.N.Y. July 25, 2000).  It is undisputed that Bourne denied Fox a license and

protested within two months of learning of the infringement.  Defendants cannot possibly show any

evidence that Bourne had any intent to waive its claim.

To prevail on laches, Defendants must show that they have suffered prejudice as the result of

Bourne's unreasonable and inexcusable delay.  *New Era Publrs. Int'l v. Henry Holt & Co.,* 873 F.2d

576, 584 (2d Cir. 1989). As a preliminary matter, laches operates only as a bar to injunctive relief,

and not to liability or damages.  *Id.*  Moreover, laches is an equitable common law doctrine, meant to

provide a limitations period in the absence of a statutory period.  *Ivani Contr. Corp. v. City of New*

York, 103 F.3d 257, 259-60 (2d Cir. 1997).  Consequently, the statutory limitations provision in the

Copyright Act generally precludes the availability of a laches defense in copyright cases.  *Price,* 2007

WL 241387, at *3.  The only exception, recognized in some cases, applies in cases of continuing

infringement where the plaintiff had actual knowledge of the infringement for many years prior to

bringing suit.  *Id.*  Given the speed with which Bourne protested and brought suit in this case after

learning of the infringement, no reasonable juror could find that Bourne unreasonably delayed after

actual knowledge.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR FAIR USE DEFENSE

As established above, Bourne is entitled to summary judgment on liability, including the subsidiary issue of fair use. Even if, however, Bourne is not entitled to summary judgment, it has at the very least raised material questions of fact relevant to Defendants' fair use defense.

### A. The Purpose and Character of the Use

As demonstrated above, the testimony of Defendants' own witnesses indicates that Jew was not intended to criticize or ridicule Star. *Supra* at 12-23. Even if not dispositive in Bourne's favor, this admissions are sufficient to allow a reasonable jury to find that Jew is not a parody, or at least has only a very minor parodic component. In addition, Defendants offer conflicting testimony regarding whether Walt Disney's alleged anti-Semitism was a target of Jew. Indeed, the Episode's writer, when asked to list all of the thing the song made fun of, did not even mention Walt Disney. The testimony establishes that this rationale for using Star was never discussed until after the song was written and in production, and was never given as a justification during the standards and practices review for the Episode. Nor was this after-the-fact justification mentioned in the DVD commentary for the Episode. *Supra* at 17-20. This evidence at least raises material facts with respect to Defendants' claim of parody.

### B. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

In *Campbell*, even after finding that the defendants' song was a clear parody, and where all that was taken was an eight-note bass riff, the Supreme Court refused to find that the third factor favored fair use as a matter of law, and instead remanded for further fact finding on that issue. *Campbell*, 510 U.S. at 589. In this case, there is little or no parodic component to Jew, and Jew took far more from Star than did the defendants' song in *Campbell*. *Supra* at 24-30. Even if Defendants' expert testimony on the third factor is credited, that testimony at best raises a fact question when contrasted with the overwhelming evidence submitted by Bourne's expert musicologist and

corroborated by the testimony of Star's composer.

    **C.**    <u>**The Effect of the Use on the Potential Market For or the Value of the Copyrighted Work**</u>

In *Campbell*, the Court refused to find that the fourth factor favored fair use where the defendants failed to introduce any affirmative evidence establishing lack of market harm for derivative markets related to the non-parodic elements of the defendants' song. *Campbell*, 510 U.S at 593-94. Defendants in this case have similarly failed to introduce any evidence. Unlike the plaintiff in *Campbell*, Bourne has introduced substantial evidence showing market harm. *Supra* at 30-35. Under these circumstances, Bourne should be entitled to summary judgment in it favor. At the very least, however, Bourne has raised questions of fact sufficient to allow a reasonable jury to find in its favor on the fourth factor.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff Bourne. respectfully requests that the Court grant summary judgment in favor of Bourne as to liability. Alternatively, Bourne requests that the Court deny Defendants' motion for summary judgment on fair use and allow the parties to proceed to discovery on remedies and to trial.

                                     Respectfully submitted,

Date: May 23, 2008                     s/Paul M. Fakler_____
                                     Paul M. Fakler  (PF-0249)
                                     Ross Charap  (RC-2584)
                                     Julie Stark  (JS-8925)
                                     Amanda J. Schaffer  (AS-2004)
                                     MOSES & SINGER LLP
                                     405 Lexington Avenue
                                     New York, New York 10174-1299
                                     Tel.: 212-554-7800
                                     Fax: 212-554-7700
                                     pfakler@mosessinger.com
                                     *Attorneys for Plaintiff, Bourne Co.*