Paul M. Fakler  (PF-0249)
Ross Charap  (RC-2584)
Julie Stark  (JS-8925)
Amanda J. Schaffer  (AS-2004)
MOSES & SINGER LLP
405 Lexington Avenue
New York, New York 10174-1299
Tel.: 212-554-7800
Fax: 212-554-7700
pfakler@mosessinger.com
*Attorneys for Plaintiff, Bourne Co.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                   :

BOURNE CO.,                              :
                                   :

             Plaintiff,             :
                                   :      07 Civ. 8580 (DAB)

    - against -                :
                                   :      **PLAINTIFF'S**
TWENTIETH CENTURY FOX FILM      :      **LOCAL RULE 56.1**
CORPORATION, FOX BROADCASTING   :      **STATEMENT OF**
COMPANY, TWENTIETH CENTURY FOX   :      **UNDISPUTED FACTS AND**
TELEVISION, INC., TWENTIETH CENTURY  :      **COUNTERSTATEMENT**
FOX HOME ENTERTAINMENT, INC., FUZZY  :      **OF DISPUTED FACTS**
DOOR PRODUCTIONS, INC., THE CARTOON  :
NETWORK, INC., SETH MACFARLANE,    :
WALTER MURPHY,                  :
                                   :
             Defendants.       :
-------------------------------------------------------------- X

       Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, Plaintiff Bourne Co. ("Bourne"), by its attorneys, Moses & Singer

LLP, submits this Rule 56.1 Statement of Undisputed Facts in support of its Motion for Summary

Judgment on Liability and in Opposition to Defendants' Motion for Summary Judgment on Fair

Use.

## PLAINITFF'S STATEMENT OF UNDISPUTED FACTS

**PLAINITFF'S SONG**

1.      "When You Wish Upon a Star" ("Star"), written by Leigh Harline and Ned Washington, is one of the most famous songs of all time. The song was originally written for the classic Walt Disney film, "Pinocchio" in which it was sung by Cliff Edwards as the voice of the character Jiminy Cricket. (Berrocal Decl. ¶ 3; Soroka Decl. ¶ 30; Horan Decl. ¶ 11).

2.      Plaintiff Bourne was founded in 1919 and is one of the world's largest international music publishing companies. (Berrocal Decl. ¶ 2).

3.      Bourne owns the copyright registrations for the unpublished version of Star, the published version of Star, as included in the film "Pinocchio," the published sheet music for Star and may other arrangements of the song. (Berrocal Decl. ¶¶ 5-10).

4.      Since then Star has become a standard. The beautiful and heartfelt lyrics are known the world over, epitomizing the wonders of childhood and the powers of love, hope and belief. Over 100 performing artists and orchestras --from Rosemary Clooney to N Sync --have recorded Star in order to share its message of wholesome hopefulness and reward with their fans. (Berrocal Decl. ¶¶ 11-13; Soroka Decl. ¶¶ 31-33; Horan Decl. ¶ 11; Fakler Decl. Ex. E (Ferrara Tr. 61:3-5)).

5.      The American Film Institute, in recognition of songs that have "captured the nation's heart, echoed beyond the walls of a movie theater, and ultimately stand in our collective memory," ranked Star seventh in its list of the top one hundred movie songs of all time. Star is recognized worldwide as a classic and a cultural treasure. (Berrocal Decl. ¶ 12; Soroka Decl. ¶ 30).

6.      Star has also been used extensively in commercials, television and film. (Berrocal Decl. ¶ 13; Horan Decl. ¶ 11).

**DEFENDANTS' INFRINGMENT**

**The Defendants**

7.      Defendants Seth MacFarlane ("MacFarlane"), Fuzzy Door Productions, Inc. ("Fuzzy Door"), Twentieth Century Fox Film Corporation ("Fox Film") and Defendant Twentieth Century Fox Television ("Fox Television") (a unit of Defendant Fox Broadcasting Company ("Fox Broadcasting")) (hereinafter "Fox") create and produce an animated television series called "The Family Guy" or "Family Guy" (hereinafter "Family Guy") including an Episode entitled "When You Wish Upon a Weinstein" (hereinafter the "Episode"). (Answer ¶¶ 23-24; Fakler Decl. Ex. D (MacFarlane Tr. 9:8-10:11)); MacFarlane Decl. ¶ 1).

8.      Defendant The Cartoon Network, Inc. ("Cartoon Network") first aired the Episode as part of its late-night Adult-Swim programming in November 2003 and has telecast the Episode no less than 36 times. (Fakler Decl. Ex. I (Tingle-Heppner Tr. 14:12-23); Fakler Decl. Ex. G (Lazzo Tr. 10:22-11:2)).

9.      Defendant Walter Murphy ("Murphy") is a composer of television film scores for Family Guy and wrote the music for a song entitled "I Need a Jew" (hereinafter "Jew") that appears in the Episode. (Fakler Decl. Ex. A (Murphy Tr. 7:3-12, 8:2-9, 9:19-23. 11:10-19)).

**Defendants Were Not Authorized to Use Star
in the Episode or to Broadcast or Telecast Jew**

10.     Fox requested a license from Bourne to use Star to create Jew but Bourne denied the request. (Fakler Decl. Ex. F (Cavanaugh Tr. 6:2-7:3, 7:7-8:13, 9:7-13); Fakler Decl. Ex. D (MacFarlane Tr. 47:10-47:16, 70:10-17)); Fakler Decl. Ex. K, L. M (Murphy, MacFarlane and Fox Response to Pl. Request For Admission Nos. 5 and 6)).

