# EXHIBIT C

LAWRENCE FERRARA, PH.D.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

BOURNE CO.,

                    Plaintiff,

  - against -        07 Civ 8580 (DAB)

TWENTIETH CENTURY FOX FILM

CORPORATION, FOX BROADCASTING

COMPANY, TWENTIETH CENTURY FOX

TELEVISION, INC., TWENTIETH CENTURY

FOX HOME ENTERTAINMENT, INC., FUZZY

DOOR PRODUCTIONS, INC., THE CARTOON

NETWORK, INC., SETH MACFARLANE,

WALTER MURPHY,

                    Defendants.

------------------------------------------x

    DEPOSITION of LAWRENCE FERRARA, Ph.D., held at the offices of Moses & Singer LLP, 405 Lexington Avenue, New York, New York 10174-1299, on the 6th day of March 2008, commencing at 10:05 a.m., before Colette Cantoni, a Registered Professional Reporter and Notary Public of the State of New York, pursuant to Notice.

Page 2

```
 1
 2  APPEARANCES:
 3
 4     MOSES & SINGER LLP
           Attorneys for Plaintiff
 5         The Chrysler Building
           405 Lexington Avenue
 6         New York, New York 10174-1299
 7     BY:  PAUL M. FAKLER, ESQ.
               -and-
 8         ROSS CHARAP, ESQ. (A.M. Session)
 9
       LOEB & LOBE LLP
10         Attorneys for Defendants and the Witness
           345 Park Avenue
11         New York, New York 10154-1895
12     BY:  JACQUES M. RIMOKH, ESQ.
13
       ALSO PRESENT:
14
       SANDY WILBUR
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    Ferrara
 2     L A W R E N C E   F E R R A R A, Ph.D.,
 3        having been first duly sworn by the Notary
 4        Public, was examined and testified as
 5        follows:
 6   EXAMINATION
 7   BY MR. FAKLER:
 8     Q    Good morning, Professor Ferrara, my name
 9   is Paul Fakler, I represent the plaintiffs in this
10   matter.
11         Have you had your deposition taken before?
12     A    Yes.
13     Q    So I'll assume you're pretty much familiar
14   with the way depositions go?
15     A    Yes, I am.
16     Q    I'll just give the highlights again,
17   because we lawyers always seem to have to do this.
18         Of course I'll be asking you questions,
19   you'll answer under oath.
20         We need all of your responses to be verbal
21   so they show up on the transcript.
22         I am sure it will become clear quickly
23   that I am not an expert musicologist.
24         So if I ask a question in a way that
25   doesn't make any sense or is confusing to you, please
```

Page 4

```
 1                    Ferrara
 2   just let me know, and I promise I'll try to figure
 3   out a way of asking it so that we're communicating
 4   properly. Okay?
 5     A    Yes. Thank you.
 6     Q    And if you need at any time to take a
 7   break for the bathroom or for anything else, just let
 8   me know. You know, we'd prefer that it's not in the
 9   middle of a question, but barring that sort of thing
10   I'm sure we can accommodate any needs that you have.
11         Okay?
12     A    Yes. Thank you.
13     Q    I would like to show you a document I have
14   premarked as Plaintiff's Exhibit 1.
15         MR. FAKLER:  I will have that initialed by
16   the court reporter.
17         (Marked for identification.)
18         (Witness reviewing document.)
19     Q    And what is that document?
20     A    This is the report that I submitted with
21   respect to this issue.
22     Q    Could I direct your attention to your CV,
23   which is attached as an exhibit to the report.
24     A    Yes.
25     Q    I would like to ask you to just take a
```

Page 5

```
 1                    Ferrara
 2   moment and review it and confirm for me that that CV
 3   is presently accurate.
 4         (Witness reviewing document.)
 5     A    Yes, I believe that it is.
 6     Q    And is it reasonably complete?
 7     A    Yes, I believe it is.
 8     Q    Okay.  Have you worked for the law firm
 9   Loeb & Loeb before as an expert?
10     A    Yes, I have.
11     Q    How many times?
12     A    Over the years, perhaps three or four
13   times.
14     Q    And when was the first time you were hired
15   by Loeb & Loeb?
16     A    It may have been seven or eight years ago.
17     Q    Have you worked with Jonathan Zavin before
18   on any of those matters?
19     A    Yes.
20     Q    Do you remember how many of them?
21     A    I believe two times for this issue.
22     Q    And you're here today, and submitted this
23   report, in the capacity as an expert musicologist; is
24   that correct?
25     A    Yes, it is.
```

Page 62

Ferrara

performed in the same way.

