# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

BOURNE CO.,                           )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               ) No. 07 CIV. 8580(DAB)
                                      )
TWENTIETH CENTURY FOX FILM            )
CORPORATION, FOX BROADCASTING         )
COMPANY, TWENTIETH CENTURY FOX        )
TELEVISION, INC., TWENTIETH           )
CENTURY FOX HOME ENTERTAINMENT,       )
INC., FUZZY DOOR PRODUCTIONS,         )
INC., THE CARTOON NETWORK, INC.,      )
SETH MAC FARLANE, WALTER MURPHY,      )
                                      )
        Defendants.                   )
_____)

30(B)(6) DEPOSITION OF FOX EMPLOYEE

LINDA SHIMA-TSUNO

TAKEN ON

WEDNESDAY, MARCH 12, 2008

Reported by:

Daryl Baucum, RPR, CRR, CBC, CSR No. 10356

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 6

LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 12, 2008
3:35 P.M.

LINDA SHIMA-TSUNO,
having been first duly sworn, was
examined and testified as follows:

EXAMINATION
BY MR. FAKLER:
Q. Could you state your name for the record, please.
A. Linda Shima-Tsuno.
Do you want me to spell it?
S-as-in-Sam-H-I-M-A, dash, capital-T-as-in-Tom-S-as-in-Sam-U-N-O.
Q. Good afternoon, Ms. Shima-Tsuno. My name is Paul Fakler. I represent the plaintiff in the litigation that my client has brought against Fox on some of the "Family Guy" people relating to the "Family Guy" show.
Have you ever had your deposition taken before?
A. Yes.
Q. How many times?
A. I don't remember. Maybe it was four or five times.

Page 7

Q. So are you generally familiar with the process?
A. Yes.
Q. I would just remind you that it's important that we try not to talk over one another so that the court reporter can take down the words and that any responses that you give should be verbal because the court reporter can't transcribe a nod or a head shake or something like that.
A. Okay.
Q. If you would like to take a break at any point, please, just let me know and I am sure we can accommodate you. I don't anticipate this taking very long.
A. Okay.
Q. What is your current occupation?
A. I own a cafe.
Q. And what did you do before that?
A. I was in standards and practices at Fox.
Q. And when did you start working for Fox in standards and practices?
A. I freelanced. I think it was in '89, '90, '91 maybe.
Q. And at some point did you become an employee?
A. Yes. I think it was '92.
Q. And when did you leave the employee of Fox

Page 8

standards and practices?
A. In 2000.
Q. What position did you have at the time that you left?
A. Director of Standards and Practices.
Q. And how long were you Director of Standards and Practices?
A. I don't remember. Maybe two years.
Q. In your capacity in working in standards and practices, were you involved at all in the "Family Guy" television show?
A. Yes.
Q. What did you do with respect to the "Family Guy" show?
A. I was assigned to "Family Guy" for standards and practices purposes for clearance.
Q. And did you do that from the beginning of when the "Family Guy" show was first on the air?
A. Yes.
Q. And were you assigned to the "Family Guy" show up until the time you left Fox?
A. Yes, I was.
Q. Can you please explain to me what exactly is standards and practices.
A. We review material for acceptability for

Page 9

broadcast.
Q. And when you were working on the "Family Guy" show during that period of time, whom did you report to?
A. Roland MacFarland.
Q. And what was his position?
A. Vice President of Standards and Practices.
Q. How would you characterize your working relationship with the folks at "Family Guy"?
A. I thought it was very good.
Q. Do you remember working on an episode called "When You Wish Upon a Weinstein?
A. Yes, I do.
Q. And how is your memory of the work that you did on the Weinstein episode?
A. What do you mean?
Q. Do you remember it well?
A. I remember it. I may not remember details. I have put a lot of time into that episode because it was problematic.
Q. And why was that episode particularly problematic?
A. It had the potential to be offensive to Jewish -- to the Jewish community.
Q. What it was about the episode that had that potential?

