# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


BOURNE CO.,

    Plaintiff,

                    CIVIL ACTION FILE

vs.

                    NO. 07 Civ. 8580 (DAB)


TWENTIETH CENTURY FOX FILM

CORPORATION, FOX BROADCASTING

COMPANY, TWENTIETH CENTURY FOX

TELEVISION, INC., TWENTIETH CENTURY

FOX HOME ENTERTAINMENT, INC., FUZZY

DOOR PRODUCTIONS, INC., THE CARTOON

NETWORK, INC., SETH MACFARLANE,

WALTER MURPHY,

    Defendants.


DEPOSITION OF

TERESA TINGLE-HEPPNER


March 13, 2008

9:29 a.m.


600 Peachtree Street, NE

Suite 5200

Atlanta, Georgia


Jennifer D. Hamon, CCR-B-2287, RPR

Page 14

1  Q. (By Ms. Stark) You can answer.
2  A. I would consider Fox a broadcast
3  network.
4  Q. These are not trick questions. I'm
5  just trying to get my terminology correct.
6     So I will refer to it as a telecast,
7  then, when I'm referring to Cartoon Network.
8     Does the Cartoon Network --
9     MR. RIMOKH: One second. I'm sorry.
10    Let her finish her question and
11  pause before you answer.
12  Q. (By Ms. Stark) Does Cartoon Network
13  telecast the show "Family Guy"?
14  A. Adult Swim telecasts the show
15  "Family Guy." They share channel space with
16  Cartoon Network.
17  Q. Can you explain the relationship to
18  me between Adult Swim and Cartoon Network.
19  A. The way I view it, they are two
20  separate program services that share the same
21  channel space, sort of like in the daytime
22  hours, it's Cartoon Network, and
23  post 11:00 p.m., it's Adult Swim.
24  Q. Adult Swim is not owned by Turner?
25  A. Yes, it is.

Page 15

1  Q. Is Cartoon Network also owned by
2  Turner?
3  A. Yes.
4  Q. Do they share the same office space?
5  A. No.
6  Q. Where are Adult Swim's offices
7  located?
8  A. Adult Swim is located on Williams
9  Street. I don't know the street number.
10  Q. And Cartoon Network's office is
11  located where?
12  A. 1050 Techwood Drive.
13  Q. How far away are the offices,
14  approximately?
15  A. A mile.
16  Q. Tell me about your position at
17  Cartoon Network. At the time of the airing of
18  the Weinstein episode, what was your position?
19  A. My title at that time was senior
20  vice president standards and practices for the
21  Turner Entertainment Group.
22  Q. So what was your responsibility with
23  respect to the Weinstein episode?
24  A. My responsibility for that episode,
25  as for all programming, is to ensure

Page 16

1  compliance with our standards and practices
2  guidelines.
3  Q. So it didn't matter that the program
4  was part of Adult Swim as opposed to part of
5  Cartoon Network, did it?
6     MR. RIMOKH: Objection.
7  Q. (By Ms. Stark) You can answer.
8  A. It does matter, because the
9  standards are different for the two services.
10  Q. I'll rephrase the question, then.
11     Your responsibility to review a
12  program does not differ regardless of whether
13  the program airs on Adult Swim or Cartoon
14  Network; is that correct?
15     The criteria may differ, but your
16  responsibility to review a program does not
17  change; is that correct?
18  A. That is correct.
19  Q. When did Adult Swim start the
20  telecast of "Family Guy"?
21  A. I don't remember exactly.
22  Q. Was it in 1999? 2000?
23  A. I don't remember exactly. I think
24  it was after that.
25  Q. 2001?

Page 17

1  A. I don't remember.
2     MR. RIMOKH: I believe, Counsel, you
3  can get that information from the other
4  witness.
5     MS. STARK: I understand.
6  Q. (By Ms. Stark) Is "Family Guy"
7  broadcast or telecast on any other cable
8  network or television network or station or
9  channel?
10  A. I believe that it airs in
11  syndication currently on broadcast networks
12  across the country. I know that in addition
13  to us airing it on Adult Swim, we also air it
14  on TBS and, of course, on Fox.
15  Q. On Adult Swim, when was the first
16  telecast of the Weinstein episode?
17  A. I don't remember the date exactly.
18  Q. How many times to date has the
19  Weinstein episode been telecast on Cartoon
20  Network/Adult Swim?
21  A. I don't know.
22  Q. Is there a song on the episode
23  called "I Need a Jew"?
24  A. Yes.
25  Q. Let's talk about a topic that you