**Jew Was Copied from Star**

11.     As originally written Jew was musically identical to Star just with different lyrics. (Fakler Decl. Ex. D (MacFarlane Tr. 48:21-49:3)), Fakler Decl. Ex. M (MacFarlane Response to Pl. Request for Admission Nos. 1-2)).

12.     After Bourne denied his license request for Star, MacFarlane and co-producer David Zuckerman ("Zuckerman") asked Murphy to write music similar to Star to go with the lyrics that had already been written.   (Fakler Decl. Ex. D (MacFarlane Tr. 49:4-18)).

13.     With Star in mind, Murphy wrote a version of Jew and made a recording of himself on piano with MacFarlane singing the vocal; this version of Jew is reflected in Murphy's Leadsheet. (Fakler Decl. Ex. A (Murphy Tr. 10:12-11:9; 13:9-19; 18:24-20:13)), Pl. Ex. 3 (Leadsheet) Fakler Decl. Ex. K (Murphy's Responses to Pl. Request for Admission Nos. 3-4)).

14.     Although MacFarlane initially approved the Leadsheet version, either MacFarlane or Zuckerman told Murphy to write another version of the melody to make it sound even closer to Star.  (Fakler Decl. Ex. A (Murphy Tr. 11:20-12:12)).

15.     Murphy voiced his concern about taking even more from Star to MacFarlane because his agreement with Fox states that he is to provide unique music.  (Fakler Decl. Ex. A (Murphy Tr. 12:16-19)).

16.     MacFarlane sang the changes he wanted made to Jew and insisted Murphy make them.  (Fakler Decl. Ex. A (Murphy Tr. 12:19-13:8)).

17.     This second version of Jew -- which is reflected in the Score -- is the one that was performed in the Episode and it is more similar to Star than is the Leadsheet version.  (Murphy

14:19-18:23; Pl. Ex. 2 (Score); Fakler Decl. Ex. K (Murphy's Responses to Plaintiff's Requests to Admit Nos. 45, 46)).

18.    Although the Leadsheet is significantly less similar to Star than the version of Jew ultimately used in the Episode, it was sufficient to evoke Star for the purpose of the intended "parody."  (Fakler Decl. Ex. A (Murphy Tr. 13:20-14:9)); Wilbur Decl. ¶ 54).

19.    The final version of Jew incorporates musical elements from Star, which make Jew sound similar to Star.  (MacFarlane, Murphy and Fox Requests for Admission Nos. 8 and 9).

20.    Jew was created in a manner intended to "evoke" Star.  (Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Requests for Admission No. 10)).

**<u>Jew is a Satire of Bigotry and Ignorance</u>**

21.    MacFarlane conceived the idea for the Episode when he realized that every time he made a significant purchase, he asked a Jewish friend to come with him to negotiate on his behalf. (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8)).

22.    The Episode's theme is that Peter Griffin, the Family Guy lead character, holds various bigoted ideas and stereotypes, such as that Jews are good with money, whine, and are responsible for killing Jesus Christ.  By the Episode's end he learns that his bigotry was wrong. (MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17); Pl. Ex. 3; Fakler Decl. Ex. D (MacFarlane Tr. 53:3-55:7); Fakler Decl. Ex. B (Blitt Tr. 17:18-18:2)).

23.    Jew is the centerpiece of the Episode and its lyrics are as follows:

> Nothing else has worked so far,
> So I'll wish upon a star,
> Wondrous dancing speck of light,
> I need a Jew.

> Lo is makes me take the rap,
> cause our check-book looks like crap,
> Since I can't give her a slap,
> I need a Jew.
>
> Where to fine a Baum or Steen or Stein
> to teach me how to whine and do my taxes?
>
> Though by many they're abhorred,
> Hebrew people I've adored.
> Even though they killed my Lord,
> I need a Jew. (PL. Exs. 2-3; MacFarlane Decl. Ex. A (Episode DVD))

24.     Jew was intended to hold bigotry up to ridicule, in particular Peter's tendency to be ignorant and biased about people different than he.  Making fun of Peter and his beliefs is often the theme of Family Guy episodes.  (Fakler Decl. Ex. D (MacFarlane Tr. 51:3-11, 53:3-18; 54:13-55:7)).

25.     The point of Jew is to illustrate Peter's ignorance.  (Fakler Decl. Ex. J (Zuckerman Tr. 25:19-26:2)).

26.     Ricky Blitt ("Blitt"), the writer of the Episode, said Jew was intended to be a joke about bigotry experienced in the context of the Episode.  (Fakler Decl. Ex. B (Blitt Tr. 15:11-16:16, 17:18-18:2, 21:22-22:21)).

**Jew is not a Parody of Star**

27.     When asked if Jew makes fun of Star, Blitt stated as follows:

> It's just weird because you can describe it in different ways.  It's not like -- there's a type of parody that is done when you are mercilessly trying to mock.  What you are doing here, it's more like you are using it in kind of a wink to evoke the other things that you are mocking with, you know, his ignorant views sung in that song.  It's like -- you know, it's not intended to skewer the song and just say we think it's a bad song and we're making fun of it.  It's the perfect song because it's of another era and it's a song about wishing, and usually you are working for world peace or the world to be perfect, and this guy is wishing for a Jew who is good with money to come into his life.  So it's like that's the juxtaposition that makes it funny, and, you know, it's just sort of like a direct through line that when you are parodying

something, you just need to put it in the perfect body or else it won't work, and that was the perfect body for us was the song. (Fakler Decl. Ex. B (Blitt Tr. 20:6-25)).