Then as I recall, there was an extra orchestral section that played the melody at the beginning, and then the Jiminy Cricket character comes in and essentially repeats the last part and takes it out again.

So that was the only other recorded version of the what I'm calling the Pinocchio song, you're calling the movie song that I listened to and checked.

Q  Do you remember what CD that was on?
A  I don't.
In fact, to the best of my recollection, I downloaded it from iTunes.
Q  Turning to page 2 of your report, in paragraph 2 halfway down in your conclusion here you state that "there is no wholesale copying of Pinocchio song."
Could you please tell me what you mean by wholesale copying?
A  Yes.
As a musicologist, wholesale copying would allow the second song to substitute for the first song.

Page 63

Ferrara

Q  Okay. But what is wholesale copying?
A  Wholesale is massive.
And I think part of a definition of wholesale would be that within that massive copying, or significant, large amount of, you know, high quantity, a large amount of copying, that there is less of a sense of the individual, in this case notes, that is that you can't point readily to differences in individual sequences of pitches, for example, or to lyrical lines or even overall verses and so forth. That essentially all you get is a sense of whole. And so that is how I would further define it.
One substituting for the other and the other -- and again, it is just so wholesale that it kind of moves away from the kind of sculpted transformation that I believe is the case in Family Guy song.
Q  Now turning to the CD copy that you actually used to make your transcription -- I know we were just talking about a longer version, so put that one aside -- and back to the one you actually used, where did you obtain that particular CD?
A  That CD was sent to me by Jonathan Zavin.

Page 64

Ferrara

Q  And you mentioned that you also reviewed a VHS copy of the film Pinocchio?
A  A DVD copy.
Q  Oh, okay.
A  Oh, I am sorry. You said Pinocchio. I should --
Q  No. Pinocchio. I am sorry.
A  I should wait and answer the question.
Yes, I did.
Q  And where did you obtain that?
A  That was a copy that we owned for our children.
Q  Was there a difference between the sound recording of "When You Wish Upon a Star" in the VHS version versus the CD version that you used?
A  To the best of my recollection, no.
Q  And now turning to "I Need a Jew." Where did you get the sound recording for that?
A  The sound recording for "I Need a Jew" was sent to me by Jonathan Zavin.
Q  I think you mentioned before you did actually also -- was that a CD of just the music?
A  Yes.
Q  And at some point you also got a DVD

Page 65

Ferrara

version of the entire episode?
A  That is correct.
Q  Where did you get that?
A  Jonathan Zavin supplied that.
Q  And you reviewed both of those in the process --
A  Yes, I did.
Q  -- of doing your report?
A  Yes, I did.
Q  Okay.
MR. RIMOKH: Let him finish his question.
THE WITNESS: I know. I know.
Q  Now if we turn to page 3 and paragraph 5. Again, you mention here that in your methodology the comparison you did in the rest of this report, specific analysis that you do, is a comparison of your transcription of the movie version of "Pinocchio" to your transcription of "I Need a Jew." Is that correct?
The following specific analysis. The analysis that follows this in your report is based on your comparison of your transcription of the movie version of "When You Wish Upon a Star" and your transcription of "I Need a Jew"; is that correct?

Page 114

1     Ferrara
2  beginning to end.
3        And in order to show beginning to end
4  after the introduction, you have to include the
5  instrumental melody.
6        I say very clearly in my analysis there is
7  no correlative part.
8     Q   But then in your conclusion you say that
9  out of 157 notes, 34 have identical correlative
10 melodic rhythm, correct?
11    A   Yes.
12    Q   But there aren't 157 notes in "When You
13 Wish Upon a Star," are there?
14    A   That's correct.
15    Q   So there are not?
16       So doesn't one start using 157 as a
17 starting point to inflate the differences between the
18 two songs?
19    A   No.
20    Q   You conclude here that "34 notes have
21 identical correlative melodic rhythms."
22       MR. RIMOKH: What page is that?
23       MR. FAKLER: Page 9, paragraph 21.
24    Q   Take a look at that.
25    A   That's correct.