### Page 10

1   A.  Well, Peter wanted to -- Peter wanted to be
2   good with money and he wasn't a very bright guy. And in
3   speaking with his friends, he discovered that all his
4   friends had people helping them manage their money, and
5   it just happened that his friends' people had Jewish
6   last names.
7       So Peter deducted that Jewish people were good
8   with money, could handle money well, and so he wanted to
9   become Jewish.
10  Q.  Who at "Family Guy" in the production did you
11  deal directly with for purposes of clearance?
12  A.  Mostly David Zuckerman and Seth MacFarlane.
13  Q.  And at what stage of the production of the
14  episode did you first get involved?
15  A.  Actually, I think someone brought it up during
16  the concept level. That's my memory.
17  Q.  Were you at the first table read of the
18  episode?
19  A.  I imagine I was -- yes, I was.
20  Q.  And what was your first reaction after the
21  table read?
22  A.  That there were many problems with the episode,
23  that we would have to work through a lot of things in
24  the episode.
25  Q.  And did you communicate this reaction to the

### Page 11

1   "Family Guy" staff?
2   A.  Yes.
3   Q.  And in what ways did you have telephone
4   conversations with them?
5   A.  Yes, many.
6   Q.  And did you also send letters?
7   A.  Yes.
8   Q.  I would like to show you a document that I have
9   got marked as Plaintiff's Exhibit 11. It was a document
10  produced in discovery at FOX 8.
11      (Plaintiff's Exhibit 11 was
12      marked for identification.)
13  BY MR. FAKLER:
14  Q.  Do you recognize this document?
15  A.  Yes, I do.
16  Q.  Can you tell me what it is, and, please, take
17  your time and take a look.
18  A.  Yes, this is a table draft review that I did
19  after the table read.
20  Q.  And is this a letter that you wrote as part of
21  your job in standards and practices?
22  A.  Yes.
23  Q.  And you wrote several letters like this as part
24  of your job in standards and practices with respect to
25  the clearance process --

### Page 12

1   A.  Yes.
2   Q.  -- for the "Family Guy"?
3   A.  Yes.
4   Q.  And would you say that this is one of the
5   earlier letters that you sent?
6   A.  Yes.
7   Q.  I would like to show you a document that I have
8   marked as Plaintiff's Exhibit 12.
9       (Plaintiff's Exhibit 12 was
10      marked for identification.)
11  BY MR. FAKLER:
12  Q.  Can you tell me what that document is, please?
13  A.  It looks like a review of a revised table
14  draft.
15  Q.  So this is another document of the type that we
16  just looked at in Exhibit Number 11?
17  A.  Yes.
18  Q.  If I could ask to you take a look at a document
19  I have marked as Plaintiff's Exhibit 13.
20      (Plaintiff's Exhibit 13 was
21      marked for identification.)
22  BY MR. FAKLER:
23  Q.  Is that another document of the same character?
24  A.  Yes.
25  Q.  I would like to show you something I have

### Page 13

1   marked as Plaintiff's Exhibit Number 14.
2       (Plaintiff's Exhibit 14 was
3       marked for identification.)
4   BY MR. FAKLER:
5   Q.  And I will just ask you is that another
6   document of the same type?
7   A.  Yes, it is.
8   Q.  Can you tell me who Ken Dennis is?
9   A.  Ken Dennis, he was a producer for "Family Guy."
10  Q.  Could I have the folder for Exhibit Number 15,
11  please.
12      This is a document that I have marked as
13  Plaintiff's Exhibit 15. It was produced in discovery at
14  FOX 14.
15      (Plaintiff's Exhibit 15 was
16      marked for identification.)
17  BY MR. FAKLER:
18  Q.  And I just ask you is this another document of
19  the type that we have just been reviewing?
20  A.  Yes, it is.
21  Q.  I would like to show you a document that I have
22  marked as Plaintiff's Exhibit 17.
23      (Plaintiff's Exhibit 17 was
24      marked for identification.)
25  BY MR. FAKLER:

Page 14

1  Q. And is this also a document -- a similar
2  document, a letter that you wrote in the review process?
3  A. Yes, it is.
4  Q. I will ask you to take a look at the part where
5  it's discussing pages 16 and 17.
6     There's a line that says the audiotape of this
7  song is being reviewed further by senior management.
8  A. Yes.
9  Q. What does that audiotape refer to?
10 A. The song that was in the episode that parodied
11 "Wish Upon a Star."
12 Q. And do you know what happened to that tape?
13 A. No.
14 Q. Do you know whether it would have been kept
15 within standards and practices in their records?
16 A. It may have. I don't recall.
17 Q. At the bottom of this page, in the last
18 sentence, the letter says, "Thank you for sharing your
19 consultant with us."
20    What does that refer to?
21 A. Rabbi Levi.
22 Q. So Rabbi Levi who's referenced from the
23 preceding sentence, that's the consultant that you are
24 talking about here?
25 A. Yes.

Page 15

1  Q. And who was Rabbi Levi?
2  A. You know, I am not -- okay. He must have been
3  the guy from the University of Judaism.
4  Q. And what is this referring to?
5     Why are you talking about him in this letter?
6  A. Because we sent the script to Rabbi Levi.
7  Q. And whose idea was it to send the script to
8  Levi?
9  A. You know, I thought it was mine but maybe it
10 wasn't. Maybe it was their idea.
11 Q. Based on what you wrote in this letter, you
12 think that they suggested him in particular?
13 A. Yes.
14 Q. And you just said that you sent him a copy of
15 the script?
16 A. Yes.
17 Q. For what purpose?
18 A. To get his input to see if he had any feelings
19 about it, whether he thought it would be too offensive
20 or not.
21 Q. And did Seth and David know in advance that you
22 would be speaking with him?
23 A. Yes.
24 Q. Did Rabbi Levi ever provide a written letter
25 of -- any written form of his opinion about the episode?

Page 16

1  A. You know, I don't recall.
2  Q. And what was his opinion?
3  A. He was not offended by the episode, but I do
4  believe that he thought the song might offend some
5  people. I think everyone thought that.
6  Q. And so did he -- he didn't give an overall
7  approval of the entire episode?
8  A. No, he gave some notes, you know, on sections
9  that he thought should be revised.
10 Q. And particularly, he mentioned the song as one
11 thing that he had a --
12 A. That was one -- I believe everyone mentioned
13 the song. So I am assuming he did, too.
14 Q. I would like to show you a document that I have
15 marked as Plaintiff's Exhibit 18. It was produced in
16 discovery at FOX 18.
17 A. Okay.
18    (Plaintiff's Exhibit 18 was
19    marked for identification.)
20 BY MR. FAKLER:
21 Q. And is this another one of the letters that you
22 wrote during the approval process?
23 A. Yes, it is.
24 Q. And if you look at the bottom, the letter says,
25    "I am in contact with Rabbi

Page 17

1     Laura Geller and you should be
2     hearing from her today."
3  A. Yes.
4  Q. What is that referring to?
5  A. She was another rabbi that we had consulted.
6  Q. For the same purpose?
7  A. For the same purpose.
8  Q. And do you know who selected Rabbi Geller?
9  A. I did through a recommendation from someone
10 else.
11 Q. And was she provided a copy of the script?
12 A. Yes.
13 Q. And I take it Seth and David knew you were
14 going to talk to her, as well?
15 A. Oh, yes.
16 Q. Did Rabbi Geller give any written opinion to
17 you?
18 A. You know, I don't recall if any of them gave a
19 written opinion.
20 Q. What was Rabbi Geller's opinion of the program?
21 A. She thought it was very offensive.
22 Q. Do you recall what her specific problems were
23 with the episode?
24 A. She didn't like it at all.
25 Q. And I take it that would include the song?