**Page 18**

1  briefly discussed in the beginning, when we
2  were talking about your conversations before
3  the episode aired.
4      Before Adult Swim aired the episode,
5  take me through the steps that you went
6  through one by one to make the decision
7  whether or not it would go on Adult Swim and
8  be telecast.
9      What was the very first thing you
10 did?
11     MR. RIMOKH: Just to be clear, when
12     you say "you," do you mean her, or do you
13     mean --
14     MS. STARK: I mean the company.
15     She's here's as a representative of the
16     company. She's here identified to discuss
17     that particular issue.
18     Q. (By Ms. Stark) Please tell me what
19 the company did step by step.
20     I'll help you a little bit. How did
21 it come to be that this episode was going to
22 be telecast on Adult Swim?
23     A. As is the case in general, James
24 Bagley, in my department, was the first to see
25 the program. He screened the program and

**Page 19**

1  wrote the e-mail that you have to Mike Lazzo
2  and Keith Crawford, giving his opinion of the
3  program from a standards and practices point
4  of view and outlining what he thought
5  appropriate next steps were.
6      At some point after that, I recall
7  that Mike Lazzo called me to discuss it and
8  asked me to take a look at it. I screened it
9  and gave Mike my thoughts.
10     Sometime after that, alternate lines
11 were presented for review, and we reviewed
12 those, according to our practice.
13     And then I wrote a memo in an
14 e-mail, which you have, giving my opinion
15 about the program and how it should be
16 handled. And then the decision was made by
17 the network to move forward.
18     Q. Who made the decision?
19     A. I believe that ultimately -- this is
20 my opinion. I believe ultimately it was Jim
21 Samples.
22     Q. Who is Jim Samples?
23     A. Jim Samples, at that time, was the
24 head of Cartoon Network.
25     Q. And what does he do now?

**Page 20**

1      A. Jim is no longer with the company.
2      Q. So going back to the answers that
3  you gave, you said -- and I may be
4  paraphrasing, so please correct me if I'm not
5  stating it correctly -- as always, James
6  Bagley screened the program.
7      Why is James Bagley the one to
8  always screen the program?
9      A. James's role in the department is to
10 support Cartoon Network and Adult Swim, and he
11 is identified as the first point person to
12 look at programming for those networks.
13     Q. And was Adult Swim/Cartoon Network
14 aware that this episode had not aired on Fox?
15     A. Yes.
16     Q. And had you, meaning the company,
17 had conversations with Fox about why it had
18 not aired?
19     A. I did not.
20     Q. The company.
21     A. I do not know who in the company may
22 have spoken to Fox. I don't know.
23     Q. Did you, in preparation for this
24 deposition, talk to anybody who may have had
25 conversations with Fox about why the episode

**Page 21**

1  didn't air on Fox?
2      A. No.
3      Q. Did the fact that the episode didn't
4  air on Fox enter into your decision-making
5  process?
6      A. No.
7      Q. Why is that?
8      A. We make decisions based on the
9  content of the program. We don't know what
10 other networks' standards and practices
11 guidelines or decision-making is.
12     Q. So just to clarify, you don't know
13 whether anyone spoke with Fox or you don't
14 think anyone spoke with Fox regarding why the
15 episode didn't air on Fox?
16     A. I don't know.
17     Q. With respect to the alternate lines
18 in the program, did Cartoon Network/Adult Swim
19 request the alternate lines?
20     A. My department will identify content
21 that cannot air and refer that back to the
22 network. I do not know what conversations
23 anyone else had in terms of requesting those
24 lines. I wasn't a part of that process. I
25 merely identified the line that I wasn't

Page 22

1  comfortable with airing.
2      Q.  And what line was that?
3      A.  That was the line "Even though they
4  killed my Lord."
5      Q.  In the song?
6      A.  In the song.
7      Q.  Was there any other content that you
8  identified in the episode or in the song that
9  you were uncomfortable with?
10     A.  No.
11     Q.  So you testified that you identified
12 this line in the song that you were not
13 comfortable with. Who proposed the alternate
14 line? Who proposed an alternate line?
15         MR. RIMOKH: Objection.
16         MS. STARK: Basis?
17         MR. RIMOKH: It's vague and
18     ambiguous.
19     Q.  (By Ms. Stark) Was an alternate
20 line proposed for the song?
21     A.  An alternate line was presented to
22 me at some later point. And it was
23 acceptable.
24     Q.  Who presented the line to you?
25     A.  Mike Lazzo.