28.     Jew was meant to use the sweetness and wholesomeness of Star to contrast with Peter's racist and ignorant views about Jewish people to emphasize how wrong those views are. (Fakler Decl. Ex. B (Blitt Tr. 15:19-16:16)).

29.     The viewpoint expressed in Jew's lyrics is being held up to ridicule, not the viewpoint of Star.  (Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4, 17:7-18:2, 19:14-20:19, 22:10-22:21); Fakler Decl. Ex. A (Murphy Tr. 30:10-32:16); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 26:3-13)).

30.     The Episode has been distributed on DVD with an accompanying commentary track in which MacFarlane, Blitt and others discuss the Episode, including all of its so-called "pop-culture" references.  Nowhere in their discussions does anyone state that Jew was intended to comment on or parody Star.  (Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A  Episode Commentary).

31.     There are no parodic musical devices in "Jew."  (Wilbur Decl. ¶ 95).

32.     Murphy, the composer of Jew was unable to identify any specific parodic musical devices in his own composition.  (Fakler Decl. Ex. A (Murphy Tr. 30:10-32:16)).

**Jew Does not Comment on Walt Disney or the Disney Company**

33.     When asked to list everything Jew is making fun of, Blitt, the writer of the Episode, did not mention Walt Disney.  (Fakler Decl. Ex. B (Blitt Tr. 20:1-21:20)).

34.     The notion of Jew making fun of Walt Disney's alleged anti-Semitism was not considered, if at all, until after the song was written and was considered an additional, unintended

joke.  (Fakler Decl. Ex. J (Zuckerman Tr. 24:7-21); Fakler Decl. Ex. D (MacFarlane Tr. 62:22-63:18)).

35.     In order to perceive a joke in Jew about Walt Disney, the viewers must associate Star with Walt Disney the person not the Disney Company and they must be aware of the rumors that was an anti-semite.  (Fakler Decl. Ex. D (MacFarlane Tr. 57:24-59:13, 61:19-22)).

36.     Walt Disney's alleged reputation as an anti-Semite is not explicitly referenced anywhere in "Jew."  (Fakler Decl. Ex. D (MacFarlane Tr. 60:19-61:19)).

37.     The Disney Company is not reputed to be anti-Semitic.  (Fakler Decl. Ex. D (MacFarlane Tr. 59:14-60:5)).

38.     The Fox Defendants have no basis for their allegation that Walt Disney was publicly known as an anti-Semite.  (Fakler Decl. Ex. H (Siegel-Shattuck Tr. 12:19-23)).

39.     Fox had "extreme anxiety" about the Episode offending the Jewish community and the approval process conducted by its "Standards and Practices" Department was more difficult than usual for the show.  (Fakler Decl. Ex. D (MacFarlane Tr. 24:5-19, 25:12-18)).

40.     The Episode went through numerous script changes, and was vetted by two rabbis, both of whom found Jew offensive.  In fact, Linda Shima-Tsuno, Fox's Director of Standards and Practices during the creation of the Episode, testified that everyone who reviewed the song had a problem with it.  (Fakler Decl. Ex. C (Shima-Tsuno Tr. 13:21-16:13)).

41.     Ms. Shima-Tsuno testified that throughout the review and revision process nobody from the Family Guy staff explained that the song was meant to ridicule Walt Disney's supposed anti-Semitism.  (Fakler Decl. Ex. C (Shima-Tsuno Tr. 19:6-9)).

42.     The only justification MacFarlane gave to Ms. Shima-Tsuno for the problematic content of the Episode was that the show was a satire holding bigotry and anti-Semitism up to ridicule.  (Fakler Decl. Ex. D (MacFarlane Tr. 26:24-27:9)).

43.     Neither MacFarlane, nor Blitt nor any anyone else on the DVD Episode commentary track says that Jew was meant to comment on or ridicule Walt Disney or the Disney Company.  In fact, Disney is never mentioned at all.  (Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admission Nos. 15 and 16); MacFarlane Decl. Ex. A Episode Commentary).

### Jew has Harmed the Market for Star

44.     Songwriters and their publishers earn income by licensing their songs.  There are several ways income is generated through licensing.  One important income stream comes from Synchronization Licenses (or "synch" licenses).  Synch licenses are especially important once the song becomes famous and widely associated with a particular theme, as Star has become with wholesomeness and sweetness. (Soroka Decl. ¶¶ 9-10, 12; Horan Decl. ¶ 12).

45.     Often, copyright owners will reject license requests because the context of the use is not up to their standards or values in some way and would, therefore, diminish the value of the song either monetarily or in the eyes of their fans.  (Soroka Decl. ¶¶ 21-28).

46.     Almost all music publishing and recording contracts provide some sort of approval over the use of their songs or recordings in so-called x-rated films or political advertisements, which is an indication that both sides acknowledge how detrimental to the value of the songs these types of uses can be if they conflict with the values of the writer or recording artist, and may offend the audience.  (Soroka Decl. ¶ 29).

47.     Jew is highly controversial and would be viewed as offensive and jolting by a broad cross-section of the viewing and listening public.  (Soroka Decl. ¶ 32).

48.     Because the Episode dealt with Jewish stereotypes, Fox believed it had the potential to be offensive to the Jewish community.  The Episode went through intensive scrutiny by Fox's Standards and Practices Department, which must approve any controversial content to be aired on the network.  This process included many communications between the Family Guy creative team and Linda Shima-Tsuno, the Director of Standards and Practices, in which Ms. Shima-Tsuno listed all of the problematic content in the Episode that Fox wanted cut, and Mssr MacFarlane and Zuckerman attempted to justify keeping that content. (Fakler Decl. Ex. C (Shima-Tsuno Tr. 8:3-14:3, 16:14-23; Pl. Exs. 11,12, 13,14, 15, 17, 18)).