Page 115

1     Ferrara
2        MR. FAKLER: Off the record, please.
3        (Off the record.)
4        MR. FAKLER: Back on the record.
5  BY MR. FAKLER:
6     Q   Your conclusion that 34 notes have
7  identical correlative melodic rhythm, this is one of
8  the bases for your ultimate conclusion in this
9  report, correct?
10    A   Yes.
11    Q   Is there a number of notes above 34 that
12 would have altered your conclusion in any way?
13       MR. RIMOKH: Objection.
14    A   I would not be able to speculate.
15       The key is that in addition to those
16 rhythmic similarities, there would have to be pitch
17 similarities.
18    Q   So additional rhythmic similarities, even
19 if it went up to everything other than the interlude,
20 if every other note was identical, that alone
21 wouldn't change your conclusion?
22       MR. RIMOKH: Objection.
23       Would you mind reading the question back.
24       (Question read.)
25    Q   Rhythmically.

Page 116

1     Ferrara
2     A   My conclusion is to the combination of
3  elements.
4        I didn't make a specific conclusion as to
5  rhythm.
6     Q   I am sorry. I meant conclusion with
7  respect to the transformative nature of the song.
8        MR. RIMOKH: Objection.
9     A   Sorry, the question's not clear.
10    Q   Your ultimate conclusion in the report,
11 you just mentioned that this analysis was one of the
12 bases of your ultimate conclusion.
13       And your ultimate conclusion is the
14 musical composition -- well, if you look at paragraph
15 31. Let's just use that as an example.
16       (Witness reviewing document.)
17    A   On the basis that there is no distinctive
18 melodic rhythm in the Pinocchio song, as is the case
19 for example in the opening of the Fifth Symphony of
20 Beethoven, and to the extent that the sequences of
21 pitches were so different as they are, I would not be
22 able to say that there was a wholesale copying,
23 because in my opinion, with so many different
24 sequences of pitches, even with the greater melodic
25 rhythmic similarity but the huge differences in the

Page 117

1     Ferrara
2  sequences of pitches, that the Family Guy song would
3  still not be able to substitute for the Pinocchio
4  song.
5        And so my conclusion would hold in that
6  very hypothetical case, which is very distant from
7  what is actually the case here.
8     Q   Now where do you mention substitution in
9  your conclusion in paragraph 31?
10    A   You asked earlier for a definition of
11 wholesale and I said --
12    Q   Wholesale, okay. Thanks.
13       And as far as substantially transformed,
14 is that a different, in your mind, opinion than
15 wholesale copying, is that a different statement or
16 are they the same thing?
17    A   Well, they're two different things.
18    Q   Okay, good. No, that's a fine answer.
19 Okay.
20       So would that different conclusion about
21 substantially transformed, would that conclusion be
22 altered in any way?
23    A   My opinion --
24       MR. RIMOKH: Objection.
25    A   In my opinion, if the substantial

Page 134

1      Ferrara
2      For example, yes, I was asked not to
3  include the analysis of lyrics.
4      That analysis of lyrics would have added
5  even more transformative change, more substance to my
6  opinion that The Family Guy song is a parody.
7      And so, yes, that is certainly an example
8  of something that was analyzed and was not included.
9  Q   But just to clarify here, that was not
10 part of the basis of your report, correct?
11     I am asking, did you do any analysis -- I
12 actually asked you, were there any other bases of
13 your opinion in this report that are not reflected in
14 the report?
15     And I appreciate you bringing up the
16 lyric, and you disclosed that in the report. But
17 your opinion -- you said that you didn't consider --
18 well, let's look back.
19     "I have not been asked to opine on the
20 lyrics in this report."
21     Are you saying that that analysis,
22 nonetheless, is one of the bases of your final
23 conclusion in this report?
24     MR. RIMOKH: Objection.
25 A   No.

Page 135

1      Ferrara
2  Q   Okay.
3  A   And if in your earlier question you said
4  bases --
5  Q   Yes.
6  A   -- then what I would say is my answer is
7  the right one, and that is that the analyses in this
8  report not only represent the bases but do so more
9  than sufficiently to support my conclusions.
10     I am not suggesting in this statement that
11 my analysis of the lyrics, which is not included --
12 Q   Right.
13 A   -- represents the basis for this.
14     In fact, the bases for -- the basis for
15 this conclusion is in this report.
16 Q   All of the bases for that conclusion are
17 in this report?
18 A   Yes.
19 Q   Is that correct?
20 A   Yes.
21 Q   Now turning to the section where you
22 discuss parody.
23     Your opinion on parody I take it is again
24 not a legal? You're not giving legal testimony as to
25 parody?