Page 18

1    A. That included the song.
2    Q. Can I have the folder for Exhibit 19, please.
3        I would like to show you a document that has
4    been premarked as Plaintiff's Exhibit 19. It was
5    produced in discovery at FOX 19.
6        (Plaintiff's Exhibit 19 was marked
7         for identification by the court
8         reporter and is attached hereto.)
9    BY MR. FAKLER:
10   Q. Please, take a look at this, and when you are
11   ready, please, tell me what this document is.
12   A. Yes, this is a summary that I wrote after my
13   conversation with Rabbi Geller about her comments
14   regarding the episode.
15   Q. And you wrote this as part of your job in
16   standards and practices?
17   A. Yes.
18   Q. Who is Ira Kurgan?
19   A. He was Roland McFarland's boss. So Roland
20   reported to Ira Kurgan. He was -- I forgot his title.
21   Q. And who is Larry Jacobson?
22   A. I have forgotten his title, too. They were
23   both presidents of something.
24   Q. And had they asked you to write this summary
25   for them?

Page 19

1    A. You know, I don't remember if they had asked me
2    or it was just, you know, my process.
3    Q. And does this memo accurately reflect the
4    consent of your conversation with Rabbi Geller?
5    A. Yes.
6    Q. Did anyone at "Family Guy" ever tell you that
7    the "I Need A Jew" song was specifically meant to make
8    fun of the alleged antisemitism of Walt Disney?
9    A. I don't recall that.
10   Q. At some point -- I'm sorry -- what was the --
11   was the episode cleared during season two for broadcast?
12   A. No.
13   Q. Why not?
14   A. Senior management felt that it was just too
15   potentially offensive.
16   Q. At some point did you learn that Fox had
17   decided to broadcast the Weinstein episode?
18   A. After I had left, yes.
19   Q. And were you surprised to find that out?
20   A. Actually, they did this once before. So, no.
21       MR. FAKLER: Those are all the questions I
22   have.
23       MR. ZAVIN: Hold on just one moment.
24       (Off the record.)
25       MR. ZAVIN: Just a couple of very brief

Page 20

1    questions.
2
3                    EXAMINATION
4    BY MR. ZAVIN:
5    Q. Ms. Shima-Tsuno, my name is Jonathan Zavin. I
6    am the lawyer for Seth MacFarlane and Rickey Blitt and
7    the Fox defendants in this case.
8        Before your deposition today, did you talk with
9    anyone from Fox about this deposition or your testimony?
10   A. No.
11   Q. Or Fox's lawyers?
12   A. No.
13   Q. So you have never talked with anyone from Fox
14   or Fox's lawyers about the subject matter of this
15   lawsuit?
16   A. No.
17   Q. You said at one point I believe that many
18   people or everyone found the song offensive.
19       I would like you to take a look at the
20   documents that you were shown. I think you still have
21   them in front of you, which are -- if I may be so bold
22   as to lean over --
23   A. Oh, sure.
24   Q. -- it might be faster.
25       Documents that are marked 11, 12, 13, 14, 15,

Page 21

1    17, 18 and 19. Could you look at these and tell me
2    other than -- well, I am going to exclude 19 because you
3    didn't author that. Other than --
4        MR. FAKLER: Jonathan, just for the record, she
5    did author that.
6        MR. ZAVIN: I am sorry. I will withdraw that.
7    BY MR. ZAVIN:
8    Q. Could you look at documents 11, 12, 13, 14, 15,
9    17 and 18, all of which if I am correct contain your
10   comments on the episode; is that correct?
11   A. Yes.
12   Q. Could you look at those and tell me other than
13   the comment on one line in the song, did you have any
14   other comments on the song, itself?
15   A. Initially, yes. You know, we felt that it
16   objectified Jews by saying "I need a Jew."
17   Q. Is that in one of those documents?
18   A. Yes, it's in this one.
19   Q. Which one is that?
20   A. (Witness shows document to counsel.)
21   Q. Just so I am sure, on Plaintiff's Exhibit 11,
22   the phrase "I Need a Jew" doesn't specifically refer to
23   that phrase in the song.
24       Is in your recollection that that's what you
25   were referring to?