Page 23

1      Q.  What was the line?
2      A.  "I don't believe they killed my
3  Lord."
4      Q.  Did Mike tell you how that line came
5  about, how that new line came about?
6      A.  I don't recall.
7      Q.  And you found that line acceptable?
8      A.  Yes.
9      Q.  And once you found that line
10 acceptable, what actions did you take, based
11 on that determination, with respect to the
12 episode and the song? And I say "you,"
13 meaning the company.
14     A.  I can only respond to what my
15 department did on that. At that point, I
16 wrote a memo, which you have in an e-mail, to
17 Jim Samples, Mark Lazarus, and Phil Kent,
18 giving my opinion about the program and saying
19 that with that line changed, I was okay with
20 it airing.
21         (Whereupon a document was identified
22     as Plaintiff's Exhibit 39.)
23         MR. RIMOKH: Do you have extra
24     copies?
25         MS. STARK: I do. I'm sorry.

Page 24

1         MR. RIMOKH: Thank you.
2      Q.  (By Ms. Stark) Can you tell me what
3  this is, what this document is.
4      A.  This e-mail has the memo I wrote on
5  the Weinstein episode.
6      Q.  The one that you just testified to?
7      A.  The one that I just referred to.
8      Q.  And just so we can get the record
9  clear, is that on page TCN-00014, there on the
10 bottom right?
11     A.  Yes.
12     Q.  Okay. Continue.
13     A.  And I see comments from other people
14 and discussion about how we would move
15 forward.
16     Q.  When you print e-mails, it goes from
17 the bottom up. So did you receive this full
18 chain here on this first page, TCN-00013?
19     A.  Yes.
20     Q.  I see your name appears on each one
21 of these back and forth. So you received
22 this.
23     A.  Yes.
24     Q.  Turning to your memo on the second
25 page that you were discussing, I just want to

Page 25

1  go back to -- I want to go back to exploring
2  and learning about after you wrote this
3  memo -- and this memo, you testified that you
4  wrote this after the alternate line was
5  approved; correct?
6      A.  That is my memory, yes.
7      Q.  At the very bottom, in the last
8  paragraph before it says, "Please call," it
9  says, I do believe CN should use one of the
10 edited versions that lose -- I assume that
11 means loses -- the line, quote, even though
12 they killed my Lord.
13         Does this refresh your memory as to
14 the circumstances concerning the edited
15 version of the episode?
16     A.  I remember that there were alternate
17 lines available and that they satisfied my
18 need for an alternate line that was
19 approvable. I do not know where they came
20 from.
21     Q.  Is it fair to characterize this memo
22 to Jim as stating that you recommend airing
23 this program with that line revised?
24     A.  Yes.
25     Q.  And if you look at the date of this

Page 26

1  memo, it's dated October 27th, 2003. Does
2  that refresh your memory as to when the
3  program aired?
4      A. I'm sorry. No.
5      Q. Not a month later or six months
6  later?
7      A. No.
8      Q. But it is your testimony that you
9  know that it did air.
10     A. Yes.
11     Q. After you wrote this memo, what
12 happened between this memo and the time --
13 although you can't remember when -- the time
14 that the episode aired?
15     A. I don't have much memory of what
16 happened once the decisions were made and they
17 had my information. I'm sorry. I don't
18 remember much.
19     Q. If you look at the first page, just
20 take a minute to read this chain and see if
21 that refreshes your memory at all.
22     A. My memory is very vague. I mean,
23 all of this is familiar.
24     Q. Can you just tell me generally what
25 this is discussing.

Page 27

1      A. I believe this is discussing the
2  idea of whether the program would be presented
3  with any unusual context as an intro.
4      Q. Such as?
5      A. Someone making commentary about the
6  program.
7      Q. Commentary about the program in what
8  sense?
9      A. I have no really specific memory of
10 what we discussed. Sometimes Adult Swim does
11 different things.
12     Q. Well, you were obviously concerned
13 about the episode. You asked for a line to be
14 changed. What was your concern?
15     A. My concern was that it would
16 possibly offend some viewers.
17     Q. So this first page here talking
18 about an intro using black-and-white cards,
19 would that be an intro discussing the
20 controversy of the episode or some other
21 offensive content in the episode?
22        Is that a fair characterization?
23        MR. RIMOKH: Objection.
24     Q. (By Ms. Stark) You can answer.
25     A. I don't honestly remember any