49.     Fox went so far as to provide copies of the script to two rabbis for their input. (Fakler Decl. Ex. C (Shima-Tsuno Tr. 14:17-19:5); Pl. Exs. 17, 18, 19).

50.     Both rabbis that were shown a copy of the script for the Episode found Jew to be offensive.   (Fakler Decl. Ex. C (Shima-Tsuno Tr. 14:17:-18:17); Plaintiff's Ex. 19).

51.     In fact, Ms. Shima-Tsuno testified that everyone who heard Jew found it offensive. (Fakler Decl. Ex. C (Shima-Tsuno Tr. 16:6-13)).

52.     The Episode was not cleared during Season Two for broadcast because senior management felt it was "too potentially offensive."  (Fakler Decl. Ex. C (Shima-Tsuno Tr. 19:10-15)).

53.     Due to the highly offensive nature of the Episode, Fox initially refused to air the Episode and it remained unseen by the public for years.  (Fakler Decl. Ex. H (Siegel-Shattuck Tr. 10:3-11:2); Fakler Decl. Ex. G (Lazzo Tr. 10:17-11:2)).

54.     A Standards and Practices Executive for the Turner Entertainment Group had concerns about airing the Episode and commented that the Episode was "likely to offend some viewers." (Fakler Decl. Ex. I (Tingle-Heppner Tr. 15:16-16:18, 23:9-27:16); Pl. Ex. 39).

55.     When the Episode finally aired years later, one line about Jews was changed for broadcast from "even though they killed my lord" to "I don't think they killed my lord."  (Fakler Decl. Ex. D (MacFarlane Tr. 39:13-23, 45:1-24); Fakler Decl. Ex. I (Tingle-Heppner Tr. 18:18-27:16, 31:7-32:19); Pl. Exs. 21, 39).

56.     When TBS accidentally aired the Episode with the original lyrics, a viewer wrote TBS to let them know they were "very offended" by the lyrics.  (Fakler Decl. Ex. I (Tingle-Heppner Tr. 32:25-36:3); Pl. Ex. 40).

57.     Notably, when the Episode was released on DVD, the more offensive line, blaming Jews for killing Jesus Christ, was reinstated.  (MacFarlane Decl. Ex. A (DVD release of the Episode at time code 7:44-7:49-Chapter 2/6)).

58.     Star is a "standard" that is used worldwide for television, film, commercials, musical recordings, live performances and other uses.  It is an important source of income for Bourne. (Horan Decl. ¶ 11).

59.     Star has mainstream appeal and the mainstream market is the most lucrative segment of the market.  It is also the market most likely to be taken aback by a controversial and offensive

connection with a song, directly impacting the song's ability to still speak its message.  (Soroka Decl. ¶ 33).

60.    The offensive use of Star in the Episode has likely had and will continue to have a negative effect on the commercial value and licensing potential of this beloved song.  (Soroka Decl. ¶ 34).

61.    With respect to Defendants' particular use of Star, Bourne's problem is not that Jew contains funny lyrics or is satiric, Bourne is willing to grant these types of synch licenses for Star. However, Bourne must be certain that the licensed use will not tarnish or damage the image of the song in the mind of the public because this will harm the established markets for Star.  (Berrocal Decl. ¶¶ 15-18).

62.    The anti-Semitic content of Jew associates Star with highly offensive and hurtful lyrics.  This is precisely the kind of offensive comedic content Bourne does not want associated with Star and epitomizes a license request Bourne would reject.  (Berrocal Decl. ¶¶ 16-17; Horan Decl. ¶ 34).

63.    Star is frequently licensed for synchronization use in comedy programs, including when the song is used in sketches for comedic effect.  (Horan Decl. ¶¶ 13-16).

64.    Consequently, there is an established market for comedic synchronization uses of Star.  (Horan Decl. ¶¶ 13-16).

65.    Bourne also licenses many of its other songs for comedic uses.  (Horan Decl. ¶ 17).

66.     The comedic use of a song in synchronization with an audiovisual work can and often does include contrasting or "juxtaposition" the lyrics and theme of the song with the visuals playing on screen for a humorous effect.  (Horan Decl. ¶¶ 18-23).

67.     There is also an established licensing market for derivative works that change the lyrics to popular songs and Bourne issues these types of licenses as long as it is comfortable that the use will not harm the value of the song by, for example, creating negative associations with the song in the mind of the public.  (Horan Decl. ¶¶ 24-26).

68.     Defendants have obtained licenses to change lyrics to pre-existing musical compositions and use such altered musical compositions in episodes of Family Guy.  (Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions No. 43)).

69.     Although Star has not yet been licensed in this way, other songs owned by Bourne have and Bourne would certainly license a comedic or satiric use of Star with lyric changes, under appropriate circumstances.  (Horan Decl. ¶ 27).

70.     Bourne has licensed several songs for comedic use on Family Guy in scenes depicting or discussing various irreverent or provocative themes.  (Horan Decl. ¶¶ 28-32).

71.     If television shows and other similar potential licensees were allowed to use Star without paying for a license, as Defendants did, the cumulative loss in license fees would obviously cause harm to the market for Star.  Such unlicensed comedic uses would also compete with and substitute for Bourne's licensed comedic uses. (Horan Decl. ¶¶ 35-36).