Page 136

1      Ferrara
2  A   That's correct.
3  Q   And your opinion is based on this quoted
4  definition that you include in your report?
5  A   Not wholly, no.
6  Q   Okay. What else is it based on?
7  A   Based on numerous examples and writings
8  about parody in the music of Mozart and Shostakovich
9  and other composers, and Lully, who I believe I
10 mentioned earlier.
11     This is also just a portion of an article
12 from the Baroque dictionary which is bifurcated, one,
13 really talking about parody in an earlier time where
14 it meant a different thing and then in a more modern
15 let's say, post-19th century discussion of what
16 parody music is.
17     And in addition of my having studied the
18 music at issue in Campbell, and looking at those
19 similarities and differences in "Oh, Pretty Woman"
20 and "Pretty Woman," which by the way far exceed the
21 similarities here. And so on that basis I have
22 talked about parody and why I believe that parody --
23 it is certainly not just this small part of the
24 definition.
25 Q   Is there anything else that you based your

Page 137

1      Ferrara
2  definition of parody, as applied in your report, on?
3      Well, let me restate that.
4      Did you base the definition you applied in
5  your report of parody on anything other than the
6  elements that you just discussed and this quote that
7  you included in your report?
8  A   To the best of my recollection, that would
9  sufficiently represent the bases for my use of the
10 word "parody" in musicology.
11 Q   On page 11 in paragraph 28 you mention
12 numerous bars that use musical devices that poke fun
13 at "When You Wish Upon a Star."
14     You go on to give two examples.
15     The first example is this melodic contour,
16 if you follow along -- because I don't want to
17 misstate anything here -- in which essentially you
18 say "certain phrases are turned upside down"?
19 A   The second bar of six two-bar phrases are
20 turned upside down.
21 Q   And then the second example you give are
22 eight descending notes -- this is in paragraph 29 --
23 in "When You Wish Upon a Star" that are made
24 ascending in "I Need a Jew" with inner melodic
25 contours moving up and down.

Page 138

1    Ferrara
2    Is that an accurate reflection of your --
3    A    As compared to a completely descending
4    contour. Right. That's correct.
5    Q    Are there any other examples of devices
6    that poke fun at "When You Wish Upon a Star"?
7    A    There are others, yes.
8    Q    Are they disclosed in your report
9    anywhere?
10    A    No.
11    I said, "for example," I believe. Yes.
12    That was just to exemplify.
13    Q    What are the other examples?
14    (Witness reviewing document.)
15    MR. RIMOKH: You could take your time to
16    review whatever you need to.
17    MR. FAKLER: Sure. Absolutely.
18    A    If you were to look at, in Exhibit D in my
19    report and specifically bars 7 and 8, starting with
20    the pickup to bar 7, if you look at the lower line of
21    music from Pinocchio song, the music melody to which
22    "will come to you" has been set. The melodic contour
23    is from "will" to "come" up a leap.
24    On the other hand, it is the opposite in
25    "I need," the correlative notes, down a step.

Page 139

1    Ferrara
2    Then from "come to you" in Pinocchio song,
3    it goes down a leap, but in "need a" it's the
4    opposite, it goes up. And once again, "to you" goes
5    up in Pinocchio song but "a Jew" goes down.
6    This happens again at the end of the next
7    eight-bar phrase, and that would be the bars 15 and
8    16 including their pickup.
9    This continues in "Where to find" compared
10    with "Fate is kind." Once --
11    Q    Which bars are those? I am sorry.
12    A    Thank you. Bars 17 and 18. Where clearly
13    the melodic contour in "Where to find" has been
14    turned upside down as compared to "Fate is kind."
15    Q    I am sorry. Just so I'm sure, or I'm
16    starting to understand. These examples that you just
17    gave, are these a similar device to the first device
18    that you mention in your report, where one phrase is
19    turned upside down, the contour is turned upside down
20    compared to the contour in the original?
21    A    That is correct.
22    Q    So it is really, these are other examples
23    of the first type of device that you mentioned in
24    your report?
25    A    That is correct.

Page 140

1    Ferrara
2    Q    Okay. Are there any other different types
3    of devices than the two examples that you have given?
4    MR. RIMOKH: And obviously, we are dealing
5    with musical devices --
6    MR. FAKLER: Yes.
7    MR. RIMOKH: -- not the lyrics?
8    MR. FAKLER: Yes. Thank you.
9    (Witness reviewing document.)
10    A    I would say that my response covers it
11    well.
12    Q    And there's nothing else?
13    A    Nothing that jumps right out at me.
14    Q    But you've considered this?
15    A    Oh, yes.
16    Q    With respect to the first type of device,
17    the turning upside down of the melodic contour, how
18    exactly does this device poke fun at "When You Wish
19    Upon a Star"?
20    A    First, in music parodies, the turning
21    upside down of a melodic contour after the setting up
22    of an expectation that this would not be the case is
23    a common device.
24    So, "When you wish up-on a star," when one
25    hears the opening four notes of the seven-note phrase