Page 28

1  specifics beyond what's on this piece of
2  paper.
3      Q. So in preparation for your
4  deposition, you did not rewatch this episode?
5         MR. RIMOKH: Objection.
6         MS. STARK: Withdrawn.
7      Q. (By Ms. Stark) Have you seen the
8  episode in its entirety, ever?
9      A. Yes.
10     Q. Did you watch it in preparation for
11 this deposition?
12     A. No.
13     Q. When is the last time you saw it?
14     A. Probably -- probably when it aired
15 the first time.
16     Q. But you can't remember when?
17     A. I don't remember.
18     Q. Were there communications between
19 you -- and I mean the company -- and any
20 rabbis concerning the episode?
21        MR. RIMOKH: Objection. Vague as to
22     time frame.
23     Q. (By Ms. Stark) During your
24 consideration of the episode, your review of
25 the episode.

Page 29

1      A. Can could you rephrase the whole
2  question, please.
3         MS. STARK: Let me just withdraw the
4     question.
5      Q. (By Ms. Stark) At any time in your
6  memory, were there any communications between
7  you -- and I mean the company -- and a rabbi
8  concerning the Weinstein episode?
9      A. I had no communication with any
10 rabbis when I was considering the show, and I
11 am not aware of any that the company had with
12 any.
13        MR. RIMOKH: She said at any time.
14        THE WITNESS: At any time?
15     Including after it aired?
16        MR. RIMOKH: Including after it
17     aired.
18     Q. (By Ms. Stark) At any time.
19     A. After it aired, I did have a request
20 for copies of the show from two rabbis who
21 found it very funny and wanted it for their
22 personal collections.
23     Q. Who were they?
24     A. Who were they? One was in a
25 rabbinical school where a friend -- the

Page 30

1  daughter of a friend of mine was training to
2  be a rabbi. It was one of her instructors.
3  And the other was a local rabbi. I don't
4  remember the name.
5      I wasn't able to give them the
6  copies because we don't distribute copies of
7  our programming.
8      Q. And are you aware of any
9  communications that any of the other
10 defendants in this case had with any rabbis
11 concerning this episode at any time?
12     A. I have no knowledge of any.
13     Q. Were there any other communications
14 between you or the company with any other
15 organization, such as a synagogue or the
16 Anti-Defamation League or any type of
17 organization associated with the Jewish
18 community, concerning the Weinstein episode,
19 other than the ones that you testified to
20 already?
21     A. I am not aware of any.
22     Q. What about communications with any
23 of the other defendants in this case?
24     A. I don't understand the question.
25     Q. Are you aware of any communications

Page 31

1  between any of the other defendants in this
2  case, Fox, Fuzzy Door, MacFarlane, and the
3  Anti-Defamation League, or any other
4  organizations representing the Jewish
5  community regarding the Weinstein episode?
6      A. No.
7      Q. So I just want to go back to these
8  changes that were made to the episode. Is it
9  your testimony that you don't know how these
10 changes were made?
11     I'm sorry. This one change. Is
12 that this one change to the line of the song?
13     A. I am not clear whether you mean
14 technically or what you mean.
15     Q. Let's go through it, then. You
16 testified that you wanted to change that one
17 line of the lyric, and you asked for it to be
18 changed; is that correct?
19     A. Yes.
20     Q. Take me through the steps of how
21 that got changed.
22     A. Our department communicated to Adult
23 Swim that that line was not acceptable for
24 air. At some point later, they came back to
25 us with alternate lines which were acceptable.

Page 32

1  And subsequently, a final was produced with
2  the alternate dialogue in its place, and that
3  was approved for air.
4      Q. And did it air with the alternate
5  dialogue?
6      A. Yes.
7      Q. The first airing aired with the
8  alternate dialogue?
9      A. Yes.
10     Q. Does "Family Guy" have closed
11 captioning?
12     A. I don't know that for a fact.
13     Q. So would you know whether the lyric
14 had been changed in the closed captioning of
15 the episode?
16     A. I do not know.
17     Q. Should it have been if there were
18 closed captioning?
19     A. Yes.
20     Q. Are you still in standards and
21 practices?
22     A. Yes.
23     Q. Were you in '04?
24     A. Yes.
25     Q. Would you have been responsible for