72.     At any given point in time, there are only so many comedic uses for Star that will be made.  If one network sitcom, for example, were to use Star as part of a joke on the show during a

given season, a competing sitcom would avoid using Star so as not to appear as though they were copying the first show. That second sitcom, which would have paid a license fee, will now choose another song to include in the show. In other words, every time Star is used without a license, one less licensed use of Star may be made and that is one less license fee that Bourne will earn. It follows that unlicensed programs and movies using Star would compete directly with and substitute for Bourne's licensed programs and movies when distributed in the DVD and other home video markets. (Horan Decl. ¶¶ 35-36).

73.    If uses such as Defendants' unlicensed use were widespread, it would cause grave damage to Bourne's business. First, a greater number of highly offensive uses would further harm the reputation of Star. Second, Bourne would be deprived of licensing revenue to which it is entitled for such uses. Third, those unlicensed uses would compete with and substitute for Bourne's licensed comedic uses, suppressing demand for licensed uses. (Berrocal Decl. ¶ 18).

### Even if Jew were a Parody of Star it Took More Than Necessary to Accomplish the Parody

74.    The first four melody notes of Jew are identical to the first four melody notes of Star, and they are repeated in both songs, in the identical place -- at the beginning of the second section and again at the beginning of the last section. (Wilbur Decl. ¶¶ 25, 31, 33).

75.    The identical first four notes of Star and Jew are an ascending octave followed by a descending whole step then half step. This intervallic pattern is repeated -- although it starts on a different note -- in bars 3, 11, and 27 of "Jew." Despite the use of different pitches, however, bar 1 of Star and bars 3 (11 and 27) of Jew sound very similar and related. (Wilbur Decl. ¶ 26; 31, 33).

76.    In "Jew," the fifth, sixth and seventh melody notes in bar 2 harmonize with the corresponding notes in Star. This harmonizing occurs again in bar 4, after the repeat in Jew of the

intervallic pattern copied from Star.  Such harmonies are significant because after hearing the first four "identifying signature" notes of Star in "Jew," one will continue to hear Star in his or her mind while Jew is playing, without being disturbed or surprised by a discordant note.  (Wilbur Decl. ¶¶ 27, 31, 33).

77.     In addition to having similar melodies, the melodic contours of Jew and Star are related because they are either parallel or inverted.  Moreover, the melodic rhythm of Jew (in both the Leadsheet and the Score) is nearly identical to Star throughout the entire song.  (Wilbur Decl. ¶¶ 30, 32, 35).

78.     With respect to harmonic similarities, over 75% of the chords in Jew are either the same as or share the same basic notes as the corresponding chords in Star.  Indeed, with the exception of measures 21 and 22 in the B section of "Jew," all of Star can be sung using the chords found in Jew and vice versa.  (Wilbur Decl. ¶¶ 28, 36, 44-45).

79.     The lyric in Jew uses the words "wish upon a star" from the lyric and title of Star. The lyric of Jew also uses vowels that rhyme with the lyric of Star in at least nine places, there are at least six phrases in Jew which share the same rhythm and rhyme as the corresponding phrase in Star, and at least one phrase in Jew that shares the same internal rhyming pattern as the corresponding phrase in Star.  (Wilbur Decl. ¶¶ 29, 34, 94).

80.     Star and Jew are almost identical in structure and are comprised of the same four sections (A A1 B A2) which as between the songs differ from each other in only minor ways.  The songs have the same number of notes (95), and are nearly the same time duration (91 seconds for Star and 92 seconds for Jew).  Each individual sung section of Jew is nearly identical in length to Star.  (Wilbur Decl. ¶¶ 31, 37-38, 43).

81.     The interlude in Jew is musically unrelated to the rest of Jew and is a separate standalone piece. And, when one watches the Episode, it is clear that is simply an underscore to picture. (Wilbur Decl. ¶ 12, 91).

82.     Murphy, the composer of "Jew," confirmed the interlude in Jew is a different piece of music, and listed it as such on the cue sheet. (Fakler Decl. Ex. A (Murphy Tr. 21:23-24:2)); Pl. Ex. 4).

83.     The last two notes of Jew are identical, in pitch and rhythm, to the last two notes of the Cliff Edwards arrangement of Star as performed in the movie "Pinocchio," which is striking. Jew also copies some of the other performance elements of the Cliff Edwards arrangement of Star. (Wilbur Decl. ¶¶ 41-42).

84.     The chords in Jew and Star also use the same two chromatic devices, chord movement going from the diminished chord to the major chord and chord movement when three notes of three consecutive chords move chromatically, either up or down.   Both of these devices are very recognizable and add to the similarity of the songs. (Wilbur Decl. ¶¶ 46-48).

85.     Murphy's Leadsheet version of Jew sufficiently evoked the feeling of Star to convey the purported parody. (Fakler Decl. Ex. A (Murphy Tr. 13:17-14:9)); Wilbur Decl. ¶ 54).

86.     The Leadsheet version of Jew is less similar to Star than is the Score. (Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 45 and 46); (Fakler Decl. Ex. A (Murphy Tr.12:7-13:8; 19:2-21:18)), Compare Pl. Exs. 2 and 3; Wilbur Decl. ¶¶ 54-60, 77, 79).

87.    Given how musically similar Jew is to Star, Murphy could easily have written Jew in a way that took less of Star for a shorter duration of the song, while still reminding the listener of Star. (Wilbur Decl. ¶¶ 49, 51).

88.    The same first four measures of Jew could have been used after which Jew could have gone in another musical direction entirely.  In that scenario the composer would have evoked Star in the mind of the listener without using and repeating so much of its other creative content. (Wilbur Decl. ¶ 50).