Page 141

1    Ferrara
2    "When you wish up-on a star," those seven notes, only
3    the four of which are the same in Family Guy song,
4    are very recognizable, to kind of come back and
5    recycle our conversation earlier.
6    When the listener hears, with the same
7    melody, the same melodic pitches "No-thing else has,"
8    da da da dum, the expectation is for da da dum, for
9    the next three pitches to go up, when in fact the
10    next three pitches pervert that expectation and go
11    down, that is a typical example of poking fun at a
12    joke.
13    Q    And is it your testimony that the average
14    listener would consider that poking fun or a joke?
15    A    I believe that the average listener who
16    could recognize the original song --
17    Q    Right.
18    A    -- would have an expectation that the next
19    three notes would continue in a particular way, and
20    when that expectation is completely turned upside
21    down could, could, with of course the lyrics -- but
22    that's another issue --
23    Q    Right.
24    A    -- but that that listener, yes, could
25    understand that there is fun being poked. Let me say

Page 142

1        Ferrara
2  that, that often in parody there is a connected set
3  of lyrics or a scene, like a cartoon, which further
4  inform the listener or the viewer.
5     Q   But you didn't do that analysis in this
6  report?
7     A   That analysis is not impacting as a
8  musicologist on my conclusion that that turning
9  upside down is poking fun.
10    Q   But you said I believe --
11        MR. FAKLER: Could you read back the last
12 answer.
13        (Record read.)
14    Q   Okay. So let me clarify a couple of
15 threads that went on in that answer.
16        First of all, what I am asking is without
17 the lyrics and without the context in that episode,
18 because that is not part of your report, not only
19 could the listener perceive it as poking fun or a
20 joke, would they likely perceive it as poking fun at
21 or making a joke?
22    A   I can't speculate as to that level of
23 specificity in the first phrase.
24        However, after the continual poking of
25 fun, I believe at some point in listening to the

Page 143

1        Ferrara
2  entirety of the song that it is very likely that a
3  listener, without the lyrics, would begin to
4  recognize that there is fun being poked at the
5  original song.
6     Q   And what do you base that belief on?
7     A   On the way in which I believe listeners
8  retain what they have heard in the bars before, that
9  they begin to develop more and more knowledge and
10 understanding as to what they've just heard. And
11 within that perspective and that context is my
12 opinion, not based as a scholar but it is just simply
13 asking hypothetically, you asked me a hypothetical
14 question, I do believe that after repeated devices --
15 and there are so many we've already pointed out --
16 that, yes, that a lay listener would likely at some
17 point, based on the music, begin to understand that
18 there is fun being poked.
19    Q   But that belief is not based on any
20 particular scholarship that you have done or read?
21    A   That is correct. Well, yes and no.
22        It's based on scholarship that I know
23 quite well and I've written about and that's called
24 the phenomenology of music, and that is the way in
25 which all listeners listen to music as a series of

Page 144

1        Ferrara
2  retained information and projected information as to
3  where it's going.
4        On that basis, certainly I believe that
5  that would be the case.
6        But I have not conducted any surveys or
7  done any empirical tests, with respect to this, that
8  would show that this is the case.
9     Q   Or any musical composition, any?
10    A   No, actually I have as a phenomenologist,
11 yes.
12    Q   And it determined whether listeners
13 perceived poking -- that this type of device as
14 poking fun at the original?
15    A   No. It -- my research in that area has
16 dealt with the way in which people listen to and
17 retain music while they're at a particular moment in
18 the piece, and how that impacts on their further
19 expectations as to what might happen.
20    Q   But it didn't specifically address whether
21 they found a device like this to poke fun at the
22 original?
23    A   That is correct.
24    Q   Do you believe that every time an
25 expectation is set up through recognition and then is

Page 145

1        Ferrara
2  perverted, every time that happens a listener would
3  necessarily perceive that as poking fun?
4     A   No.
5     Q   Turning to the second device that you
6  mention, the descending notes that are made ascending
7  with the inner melodic contours that move up and
8  down. I guess one way I can do this quickly is to
9  say would your answers to the same questions be the
10 same for this de- -- is this device any different
11 than the first one with respect to the questions I
12 asked you?
13        I could ask you the questions over again
14 if you find that too confusing.
15        MR. RIMOKH: I find it too confusing.
16 Maybe for clarity you should rephrase the question.
17        MR. FAKLER: Sure. Sure.
18    Q   How exactly does that particular device
19 poke fun at "When You Wish Upon a Star"?
20    A   At that point in the composition the
21 listener who is familiar with Pinocchio song has now
22 heard two phrases, and in both cases had their
23 expectations interrupted.
24        At this point the listener who recognizes
25 the original in this is going to expect a very