Page 33

1  TBS telecasts as well?
2      A. Yes.
3          (Whereupon a document was identified
4      as Plaintiff's Exhibit 40.)
5      Q. (By Ms. Stark) Take a look at that
6  and read it over.
7          Can you tell me what this is.
8      A. Yes. This documents a complaint
9  that we received when this episode aired on
10 TBS from a viewer and that the wrong version
11 of the program aired on TBS by mistake.
12     Q. So just to be clear, this has been
13 marked as Plaintiff's Exhibit 40, and it's
14 TCN-00124 through TCN-00126, and it's an
15 e-mail chain --
16     A. I don't have 126.
17         MR. RIMOKH: She doesn't have 126.
18     Q. (By Ms. Stark) Oh, you don't?
19         MR. RIMOKH: No.
20         MS. STARK: I apologize. We'll just
21     take 126 off. It's not important.
22         To correct the record, it's
23     TCN-00124 and 125, and it is an e-mail
24     chain that is dated between August 13th
25     and August 26th of 2004.

10 (Pages 34 to 37)

### Page 34

1  A. I don't see August 13th.
2  Q. (By Ms. Stark) If you look at the
3  subject line in the middle of the second page,
4  it says, TBS viewer comments for the period
5  8/13 to 8/20.
6      So my presumption is that the
7  comment came in sometime between that time
8  period. That's why I'm listing that date.
9      So you remember this happening?
10 A. Yes.
11 Q. And can you just tell me the details
12 of what happened.
13 A. Apparently, in the library, the
14 original Fox version was never pulled from the
15 shelf when the replacement master was created.
16 And when TBS scheduled the episode, the wrong
17 master was pulled -- we were not aware of the
18 wrong master still being in the library -- and
19 aired.
20     We became aware of it because we
21 received this viewer complaint, and
22 immediately afterwards, we had the wrong
23 version that does not have the alternate
24 dialogue removed from the library and
25 destroyed.

### Page 35

1  Q. And on the first page of this
2  document, it says this is from Karen Cassell
3  to you. It says, "My gut is to apologize."
4      Who is Karen Cassell?
5  A. Karen Cassell is the senior vice
6  president of public relations for TBS and TNT.
7  Q. Is she still?
8  A. Yes.
9  Q. And did somebody apologize to this
10 viewer?
11 A. It is my understanding that they
12 did.
13 Q. It wasn't you, though.
14 A. It was not me.
15 Q. So you don't know specifically how
16 that happened, this apology?
17 A. I don't know specifically.
18 Q. How does Cartoon Network or Turner
19 normally apologize to a viewer?
20 A. If the complaint comes by e-mail, we
21 generally respond to their e-mail, because
22 that's the only contact information we have
23 for them.
24 Q. Other than destroying the master and
25 responding to the complaint by the viewer by

### Page 36

1  e-mail, were there any other actions taken in
2  connection with this complaint?
3  A. I am not aware of any.
4      (Deposition in recess, 10:21 a.m. to
5  10:31 a.m.)
6  Q. (By Ms. Stark) I just have a few
7  more questions, and then we will release you.
8      I want to go back to Exhibit 39. Is
9  that TCN-0013? Is that 39?
10 A. Yes.
11 Q. Let's go back to your memo on the
12 second page. I just want to direct your
13 attention to the center paragraph, where you
14 talk about the median age of viewers of the
15 "Family Guy."
16     It says here the median age of
17 viewers watching "Family Guy" is 16.1. Can
18 you tell me where you got that information.
19 A. From the Turner research department.
20 Q. Is that type of demographic
21 information something that is part of your
22 knowledge base as a standards and practices
23 executive?
24 A. I'm not sure I understand exactly
25 what you're asking me.

### Page 37

1  Q. Is this something that you need to
2  know to do your job?
3  A. Yes.
4  Q. And is this something that you know
5  to be currently true?
6  A. Could you rephrase that for me so I
7  answer the right question.
8  Q. Currently, is the median age of
9  viewers watching "Family Guy" 16.1?
10 A. I don't know off the top of my head.
11 Q. Did you ever discuss the creation of
12 the song "I Need a Jew" with anyone from the
13 "Family Guy"? And by "you," I mean you or the
14 company.
15     MR. RIMOKH: I'm just going to
16 object for one second that I don't know
17 that that topic of communications with
18 anyone from Fox regarding the episode is
19 what she's here to talk about, however,
20 she can talk about her own personal
21 knowledge and what she knows.
22     MS. STARK: Well, you identified her
23 as being able to talk about any
24 instance -- No. 12, any instance prior to
25 the filing of the complaint in which any