89.    The Score accurately represents Jew as it appeared in the Episode.   (Wilbur Decl. ¶ 53; (Fakler Decl. Ex. A (Murphy Tr. 14:18-18:22)); Pl. Ex. 2 (Score)).

90.    Ferrara never communicated with Murphy concerning any element of Jew and did not even know the name of the song he had been hired to defend.  (Fakler Decl. Ex. E (Ferrara Tr. 13:13-14:9)).

91.    Ferrara had no basis for his opinion that an "upside down" melodic contour or descending notes made ascending with an inner melodic contour that moves up and down would sound "parodic" or funny to the average listener.   (Fakler Decl. Ex. E (Ferrara Tr. 137:11-144:23)).

92.    Ferrara includes the unrelated interlude in his transcription of Jew thereby adding over 50% more musical material that is unrelated to Jew to support his claim that Jew is "transformed" and therefore is "new musical expression."  Adding the interlude allows Ferrara to claim that Jew has a different structure --a "C" section -- and 157 notes rather than 95 (excluding the coda), thus diluting the percentage of identical rhythms and pitches he claims exists between Jew and Star.   (Ferrara Decl.  ¶¶ 6, 8, 10-11; Wilbur Decl.  ¶¶ 75,  85, 92).

93. Ferarra ignores that bars 3, 11 and 27 of Jew copy the intervallic pattern of the first four "identifying signature" notes of the hook of Star (ascending octave followed by descending whole step and half step). (Wilbur Decl. ¶¶ 62, 76).

94. Ferrara ignores that fifth, sixth and seventh notes of the hook of Star (in bar 2) harmonize and complement the corresponding notes in "Jew," and that this harmony between Star and Jew is repeated in bar 4 after Jew repeats the intervallic pattern of the first four identifying signature notes of Star. Ferrara also ignores that this four bar harmonic similarity between Jew and Star is repeated in all three A sections of both songs. (Wilbur Decl. ¶ 80).

95. Ferrara ignores that the melody of Jew and Star move in parallel for most of the B section of both songs and, because he ignores all lyrics, that the similarity between the two songs is enhanced by rhymes ("find" and "kind") and internal rhyming ("love" and "of" in Star versus "Stein" and "whine" in Jew), which appear in the identical place in both songs. (Wilbur Decl. ¶ 81).

96. Ferrara acknowledges only identically notated chords when comparing the chords of Jew and Star even though chords comprising identical notes can be represented in various, equally correct ways. Ferrara ignores many chords in Jew that contain virtually the same notes or that sound indistinguishable from the corresponding chord in Star. Ferrara also incorrectly notated certain chords in an attempt to make Jew and Star appear more different than they actually are. (Wilbur Decl. ¶¶ 63-74).

97. Ferrara transcribes performance elements from the Cliff Edwards version of Star from "Pinocchio" in order to make the two songs appear as different as possible. However, at his deposition Ferrara admitted that had he compared the Sheet Music to "Jew," there would have been many more rhythmic similarities, and indeed, he marked 68 notes with identical melodic rhythms

between Star and Jew.   (Wilbur Decl. ¶¶ 82-84, 86-88; Fakler Decl. Ex. E (Ferrara Tr. 120:24-128:9); Pl. Ex. 1 (Excerpted)).

98.     Ferrara excluded any analysis of the lyrics of Jew thereby ignoring the relationship of the words to the music of Jew, and the similarities between the words, rhymes, and rhythms of the lyrics of Jew and Star.  (Fakler Decl. Ex. E (Ferrara Tr. 8:21-12:23); Wilbur Decl. ¶ 93).

99.     There is no evidence that Star is based on the first seven notes of "Claire de Lune." (Wilbur Decl. ¶¶ 97-98).

**Cartoon Network's Infringement**

100.     The Episode was first aired by Cartoon Network on November 9, 2003.  (Fakler Decl. Ex. G (Lazzo Tr. 10:17-24), Defendants' 56.1 Statement ¶ 13).

101.     The Episode has aired 36 times since the initial air date.  (Fakler Decl. Ex. G (Lazzo Tr. 10:25-11:2)).

**Fox Home Entertainment's Infringement**

102.     The Episode, including "Jew," was first distributed on home video by Fox Home Entertainment on or about September 9, 2003 as part of the Family Guy Season Three DVD set, which has been continuously sold since that time.  The Episode and Infringing Song were again distributed on home video by Fox Home Entertainment on or about December 14, 2004 on the Family Guy – The Freakin' Sweet Collection DVD, which also has been continuously sold since that time.  (Defendants' 56.1 Statement ¶ 13).

103.     Jew has also been distributed in other media and formats, including PSP.   (Answer ¶ 28).

104.    The Episode is prominently featured on the packaging for the DVDs and the status of the Episode as having been initially banned from broadcast by Fox (in part due to the controversial nature of Jew) is used as a selling point.  (Fakler Decl. ¶ 31 Ex. O (copies of DVD sleeves); Fakler Decl. Ex. F (Cavanaugh Tr. 11:22-12:19); MacFarlane Decl. Ex. A (Commentary on DVD release of the Episode at time code 4:50-5:04 -Chapter 2/6)).

### Fox Television's and Fox Broadcasting's Infringement

105.    Defendants Fox Television broadcast the Episode on television at least once. (Answer ¶ 27; Fakler Decl. Ex. D (MacFarlane Tr. 41:7-13); Fakler Decl. Ex. H (Siegel-Shattuck Tr. 10:20-11:2); Defendants' 56.1 Statement ¶ 13).