### Page 146

```
 1           Ferrara
 2   memorable melody that is marked by this descending
 3   step-wise motion.
 4           That is a very distinctive melody, and it
 5   is not like anything else in its length or in its
 6   lack of large leaps from what the listener has heard.
 7           The listener hears a phrase with a big
 8   octave leap and then a phrase, that same phrase
 9   ending with another leap up a 5th, which is a large
10   leap. And the very next phrase, another octave leap,
11   and at the end of that phrase a leap of a 4th, which
12   is again another large leap or interval.
13           Now after that in the original composition
14   we have something that's very distinctively
15   different. We've also been moving up. It's all --
16   so obviously part of the reference, up to the stars.
17   And so we've been moving up, and at "an-y - thing,"
18   at "an-y - thing" we have hit the pinnacle, we have
19   hit the high note, and then we begin to drift down.
20   That high note isn't hit again and then just hit
21   above that until later in the song.
22           So at that point in the song we go to the
23   high note, and it's a complete change for the
24   listener who knows the original moving down.
25           Now at that point I believe that a
```

### Page 147

```
 1           Ferrara
 2   listener who at this point recognizes the original
 3   song is expecting something like that, and instead
 4   gets something completely different, and that is
 5   really, I believe, humorous in its difference,
 6   because it moves away from step-wise to leaps, its
 7   general direction is up, not down, and for all those
 8   reasons I believe that inherently it represents a
 9   poking fun at a very memorable and distinctive phrase
10   in the original.
11       Q   Do you presently intend to do any
12   additional work of any kind in this case?
13       A   I don't know whether further work is
14   required. I've not --
15       Q   So as you sit here today you have no
16   particular intent to perform any further services in
17   connection with this case?
18       A   It is my understanding that I have been --
19   that Mr. Zavin and Mr. --
20           MR. RIMOKH: Rimokh.
21       A   -- Rimokh would like me to aid them in
22   their preparation of the deposition they will take
23   from Ms. Wilbur.
24           MR. FAKLER: Do you want to take a quick
25   break here?
```

### Page 148

```
 1           Ferrara
 2           MR. RIMOKH: Whatever you would like.
 3           MR. FAKLER: Let's go off the record.
 4           (Recess taken.)
 5   BY MR. FAKLER:
 6       Q   Professor Ferrara, I would like to show
 7   you a document that I have premarked as Plaintiff's
 8   Exhibit 6.
 9           I will represent that this is the expert
10   report of Sandy Wilbur that was served upon
11   defendants in this case.
12           Have you seen this document before?
13       A   Yes.
14       Q   Have you reviewed it?
15       A   Yes.
16       Q   Is there anything that you believe is
17   incorrect in this report?
18       A   Yes.
19       Q   Can you tell me what those points are?
20           MR. RIMOKH: Do you want him to go
21   paragraph by paragraph to point them out?
22           MR. FAKLER: Sure.
23           (Witness reviewing document.)
24       Q   Oh, one thing I could say that might be
25   helpful in saving time, if you think it is okay, is
```

### Page 149

```
 1           Ferrara
 2   to leave aside any questions of where you believe
 3   that your notation is correct and her notation is
 4   incorrect.
 5       A   Including the harmony analysis?
 6       Q   Well, maybe the analysis I wouldn't leave
 7   out but --
 8       A   Well, then the notation of the harmony?
 9       Q   Right, right. Where you say it's this
10   chord and she says it's that chord or what have you.
11       A   Okay. Thank you.
12           (Witness reviewing document.)
13       A   In number 4 --
14       Q   On which page are we?
15       A   On page 4 -- I am sorry --
16       Q   Thanks.
17       A   -- Ms. Wilbur writes "The intervallic
18   pattern," that's the space between notes "of the
19   first four notes of the second phrase is identical."
20           If we go to -- we can use her
21   transcription, I think that would be best, and that
22   would be her Exhibit I, and in that Exhibit I she has
23   a comparison of "When You Wish Upon a Star" and the
24   top line directly over the correlative music in
25   "I Need a Jew."
```