### Fuzzy Door's Infringement

106.    Fuzzy Door is MacFarlane's production company and is involved in the production of "Family Guy."  Fuzzy Door has no employees and MacFarlane essentially is Fuzzy Door.  (Fakler Decl. Ex. D (MacFarlane Tr. 9:8-10:11)).

### MacFarlane's Infringement

107.    MacFarlane is the creator and executive producer of "Family Guy."  He was involved in and generally supervised the creation, development and production of the Episode. (MacFarlane Decl. ¶ 1).

108.    MacFarlane was involved in the writing of the lyrics and the music for Jew and he also performed "Jew."  (Fox Response to Interrogatory No. 4).

109.    Jew has been commercially exploited outside the context of the Episode, when MacFarlane performed Jew live on stage at a "Family Guy Live" show.  (Fakler Decl. Ex. D (MacFarlane Tr. 43:5-44:25)).

**Murphy's Infringement**

110.    Murphy wrote the music for "Jew."  (Fakler Decl. Ex. N (Fox Response to Interrogatory No. 4)).

**Bourne Discovers Defendants' Infringement**

111.    Typically, when Bourne rejects a license request, it monitors the requesting party or program to be sure that its song is not used without Bourne's permission, but in this case the infringing Episode did not air until several years after the license was declined.  (Horan Decl. ¶  2).

112.    Bourne did not discovery the use of Star in the Episode until March of 2007, when a Bourne Employee found a clip of Jew on the YouTube website.  (Horan Decl. ¶ 3).

113.    Bourne spent a brief time investigating the infringement and verifying that the no license was granted, after which it promptly instructed legal counsel to protest to Fox.  (Horan Decl. ¶¶ 4-9).

114.    Bourne attempted in good faith to negotiate a settlement with Fox for a few months, but after repeated delays by Fox Bourne filed this action in October of 2007.  (Horan Decl. ¶ 10).

115.    The Episode was first aired late at night on a minor cable network, and was only broadcast once on Fox's Network channel.  (Defendants' 56.1 Statement ¶ 13, Lazzo Tr. 24:6-28:1.)

116.    Bourne protested to Fox promptly after an investigatory period, and after Fox's repeated delays in responding to settlement requests, filed this action within 7 months of learning of the infringement.  (Horan Decl. ¶ 3-10).

### PLAINITFF'S COUNTERSTATEMENT OF DISPUTED FACTS

1.    Undisputed.

2.      Disputed.  Defendants cite no evidence that Walt Disney personally took the alleged "substantial steps" nor have they introduced any evidence that the song is associated in any way with Walt Disney personally.   The evidence cited, Plaintiff's Responses to Defendants' Request for Admissions ("Responses"), Response No. 5, only admits that the song has been used at times as a theme song for the Walt Disney Company.  Neither the Request not the Response even mention Mr. Disney personally.  (Response No. 5).  See also (Response Nos. 3, 6 and 9; Berrocal Decl. ¶ 13).

3.      Disputed.  Defendants cite no evidence that Walt Disney personally introduced the program or evidence as to the manner in which the Disney Company used the song in connection with its motion pictures or advertisement.  The evidence cited, Response No. 3, merely admits that the song or portions of the song were sometimes used, often in medleys with other songs, in the opening title music for a television series produced by the Walt Disney Company.

4.      Disputed.  Defendants cite no evidence that the song "is an integral part of Walt Disney's and the Walt Disney Company's personality and reputation.  Defendants merely cite an unpublished judicial opinion, which in turn quotes language from one of the litigant's briefs in that case.  The quoted language says nothing about the song being an "integral part of Walt Disney's and the Walt Disney Company's personality and reputation" and indeed says nothing at all about Mr. Disney personally.  Moreover, the court rejected the argument made in the quoted passage.  See also (Response Nos. 3, 6 and 9; Berrocal Decl. ¶ 13).

5.      Undisputed.

6.      Disputed.  Defendants cite no evidence that the show often "parodies" icons from popular culture.  Parody is a legal term, and the cited testimony does not establish that the uses often ridicule and criticize the works taken.  (MacFarlane Decl. ¶ 2).

7.      Disputed.  Defendants cite no evidence that the show frequently "parodies" popular TV shows, movies, songs and celebrities.  Parody is a legal term, and the cited testimony does not establish that the uses frequently ridicule and criticize the works taken.  (MacFarlane Decl. ¶ 2). Plaintiff does not dispute that the show frequently uses TV shows, movies, songs and celebrities for humorous effect.

8.      Disputed.  Defendants cite no evidence that the show is known for "parodies" of obscure movies, TV shows or other cultural phenomena from the past.  Parody is a legal term, and the cited testimony does not establish that the uses frequently ridicule and criticize the works taken. (MacFarlane Decl. ¶ 2).   Plaintiff does not dispute that the show frequently uses TV shows, movies, and other cultural phenomena for humorous effect.  Plaintiff also does not dispute that the series follows a pattern of irreverent, iconoclastic plotlines and non-sequitur pop-cultural references for humorous effect.

9.      Undisputed.

10.     Undisputed, except defendants cite no evidence that the scene taking from The Graduate criticizes or ridicules that film.  Therefore such use is not a parody.

11.     Undisputed.

12.     Plaintiff does not dispute that the Episode illustrates Peter's ignorance or that the song evokes When You Wish Upon a Star (Star).  Plaintiff disputes that I Need a Jew (Jew) parodies Star.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17, 30:10-32:16); Pl. Ex. 3; Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 25:19-26:2-13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to

Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A (Episode Commentary); Wilbur Decl. ¶ 95).

13.     Undisputed.

14.     Plaintiff does not dispute that Jew was purposely created in a manner intended to evoke Star.  Plaintiff denies such copying was done for parodic purposes.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17, 30:10-32:16); Pl. Ex. 3; Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 25:19-26:2-13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A (Episode Commentary); Wilbur Decl. ¶ 95).

15.     Undisputed, except Plaintiff disputes that the lyrics are parodic.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17, 30:10-32:16); Pl. Ex. 3; Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 25:19-26:2-13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A (Episode Commentary); Wilbur Decl. ¶ 95).

16.     Disputed.  Defendants were aware that they were taking too much material from Star.  Moreover, Jew is extremely similar to Star and is not a parody.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 12:7-13:8, 13:17-14:9; 14:18-18:22; 18:24-21:18, 21:23-24:2, 30:10-32:16); Pl. Ex. 2 (Score); Pl. Ex. 3 (Leadsheet); Compare Pl. Exs. 2 and 3; Pl. Ex. 4 (TV Music Cue Sheet)); Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman

Tr. 24:22-25:17, 25:19-26:2-13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13, 14, 45 and 46); MacFarlane Decl. Ex. A  (Episode Commentary); Wilbur Decl. ¶ 12, 25-31, 33-38, 41-51, 53-60, 62-77, 79-88, 91-95; Fakler Decl. Ex. E (Ferrara Tr. 8:21-12:23; 13:13-14:9, 120:24-128:9; 137:11-144:23); Pl. Ex. 1 (Excerpted); Ferrara Decl.  ¶¶ 6, 8, 10-11).

17.     Disputed.  Defendants have cited no evidence that Jew was intended to, or does, parody Star.  Parody is a legal term, and the cited testimony does not establish that Jew was intended to ridicule and criticize Star.  In fact, the evidence shows that Jew was not intended to criticize or ridicule Star and therefore was not a parody.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17, 30:10-32:16); Pl. Ex. 3; Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 25:19-26:2-13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A (Episode Commentary); Wilbur Decl. ¶ 95).

18.     Disputed.  Defendants have cited no evidence that the pose emulates that of Gepetto in *Pinocchio*.  The attached screen shots show that the two uses are not similar at all, other on the most general level of having a person looking out a window.  (MacFarlane Decl. ¶ 8 & Ex. C).  Moreover, such use does not ridicule or criticize Star.

19.     Undisputed, except disputes that the Episode parodies *Pinocchio* or Star.  (Fakler Decl. Ex. D (MacFarlane Tr. 14:19-15:8, 51:3-11, 53:3-55:7); MacFarlane Decl. ¶ 7; Fakler Decl. Ex. A (Murphy Tr. 18:24-19:17, 30:10-32:16); Pl. Ex. 3; Fakler Decl. Ex. B (Blitt Tr. 10:24-12:4,15:11-16:16, 17:7-18:2, 20:19-25, 21:22-22:21 ); Fakler Decl. Ex. J (Zuckerman Tr. 24:22-25:17, 25:19-26:2-

13); Fakler Decl. Ex. K, L, M (MacFarlane, Murphy and Fox Responses to Requests for Admissions Nos. 12, 13 and 14); MacFarlane Decl. Ex. A (Episode Commentary); Wilbur Decl. ¶ 95).

20.    Disputed.  The writer of the Episode did not identify Walt Disney's alleged public reputation as an anti-Semite at all when asked to list the comedic targets of Jew or the reasons for using Star.  (Fakler Decl. Ex. B (Blitt Tr. 19:14-21:20)).  At his deposition, MacFarlane admitted he did not know the extent to which the public actually considered Walt Disney to be an anti-Semite, but only that it is something "out in the ether of pop culture" (Fakler Decl. Ex. D (MacFarlane Tr. 59:14-61:3)).  The alleged connection between Jew and Walt Disney was not discussed until after Jew was conceived, and was merely considered an "ironic subtext" or "ironic twist" that the song could be considered as a joke about Walt Disney.  (Fakler Decl. Ex. D (MacFarlane Tr. 63:1-18)).  Zuckerman testified that the only part of the Episode he could recall being involved with writing was during the third act, where he proposed the quickie Bar-Mitzvah idea.  (Fakler Decl. Ex. J Zuckerman Tr. 8:14-9:14).

21.    Disputed.  Jew has caused harm to the market for Star.  Moreover, widespread uses similar to Jew would also cause harm to the market for Star and such unlicensed derivative works would substitute in the market for Plaintiff's licensed derivative works.  (Soroka Decl. ¶¶ 9-10, 12; 21-29, 34; Horan Decl. ¶¶ 11-32, 34-36; Berrocal Decl. ¶¶ 15-18).

22.    Disputed.  Jew has caused harm to the market for Star.  Moreover, widespread uses similar to Jew would also cause harm to the market for Star and such unlicensed derivative works would substitute in the market for Plaintiff's licensed derivative works.  (Soroka Decl. ¶¶ 9-10, 12; 21-29, 34; Horan Decl. ¶¶ 11-32, 34-36; Berrocal Decl. ¶¶ 15-18).

23.    Undisputed.

Respectfully submitted,


Date:  May 23, 2008                     s/Paul M. Fakler
                                        Paul M. Fakler  (PF-0249)
                                        Ross Charap  (RC-2584)
                                        Julie Stark  (JS-8925)
                                        Amanda J. Schaffer  (AS-2004)
                                        MOSES & SINGER LLP
                                        405 Lexington Avenue
                                        New York, New York 10174-1299
                                        Tel.: 212-554-7800
                                        Fax: 212-554-7700
                                        pfakler@mosessinger.com
                                        *Attorneys for Plaintiff, Bourne Co.*