UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

BOURNE CO.,                                          :

                    Plaintiff,              :

               -against-               :

TWENTIETH CENTURY FOX FILM           :
CORPORATION, FOX BROADCASTING
COMPANY, TWENTIETH CENTURY FOX     :     07 Civ. 8580 (DAB)
TELEVISION, INC., TWENTIETH
CENTURY FOX HOME                           :
ENTERTAINMENT, INC., FUZZY DOOR
PRODUCTIONS, INC., THE CARTOON        :
NETWORK, INC., SETH MCFARLANE,
WALTER MURPHY,                              :

               Defendants.             :

-------------------------------------------------------- X

**DEFENDANTS' COMBINED REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

LOEB & LOEB LLP
Jonathan Zavin (JZ-1846)
Jacques Rimokh (JR-0745)
Shelly Elimelekh (SE-0597)
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000

*Attorneys for Defendants*

## ARGUMENT

**I.    THE FAMILY GUY SONG IS A CLEAR PARODY OF WISH UPON A STAR. PLAINTIFF'S ARGUMENTS TO THE CONTRARY ARE BASED UPON INCORRECT LEGAL STANDARDS AND MISCHARACTERIZATIONS OF THE EVIDENCE.**

Plaintiff's primary assertion in opposition to summary judgment (and in support of its summary judgment motion), that "I Need A Jew" (or, the "Song") cannot be a "parody" because it "merely juxataposes" the music from "When You Wish Upon A Star" (alternatively, "Wish") with "offensive" lyrics meant to "ridicule" anti-Semitism, and not to "<u>ridicule</u>" Wish, is founded upon an incorrect interpretation of the law and a deliberate disregarding and misrepresenting of the indisputable facts in the record.  (Pl. Br. 8 – 23).  Plaintiff's manipulations, however, do not create a "genuine" dispute of material facts and cannot alter the plain conclusion that the Song, was intended to be and is a transformative parody of Wish as a matter of law.

### A.    Plaintiff Misapplies *Campbell's* Parody Standard.

Contrary to Plaintiff's fundamental assertion (*e.g.*, Pl. Br. 8–9, 17), the standard for finding parody <u>is not</u> that the primary or "predominant purpose" of the second work must be to "ridicule," *i.e.*, negatively treat, the work being parodied.  In fact, the Supreme Court went out of its way to confirm that a broad variety of "commentary" can constitute parody.

Plaintiff states its contrived standard for "parody" as follows:

> Thus, as the Supreme Court explained, reference <u>must be joined with ridicule</u> to constitute parody.  . . . To qualify as parody, two works with opposing themes or views must be contrasted in a way that makes clear that the purported parodist in doing so to show that the theme or view of its new work is superior or more true to life than that of the parodied work.  This is the requisite "joinder of reference and ridicule" that the Supreme Court viewed as the distinctive characteristic of parody.

(Pl. Br. 13, 17) (citing and quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583).

Accordingly, throughout its memorandum, Plaintiff urges that the Song cannot be a parody

1

because it was intended to "ridicule" Peter's anti-Semitic beliefs and, therefore, was not intended to "<u>ridicule</u>" Wish.  (Pl. Br. 1, 4, 12–17, 20–21).

Plaintiff's definition of parody is simply wrong.  The Supreme Court was far more careful to accommodate First Amendment principles and further the goals of the copyright law in setting forth the scope of works that could constitute transformative parodies.  Specifically, the Court <u>did</u> <u>not</u> hold that <u>only</u> works that "ridicule" the underlying work or press that its view is "superior" may qualify as parody.  In every instance in its discussion of the standard for parody, the *Campbell* Court broadly referred to parody as including "commentary" **or** "ridicule" that, <u>at least in part</u>, references the style or substance of the subject work.  For example, the Court held:

> The germ of parody lies in the definition of the Greek *parodeia,* quoted in Judge Nelson's Court of Appeals dissent, as "a song sung alongside another."  972 F.2d, at 1440, quoting 7 Encyclopedia Britannica 768 (15th ed. 1975).  Modern dictionaries accordingly describe a parody as a "literary or artistic work that imitates the characteristic style of an author or a work for **comic effect or ridicule,**" **or** as a "composition in prose or verse in which the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as **to make them appear ridiculous**."

*Campbell*, 510 U.S. at  580 (emphasis added).

Accordingly, in determining whether 2 Live Crew's "Pretty Woman" constituted a parody the Court held:  "While we might not assign a high rank to the parodic element here, we think it fair to say that 2 Live Crew's song **reasonably could be perceived as** commenting on the original **or** criticizing it, to some degree."  *Id.* at 583 (emphasis added).[1]  Further, the Court held:

> We have less difficulty in finding that critical element in 2 Live Crew's song than the Court of Appeals did, although having found it we will not take the further

---

[1]  In describing the standard for parody, the Ninth Circuit, for example, held "[t]he original work need not be the sole subject of the parody; the parody 'may loosely target an original' as long as the parody 'reasonably could be perceived as **commenting on the original or criticizing it**, to some degree.'"  *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) (quoting *Campbell*, at 580-81, 583) (emphasis added).

step of evaluating its quality.  **The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived.**  Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use.  As Justice Holmes explained, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits.  At the one extreme some works of genius would be sure to miss appreciation.  Their very novelty would make them repulsive until the public had learned the new language in which their author spoke."  *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251, 23 S.Ct. 298, 300, 47 L/Ed. 460 (1903) (circus posters have copyright protection); *cf. Yankee Publishing Inc. v. News America Publishing, Inc.*, 809 F.Supp. 267, 280 (SDNY 1992) (Leval, J.) ("**First Amendment protections do not apply only to those who speak clearly, whose jokes are funny, and whose parodies succeed**") (trademark case).

*Campbell*, 510 U.S. at 582-583. (emphasis added; footnote omitted).

Plaintiff disregards these key dictates and, incorrectly, takes one sentence from *Campbell* out of context and suggests a rule that is actually contrary to the rest of the Court's opinion.  The statement relied upon by Plaintiff was made by the Court in its specific analysis of the parody presented in Two Live Crew's "Pretty Woman."  The full context of the statement appears in the decision as follows:

The later words can be taken as a comment on the naiveté of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies.  It is this joinder of reference and ridicule that marks off the author's choice of parody from the other types of comment and criticism that traditionally have had a claim to fair use protection as transformative works.

*Campbell*, 510 U.S. at 583.  The Court, however, went out of its way to state that:

**A parody that more loosely targets an original than the parody presented here may still be sufficiently aimed at an original work to come within our analysis of parody**.  If a parody whose wide dissemination in the market runs the risk of serving as a substitute for the original or licensed derivatives (*see infra* at 1177-1179, discussing factor four), it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the original.  By contrast, when there is little or no risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from an original, or other factors, taking parodic aim at an original is a less

> critical factor in the analysis, and looser forms of parody may be found to be fair use, as may satire with lesser justification for the borrowing than would otherwise be required.

*Campbell*, 510 U.S. at 581 n. 14. (emphasis added).  Plaintiff's proffered "predominant purpose to ridicule" (*see*, *e.g.*, Pl. Br. 8, 10-11) standard flies directly in the face of the Supreme Court's standard for parody-fair use.

As we establish in Point III below, the Song cannot possibly serve as a market substitute for Wish (or for derivative works based upon it) nor is there any risk of any future harm. Accordingly, even if the Song is deemed a "looser form of parody" or, indeed a satire, the first factor will still weigh heavily in favor of fair use.  *See, e.g., Blanch v. Koons*, 467 F.3d 244, 254-55 (2d Cir. 2006).

### B.  Plaintiff's Parody Analysis is Also Fatally Flawed Because it Utterly Ignores the Context of the Family Guy Song, Including the Visual Elements Integral to Its Performance and Presentation in the Episode.

Plaintiff's analysis disregards yet another fundamental principle of fair use.  As the Supreme Court directed, "[i]n parody, as in news reporting, <u>context is everything</u>, and the question of fairness asks what else the parodist did besides go to the heart of the original." *Campbell*, 510 U.S. at 589 (citation omitted).  "As the words of section 107 indicate, the determination of fair use is an <u>open-ended</u> and <u>context-sensitive</u> inquiry." *Blanch v. Koons*, 467 F.3d at 251 (emphasis added).  Tellingly, Plaintiff does not even discuss the "action" taking place on screen in the Episode as the character Peter sings the Song.

As described by MacFarlane (and completely ignored by Plaintiff), the creators of the Song and the Episode:

> intended to evoke and parody the "saccharine sweet," "innocent" and "wholesome" worldview presented in and represented by Wish Upon A Star, by having Peter "wish upon a star" in a decidedly impure and unsavory manner based on his ignorant stereotypes.  The Episode visually carries through and furthers the parody by placing Peter in a pose that emulates that of the toymaker

> Gepetto in *Pinocchio* sitting by the window sill gazing up at sparkling stars wishing for a "real boy" as the music for Wish Upon A Star plays in the background.
>
> In further parodying the fantasy world of Wish Upon A Star and *Pinocchio*, the Episode absurdly inserts and juxtaposes Peter's ignorant racial stereotypes into the fantasy world by, among other things, depicting the Jews as magical creatures that come to Peter in the form of a magical spaceship that turns into a flying dreidel.

MacFarlane Dec. ¶¶ 8-9.

There would simply have been no need or purpose to any of Peter's "magical" "wishful" imaginings and absurd frolicking in the starry night sky with a dreidel and a menorah made from starlight to which the Song is sung by Peter if, in addition to making fun of Peter's beliefs about Jews, the parody was not also <u>directly</u> targeted at the idyllic and naively wholesome and hopeful message of Wish and its use in its original context of *Pinocchio*.

Moreover, while the testimony of the creators of the work may aid the Court's analysis in describing their attempted purposes in creating the subject work, the question of "parody" is a legal determination and, ultimately, it is the <u>Court's</u> <u>own</u> <u>review</u> of the claimed parodic work – in its entire context – that governs.  *See, e.g.*, *Campbell*, 510 U.S. at 582-83; *Blanch*, 467 F.3d at 255 n. 5; *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 114-15 (2d Cir.1998).  As Judge Stein aptly confirmed in his recent fair use decision concerning the use of an excerpt from John Lennon's song "Imagine" in a motion picture about "intelligent design:"

> Although defendants' reasons for using 'Imagine' in the movie and their ability to articulate those reasons ease the analysis, neither 'is the *sine qua non* for a finding of fair use.' *Blanch*, 467 F.3d at 255 n.5.  Indeed, much of defendants' asserted purpose for excerpting the song is apparent from a viewing of the movie.

*Lennon v. Premise Media Corp.*, No. 08 Civ. 3813 (SHS), 2008 U.S. Dist. LEXIS 42489 (S.D.N.Y. June 2, 2008) (a copy of the Opinion is annexed hereto as Appendix 1).  Defendants respectfully submit that the Court's own review of the Episode will confirm that not only may

the "parodic character be reasonably perceived" here, but, frankly, it is impossible to miss. *See Leibovitz*, 137 F.3d at 113 (quoting *Campbell*, at 582). This includes the more "inside joke" that viewers, who are aware of Walt Disney's reputation as being anti-Semitic, would perceive as Peter is singing the Song. Indeed, Plaintiff's own "licensing expert," Soroka, admitted that she found the Song to be a "parody," of Wish (in the "non-legal sense") because it "made fun of" the song. (Soroka Dep. 16:02 – 18:23).

The Court's review will also confirm that the parody here is plainly <u>not</u> the "mere juxtaposition" without commentary on the original work upon which Plaintiff premises virtually its entire opposition. For example, though Plaintiff tries, in vain, to distinguish it, the situation here is precisely the same (if not even more of a parody) as that presented in *Abilene Music, Inc. v. Sony Music Entm't, Inc.*, 320 F. Supp.2d 84, 91 (S.D.N.Y. 2003) where Judge Lynch concluded: "Contrary to plaintiffs' argument, therefore, this is not a case in which the author has taken the melody of a popular song purely for the sake of convenience, and then changed the lyrics to satirize a subject having nothing to do with the original song." *Id.*[2]

Similarly, the court in *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ. 6068 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) rejected the plaintiff's claim that the defendant's political ad merely juxtaposed plaintiff's "Priceless" commercials without commentary. The court's analysis and conclusions firmly support a finding of parody here:

> Ralph Nader's Political Ad attempts to show various ways different Presidential candidates can be bought in the "big-money arena of Presidential politics" and contrasts the "priceless" truth represented by Ralph Nader as the remedy for the

---

[2] *See also Fisher v. Dees* 794 F.2d 432, 436 (9th Cir. 1986) (In determining that song "When Sunny Sniffs Glue" was a parody of the famous song "When Sunny Gets Blue" the Court held: "We requested counsel to provide us with tapes of both Dees's parody and the original (as sung by Johnny Mathis). Although we have no illusions of musical expertise, it was clear to us that Dees's version was intended to poke fun at the composers' song, and at Mr. Mathis's rather singular vocal range. We reject the notion that the song was used merely as a vehicle to achieve a comedic objective unrelated to the song, its place and time.") .

bought and paid for positions of others.  Through this depiction, Ralph Nader argues that he not only sends across his own message, but that he wittingly comments on the craft of the original, "which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks."  <u>This commentary "may reasonably be perceived."  The message need not be popular nor agreed with.  It may be subtle rather than obvious.  It need only be reasonably perceived.  Ralph Nader's Political Ad is sufficiently a parody for the purposes of a fair use analysis, and consequently, is transformative</u>.

*Id* at *13 (emphasis added).  There is absolutely no principled distinction, and Plaintiff offers none, between the "juxtaposition" found to be transformative parody or commentary in these cases or the others, such as *Campbell, 510 U.S. 569*; *Leibovitz*, 137 F.3d 109; *Blanch* 467 F.2d 244; *Burnett v. Twentieth Century Fox Film Corp.*, 491 F.Supp.2d 962 (2007); and *Fisher v. Dees*, 794 F.2d 432.

Plaintiff is simply wrong to eschew these dispositive Second Circuit authorities in favor of the Ninth Circuit's decision in *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997).  (Pl. Br. 11).  In addition to being readily distinguishable on its facts, Plaintiff's reliance on *Dr. Seuss* is also misplaced because the *Dr. Seuss* fair use analysis, including its apparent disfavor of the potentially transformative value of satire, is simply not the law of the Second Circuit.  Despite having decided numerous fair use and parody cases in the more than eleven years since the issuance of *Dr. Seuss*, the Second Circuit has not once even referred to the decision; and the decision has only been cited <u>once</u> by any of the district courts within the Second Circuit.[3]

In *Dr. Seuss*, the defendants' use of the "characteristic" Dr. Seuss style and the portrayal of O.J. Simpson in the *Cat's* signature red and white stovepipe hat in their purported parody

---

[3]  In that single case, *Baraban v. Time Warner, Inc.*, No. 99 civ. 1596 (JSM) 2000 WL 358375 (S.D.N.Y. Apr. 6, 2000) Judge Martin cited *Dr. Seuss* for general principles only and went on to hold that the defendant's use of plaintiff's entire photograph was a fair use even though it was neither parody nor satire, because it could be seen as "commentary" or political criticism.  *Id.* at *4.

book about the O.J. Simpson murder trial, titled *The Cat NOT in the Hat!*, had absolutely <u>no</u> relationship to or commentary upon the Dr. Seuss works from which it copied.  Here, on the other hand, Peter Griffin's "wishing for a Jew" and the performance and portrayal of the Song in the Episode is directly related to and pokes fun at the themes of "hopeful" "wholesome" "wishfulness" for which, as Plaintiff readily proclaims, Wish has become a "cultural treasure, epitomizing the wonders of childhood and the powers of love, hope and belief."  (Pl. Br. 30).

Contrary to Plaintiff's unsupported assertion, this is decidedly not a case where the *Family Guy* writers copied Wish "to get attention" and simply substituted in unrelated, offensive lyrics.  Accordingly, the facts of this case are clearly distinguishable from the situation in the pre-*Campbell* and pre-*Blanch v.* Koons, MCA, *Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) relied upon by Plaintiff.  The court in *MCA* held that the song "Cunnilingus Champion of Company C", which copied plaintiff's copyrighted music and <u>simply</u> substituted dirty lyrics, was not a parody-fair use of plaintiff's "Boogie Woogie Bugle Boy."  Unlike here, the purpose for defendant's use in *MCA* was entirely unrelated to the substance of the original song, and, indeed, the defendants admitted that "Cunnilingus Champion" was not intended to comment upon or be a parody of "Boogie Woogie" at the time it was created (*id*. at 184); and (2) the defendants admitted that their song's parody was not targeted at the "Boogie Woogie" song, but merely was a commentary on the "mores of society."  *Id*. at 185.

### C.   Plaintiff Misrepresents the Factual Record to Support Its Meritless Contention that the Family Guy Song Was Not Intended to Parody Wish Upon a Star.

Plaintiff's argument also wrongly, disregards every single witnesses' testimony, both at deposition and in the submitted declarations that the Song was intended from inception to be, among other things a "commentary on" and parody of Wish that also lampooned Walt Disney's reputation as an anti-Semite.  Plaintiff cannot oppose summary judgment, let alone, obtain

judgment in its favor, by simply disregarding the uniform, uncontested testimony of the creators of the work or by making unsupported, conclusory statements that the creators did not mean what they said when they testified that they intended to create a parody of Wish and to make a "sharp comment" on Walt Disney's reputed anti-Semitism.  Plaintiff also improperly relies, heavily, on its mischaracterizations of witness testimony.

Plaintiff attempts to paint a false picture that the "creators" of the Episode and the Song never intended to ridicule or make fun of Wish by almost exclusively referencing purported "admissions" contained in out-of-context deposition testimony from Ricky Blitt, the credited "writer" of the Episode, and Walter Murphy, the credited "composer" of Song.  (Pl. Br. 3, 12–13, 20–21, 25-26).  However, Plaintiff fails to mention that:  (1) Ricky Blitt did not write the lyrics or have anything else to do with the creation of the Song.  (Blitt Dep. 12:05–12:25, 15:04–15:15, 18:12–18:23);  (2) Nor was Blitt present in the "Writers Room" when the idea and lyrics for the Song were created. (Blitt Dep. 21:16–21:20); and (3) Murphy did not, ultimately, compose the final version of the music for the Song that was used in the Episode.  (Murphy Dep. 12:20-13:08).  Rather, it was MacFarlane who changed (and composed) the music for the final version of the Song as he performed and recorded it for inclusion in the Episode; and (4) the uncontested testimony from the witnesses who were directly involved in creating the Song and Episode that it was intended from the outset to be a parody of Wish.

Both MacFarlane and Murphy testified that MacFarlane changed the music from Murphy's original version because he was concerned that the audience would not understand from Murphy's version that they were specifically trying to target and make fun of Wish Upon A Star.  (Macfarlane Dec. ¶13; Murphy Dep. 12-16) Plaintiff also disregards Murphy's and Blitt's

clear testimony that the Song was a "parody" and does make fun of Wish. (Murphy Dep. 10:12–

10:15, 11:22–13:05, 13:20–14:05, 31:07–32:16; Blitt Dep.11:07–11:17, 20:06–20:25).

Plaintiff's attempt to refute the clear parodic nature and purpose of the Song by pointing

out that MacFarlane and others involved in the creation of the Episode did not reference Walt

Disney or otherwise describe the parody of the Song, for example, in the commentary track on

the DVD or in the Standards & Practices documents fails as a matter of law.

First, a parody is a parody regardless of whether it is expressly labeled as such or its

creators refer to it as a parody in documents.  As held by the Court in *Campbell*:

> We note in passing that 2 Live Crew need not label their whole album, or even this
> song, a parody in order to claim fair use protection, nor should 2 Live Crew be penalized
> for this being its first parodic essay.  Parody serves its goals whether labeled or not, and
> there is no reason to require parody to state the obvious (or even the reasonably
> perceived).

*Campbell*, 510 U.S. at 583, n. 17 (emphasis added; citation omitted).  The Second Circuit has

also recognized this basic principle:

> Koon's clear conception of his reasons for using 'Silk Sandals,' and his ability to
> articulate those reasons, ease our analysis in this case.  We do not mean to
> suggest, however, that either is a *sine qua non* for a finding of fair use—as to
> satire or more generally.

*Blanch*, 467 F.3d at 255 n. 5; s*ee also Lennon,* 2008 U.S. Dist. LEXIS 42489 (quoted above).

Accordingly, whether or not MacFarlane or any of the creators of the Episode or Song referenced

it as a parody or even discussed the target of the parody in their discussions with Fox's Standards

& Practices or on the DVD commentary cannot negate the actual parodic nature of the work.[4]

---

[4] Of course, Plaintiff simply disregards all the instances where the parody was discussed during
the early stages of developing the Episode, for example when the producers first pitched the episode to
Fox.  *See, e.g.*, Seigel Shattuck Dep. 12:24 – 14:12:

> Q.  Prior to this dispute . . . did anyone at the Fox defendants have knowledge of why the
> Weinstein episode used music from "When You Wish Upon A Star" as the basis for the song "I Need A
> Jew"?

Second, Plaintiff's description (Pl. Br. 12-13) of the factual circumstances where it claims one should have mentioned the parody of Wish or Walt Disney is incomplete and misleading. For example, while MacFarlane and the others on the commentary track do not reference the Song parody of Wish, they also do not discuss the other obvious parodies of *Star Wars*, *Seinfeld*, *Fiddler on the Roof*, *Indiana Jones and the Raiders of the Lost Ark*, motivational speaker Tony Robbins or *The Graduate* (which forms the entire ending of the Episode). When one listens to the entire commentary it is obvious that the commentators were just bantering about the Episode in general. The fact that they did not reference the obvious parodies, including the parody of Wish, cannot negate the obvious fact that they are parodies.[5]

### D. Plaintiff Mischaracterizes the Evidence in Attempting to Deny That The Family Guy Song Was Also A Lampoon of Walt Disney's Reputed Anti-Semitism.

Both MacFarlane and Zuckerman, the two present witnesses with actual knowledge of and involvement in the decision to parody Wish and in the writing of the lyrics for Song, testified

---

A. Yes, it was supposed to be a parody of that song.

Q. And how did Fox come to know that?

A. The executive producer pitched it out to me. They told me at the pitch that they were going to do a parody of that song. Q. And this was at the initial pitch phase? A. Yes.

Q. And how did they describe the reason for using it? In other words, did they just say the word "parody" or did they explain? A. Yeah, they said we will have a moment when Peter launches into song; it's going to be a parody of "When You Wish Upon A Star" in which he is saying how much he wishes he could have a Jew to do his taxes. Q. And did they explain why they viewed that as a parody? A. They didn't explain it, really. It was self-evident to me."

[5] Similarly, Plaintiff provides no basis, because there is none, for why the Family Guy producers would have been expected to reference or "justify" their parodic use of Wish to Linda Shima-Tsuno from the Standards & Practices department. Among others, some obvious reasons why there is no basis for Plaintiff's assertion are 1) it is apparent from the memos cited by Plaintiff that the inclusion of the Song in the Episode was simply not an issue for Standards & Practices, only whether certain lines would be deemed inappropriate; 2) because she sat in with the "table reads" of the episodes and, in any event, 3) understood the Song to be a parody of Wish. (Q. "There's a line [in a memo] that says the audiotape of this song is being reviewed further by senior management. A. Yes. Q. What does that audiotape refer to? A. The song that was in the episode that parodied "Wish Upon a Star.") (Shima-Tsuno Dep. 14:06-14:10).

unequivocally that the reference to Wish in the Song ("I Need a Jew") was also intended as an ironic, sharp comment on Walt Disney's reputation for being anti-Semitic. (MacFarlane Dep. 51:04–51:19, 57:24–61:22).

Plaintiff attempts to undermine this clear parodic purpose by stating "MacFarlane admits that he did not consider the Walt Disney issue at the time he decided to use Star or when the lyrics were first written." (Pl. Br. 19). This statement is false. In fact, MacFarlane actually testified that it was either during or after the lyrics were written, but that he couldn't specifically remember at what point during the discussions – nine years ago – surrounding the creation of the Song that they discussed the Walt Disney aspect of the parody.[6]

Next, Plaintiff makes the insupportable assertion that Defendants failed to establish that the public associates Walt Disney, personally, with the Walt Disney Company. Not only is this a fact of which this Court could take judicial notice, but, Plaintiff disregards, for example, that on the very cover of the *Pinocchio* DVD – the film for which Wish was created and a DVD distributed by a subsidiary of The Walt Disney Company, the film is titled as "*Walt Disney's Pinocchio*." Further, despite a mountain of widely disseminated publicly-available information, including decisions from the Second Circuit and this court, Plaintiff still claims that Defendants failed to establish that the public associates Wish with Walt Disney's company. (Pl. Br. 18)

This Court may take judicial notice of pleadings in other actions, as well as matters in the public record which establish, beyond any serious dispute, the long term affiliation that the song has had with the Walt Disney Company. *See e.g., Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000) (holding courts may take judicial notice of pleadings, testimony, and decisions from

---

[6] "A. I mean at some point during or after the song was written, it was discussed in the write[r]s room that this is – you know, this is kind of an ironic subtext that hopefully enriches the parody. Q. Do you remember whether it was during or after the time that the lyrics were written? A. I believe it was after. I mean – I am sorry. Let me go back. It was – it was during or after. I don't know. I can't give you a specific answer." (MacFarlane Dep. 63:04 – 63:12).

prior lawsuits); *Lynch v. United Servs. Auto. Ass'n*, 491 F.Supp.2d 357, 363 (S.D.N.Y. 2007). Indeed, the Walt Disney Company, who has used the composition for numerous purposes for decades including in the opening sequences of the Disney anthology television series, "The Wonderful World of Disney," in Walt Disney Pictures' opening logos, and in television advertisements for its Disneyland theme park (Pltf's Admission Nos. 3–5), proudly declares on its website that "'When You Wish Upon a Star,' has become the official signature tune of The Walt Disney Company."  Rimokh Rep Dec. ¶ 16, Ex. O.  Moreover, Plaintiff even admits that a substantial number of its licenses for Wish have been with the Walt Disney Company and that the Walt Disney Company shares in fifty percent of the revenues from licensed uses of Wish." (Bourne Dep. 36:15–37:3, 47:15–48:04).

Finally, Plaintiff asserts that Defendants could not have intended to make a commentary on Walt Disney's reputed anti-Semitism because Defendants have not submitted evidence that Walt Disney was, in fact, anti-Semitic.  Plaintiff, clearly, misses the point.  The commentary was targeted at and based upon the widespread public perception, or "urban legend," (similar, for example, to the rumor that Disney's body was cryogenically frozen), about Disney being anti-Semitic; whether he actually was or not is irrelevant.  Plaintiff also misses the point regarding the fact that in 2005 *Family Guy* once again took a stab at Walt Disney's alleged anti-Semitism in *Stewie Griffin: The Untold Story*."  (See Initial Brief fn. 12).  The point is not, as Plaintiff's argue, that this was proof that the writers here could have made their comment more "overtly." (Pl. Br. 18 fn.1)  Rather, it is irrefutable proof that, contrary to Plaintiff's bare assertion, the Walt Disney anti-Semitism commentary intended by the Song was neither an "afterthought" nor invented for purposes of this litigation, because, before any claim was ever raised in this case, MacFarlane was aware of Disney's reputation and he considered it fodder for parody.

## II. THE CLEARLY TRANSFORMATIVE NATURE OF THE FAMILY GUY SONG TOGETHER WITH THE ABSOLUTE ABSENCE OF ANY HARM TO THE MARKET FOR *WISH UPON A STAR* CONFIRM THAT, WHATEVER AMOUNT PLAINTIFF CLAIMS DEFENDANTS BORROWED FROM THE ORIGINAL WAS REASONABLE.

Defendants are entitled to summary judgment on their fair use defense because, even assuming Plaintiff's expert's allegations of similarities between Wish and Song are true, the amount taken in the Song was still manifestly reasonable in light of the Song's strong parodic purpose and character.  The fact that Plaintiff and its experts admit that the Song does not take so much as to raise even the possibility of it serving as a market substitute for Wish alone is sufficient to conclude that the quality and amount taken from Wish was reasonable in light of the Song's transformative purpose and character.  (Wilbur Dep. 84-85; Bourne Dep. 25-26, 27-30, 37-38, 60; Soroka Dep. 19-20).

For example, as the court in *Mastercard* confirmed:

> [T]he third factor "enquiry will harken back to the first of the statutory factors," (*Campbell* 510 U.S.) at 586 with the consideration of the purpose and character of the copying, as well as look to the fourth statutory factor in addressing the potential for market substitution.  *Id* at 587.  "That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist."  *Liebowitz* 137 F.3d at 116.  As this Court has already found, the first factor is in favor of the defendants in that defendants' use of the Priceless Advertisements is not commercial in nature and is a transformative parody of those advertisements.

*MasterCard*, 2004 WL 434404, at *5.  Similarly, in this instance, the third factor should favor Defendants because the amount of the protectable elements of Wish used in the Song was permissible in light of its obvious parodic character and purpose, its completely transformative nature, and the conceded fact that it has not served as a market substitute for Wish or any potential derivatives, and the lack of evidence that it ever could cause any market harm.  (See Point III, below).

**A.  Murphy Never Testified that his LeadSheet Version was Sufficient to Evoke Wish Upon A Star for Purposes of the Parody.**

Plaintiff seriously misrepresents the record when it states that "[t]ellingly when asked whether the less similar Leadsheet Version was sufficient to achieve the allegedly parodic effect of the song, Murphy testified that it was." (Pl. Br 26).  In fact, Murphy testified that he did not use any music from Wish in the Leadsheet Version, and that the Leadsheet Version was <u>only</u> sufficient to evoke "the feeling of a Disney song," not, as Plaintiff asserts, Wish specifically. (Murphy Dep. 12:17–12:19, 13:20–14:09).  This outright misrepresentation negates Plaintiff's entire point on pgs. 25-26 of its brief.  Moreover, the fact that MacFarlane, who, unlike Murphy, was involved with the creation of the intended parody lyrics and scene in the Episode, thought it necessary to change a few notes in order to make the Leadsheet version, not just "Disney-esque," but more evocative of Wish, confirms both MacFarlane's intent to parody specifically Wish and that the Leadsheet version was not sufficient for purposes of his intended parody.  (MacFarlane Dec. ¶ 13; Murphy Dep. 13-16)

**B.  Plaintiff Provides No Legitimate Basis For Excluding Professor Ferrara's Testimony and Wilbur's Testimony is Manifestly Unreliable.**

Although they are ultimately irrelevant, Plaintiff is misguided in its assertions that Dr. Ferrara's statements that the Song "did not take an unreasonable amount from Star" are not based upon any analysis submitted to the Court.  Indeed, in Dr. Ferrara's expert report (Ferrara Dec. ¶ 2, Exhibit B), Ferrara repeatedly states his opinion that "there is no wholesale copying of *Pinocchio song* in *Family Guy song*."  (Ferrara Dec. ¶ 2, Exhibit B ¶¶ 2, 31).  Similarly, at Dr. Ferrara's deposition he testified regarding his opinion that there "is no wholesale copying" and his basis for that opinion.  (Ferrara Dep. 62:16–63:19, 116:17–117:12).  His opinion that "there is no wholesale copying" is synonymous with his opinion that the Song "did not take an

unreasonable amount from Wish. Accordingly, there is no basis for Plaintiff's claim that Dr. Ferrara's opinion that the Song did not take an unreasonable amount from Wish is inadmissible.

Plaintiff asserts that Wilbur's Declaration and Report[7] establishes that Defendants used more material as was necessary to evoke Star for purposes of parody. Wilbur, however, only analyzed the purported similarities between the works – and not their differences – and, thus, her analysis is flawed and her Report unreliable. (Ferrara Rep. Dec. ¶ 11).[8] Critically, Wilbur failed to compare Star with the Song (as broadcast) relying erroneously, at least in part, on an earlier lead sheet of the Song and an incomplete musical score (Wilbur Report, Ex. G.). (Ferrara Rep. Dec. ¶¶ 5-7).[9]

Further, when undertaking her actual analysis, Wilbur "cherry picked" – ignoring two sections of the Song (the interlude and coda, representing 19 measures, or approximately 35% of the work) which establish its transformative nature. *See also* Ferrara Rep. Dec. ¶ 17. Wilbur also ignored significant and transformative differences in the harmonic structure (Ferrara Rep. Dec. ¶ 18-19) and melodic rhythm of the two works. (Ferrara Rep. Dec. ¶ 20-23). Significantly, Wilbur even failed to disclose that the seven-note melodic "hook" of Star fails to appear in its entirety anywhere in the Song (Ferrara Rep. Dec. ¶ 27), or that the lyrics of the two works are substantially and obviously different. (Ferrara Rep. Dec. ¶ 29).

---

[7] As an initial matter, it should be noted that while Ms. Wilbur purports to give an "expert" musical analysis of the works in issue, she has not completed any degree in music theory and analysis, and she has not published in any peer-reviewed venue in any area of music scholarship. Her terminal degree is a master's in ethnomusicology, or the study of music in culture. (Wilbur Dep. 53:19–54:02).

[8] Consequently, she is unable to opine as to the transformative changes in the Family Guy Song which are demarcated in the differences and understood within the context of the entire musical compositions at issue. Id.

[9] Explaining that the score: (1) fails to include the "coda" (i.e., closing) section; (2) fails to include an accurate transcription of the notes played in the dominant piano part (for approximately 65% of the musical composition) and, thus an accurate harmonic transcription; and (3) fails to accurately transcribe the vocal melody and rhythm.

III.   **THE EVIDENCE INDISPUTABLY ESTABLISHES THAT THE FAMILY GUY SONG HAS NOT, AND CANNOT, CAUSE ANY COGNIZABLE HARM TO THE MARKET FOR WISH UPON A STAR OR ANY DERIVATIVES.**

A.   **Plaintiff's Newly-Asserted "Harm" To The Purported Market For "Comedic Derivatives" Of** *Wish Upon A Star* **Theory Contradicts Its Prior, Unqualified Admissions That The Family Guy Song Did Not Cause Any Such Harm.**

As set forth in Defendants' initial memorandum (pp. 22-23), the Supreme Court in *Campbell* and every Second Circuit decision following it made it clear that the only "harm to the market" cognizable under the fourth fair use factor is the harm of "market substitution", that is, whether defendant's use is so non-transformative that the use can serve as a direct market substitute for the original work or if defendant's use can serve as a market substitute for licensed derivative works based on the original." *See, e.g.*, *Campbell*, 510 U.S. at 590-92. At their depositions, Plaintiff and each of its experts admitted that the Song could not serve as a substitute in the market for Wish; and Plaintiff testified that, other than the license fee it did not receive for Defendants' use, it had no other evidence that the Song caused any harm to the market for Wish.

Now, in a transparent effort to circumvent summary judgment on fair use, Plaintiff, for the first time after the close of discovery, argues a new theory of purported market harm to purported comedic derivatives for Wish; and that, somehow, by virtue of the allegedly offensive nature of the Song persons may not want to license Plaintiffs' song. (Pl. Br. 30-31). Plaintiff's new assertions are, to say the least, unsupported (and insupportable) and flatly wrong as a matter of law.

While, as explained below, they are insufficient as a matter of law, Plaintiff's new assertions of "harm" to a purported market for licensing Wish for "comedic" works must also be disregarded because they are directly contradicted by Plaintiff's admissions during its deposition testimony. It is black-letter law that "a party may not create an issue of fact by submitting an

affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d. Cir. 1997) (citations omitted); *see also, e.g., Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109, 2007 WL 1149979, *20 (S.D.N.Y. April 18, 2007) (disregarding plaintiff's affidavit submitted in opposition to defendants' motions for summary judgment which plainly contradicted her deposition testimony).

Plaintiff's testimony is unequivocal and conclusive on this point.  Defendants urge the Court to review the full extent of Plaintiff's repeated admissions of no market harm presented in the deposition excerpts submitted as Exhibit D to the Rimokh Reply Dec.  In sum, however, Plaintiff's 30(b)(6) witness testified that:  1) Plaintiff had **no evidence** that any potential licensor used the Song instead of licensing Wish;  2)  in his opinion, no licensor would accept the Song as a substitute for Wish; 3) that, putting aside any royalty it claims it was deprived of by Fox's use in the Episode and putting aside Ms. Soroka's report [regarding the offensiveness of the Song], Plaintiff had **no evidence** whatsoever that the Song harmed the market for Wish; 4) that Plaintiff had **no evidence** that anyone refused to license Wish because of the existence of the Song; 5) that Plaintiff had **no evidence** that the number of requests for or grants of synchronization licenses for Wish diminished since the Song came out in 2003; and 6) **no evidence** that Wish decreased in popularity since then.  (Bourne Dep. 25:14–28:02; 30:02–30:22; 32:16–35:17; 38:14–40:13, 60:17–60:22)  Both of Plaintiff's "experts" also admitted in their depositions that the Song could not serve as a market substitute for Wish.  (Sor. Dep. 19:18–20:08; Wil. Dep. 89:10–89:19, 90:08–90:19).  Accordingly, Plaintiff is bound by its admissions and cannot, when faced with a summary judgment motion, attempt to impeach its own prior testimony.

Next, Plaintiff attempts to rely upon Horan's declaration and a chart submitted with it purportedly identifying a variety of licenses issued for Wish for, among other things, alleged "use in comedy programs, including when the song is used in sketches for comedic effect" to establish a purported market that could be harmed.  (Pl. Br. 31; Horan Dec. 13,  Ex. A).  This chart and all of Horan's proffered testimony regarding these purported licenses, however, are inadmissible and Plaintiff must be precluded from submitting or relying upon any such testimony or chart for two key reasons.

First, Defendants specifically requested production of all such documents and any other such documents that Plaintiff asserts support a finding of market harm, but, as confirmed by Horan himself, no such licenses or documents were ever identified or produced to Defendants.[10] FRCP 37(c)(1) provides in relevant part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not, allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial unless the failure was substantially justified or is harmless."  "The purpose of the rule is to prevent the practice of 'sandbagging' and opposing party with new evidence."  *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004) (citations omitted); *see also Fleming v. Verizon N. Y. Inc.*, No. 03 Civ. 5639 (WHP), 2006 WL 2709766 (S.D.N.Y 2006) (striking the declarations of four witnesses in support of summary

---

[10]  For example, Defendants requested:  "No 10:  All documents concerning any request to license or otherwise use the Song in a parodic or satiric work, regardless of whether such request or negotiation resulted in an agreement or actual use of the song.  No. 11:  All documents concerning any instances where Plaintiff licensed or otherwise authorized the use of the Song in a work that parodies the Song or uses it in a satire of or concerning the song, or uses it to parody or satirize some other work, person or thing. and No. 19:  All documents concerning any harm to the market for the Song allegedly caused by the Episode, including "I Need A Jew.  Rimokh Reply Dec. ¶ 2, Ex. A.  Plaintiff testified as follows:

Q.  In the document request to Bourne we requested -- I'll paraphrase it – "All documents evidencing harm in the market substitution or harm to 'When You Wish Upon A Star.'"  To the best of my knowledge, we haven't received any such documents.   Do you know whether there are any documents that Bourne has evidencing any harm of any kind to "When You Wish Upon A Star" because of ["I Need A Jew"]?

A.  No.  I do not know of any such documents.   (Seigel-Shattuck Dep. 38:04-38:24).

judgment under Rule 37 for failure to identify them in <u>Rule 26(a)</u> disclosure).  Plaintiff does not even attempt to offer any justification for why such documents were not produced during discovery.

Plaintiff relies heavily, if not exclusively, upon this belated testimony for its "widespread market harm" argument.  (Pl. Br. 31). Defendants would, of course, be severely prejudiced by the admission of this information because, for example, they were denied the opportunity during discovery to explore exactly what kinds of uses were made under these purported licenses and to test whether they were, as claimed by Plaintiff, truly "for comedic uses" or in a similar market as the Song.  Plaintiff cannot be allowed to "sandbag" Defendants by submitting this previously undisclosed information.  *See Fleming*, 2006 WL 2709766 at *8.

Second, the summary chart and proffered testimony about the contents of numerous documents is inadmissible because it violates the "Best Evidence" Rule set forth in Rule 1002 of the Federal Rules of Evidence.  The Rule provides "to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." <u>*Fed. R. Evid.*</u> § 1002.  The best evidence rule requires that the documents themselves be submitted to the Court for admission into evidence. In the alternative, Plaintiff must offer evidence as to why it is unable to submit the document. *See e.g., Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347 (JGK). 2005 WL 2429777, *8 (S.D.N.Y 2005) (precluding duplicate copy of Note in breach of contract action where "plaintiff [couldn't] point to any secondary evidence . . . that the original Note existed."); *FDIC v. Marke Painting Co., Inc.*, No. 88 Civ. 8675 (JSM), 1992 WL 315627 (S.D.N.Y. 1992).  Here, Plaintiff has neither produced the licenses or offered any evidence of why it has not produced them. Accordingly, Plaintiff has failed to establish that these licenses actually exist and as such should

be not be permitted to rely on its bare assertions regarding "an established market for comedic synchronization uses of Star." (Pl Br. 31)

Moreover, even if this purported evidence was admissible and was even pertinent to the market harm inquiry, which it is not, Plaintiff would only have succeeded in showing the existence of such a market – not that Plaintiff has suffered any <u>harm</u> to that market in the more than four years that the Episode has been telecast and distributed on DVD.  *See, e.g., Campbell*, 510 U.S. at 593 ("And while Acuff-Rose would have us find evidence of a rap market in the very facts that 2 Live Crew recorded a rap parody of 'Oh, Pretty Woman' and another rap group sought a license to record a rap derivative, there was no evidence that a potential rap market was harmed in any way by 2 Live Crew's parody, rap version.").

**B.    Plaintiff Cannot Establish that if Uses Similar to Defendants' Transformative Use in the Family Guy Song  Become "Widespread" It Would Harm the Potential Market for Wish Upon A Star or Licensed Derivatives.**

Of course, Plaintiff's admissions that, despite its coexisting in the marketplace for over four years, the Song has not caused any harm whatsoever to the market for Wish, is compelling, if not dispositive, evidence that the Song and any similar "widespread uses" cannot cause any harm to any "potential" market for Wish, or licensed derivative works, in the future.  Plaintiff's argument, however, also fails because Plaintiff's assertion that "widespread use" similar to that made of Wish in the Episode would cause harm to its alleged or potential market for comedic synchronization uses of Wish disregards the transformative, parodic nature of the Song.  Plaintiff has not submitted any evidence that it has, or ever would license Wish for a transformative use that pokes fun of Wish in an "edgy" work that Plaintiff considers to be "offensive."

In rejecting a similar claim regarding "widespread use," Judge Stein aptly summarized the law in this circuit:

"The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Blanch*, 467 F.3d at 258. In this analysis, "[t]he court looks not only to the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006).

Plaintiffs understandably contend that if unauthorized use of "Imagine" were to become widespread, it would harm the marketplace for licensing the song. In *Bill Graham Archives*, however, on a full record developed on a motion for summary judgment, the Second Circuit rejected a similar argument regarding lost licensing revenue. 448 F.3d at 614-15. That court explained that although the plaintiff had established a market for licensing its concert posters, the defendants' use of the posters in their biographical book "f[ell] within a transformative market," and therefore the plaintiff "d[id] not suffer market harm due to the loss of licensing fees." *Id.* at 615. Here, similarly, defendants copied plaintiffs' work for a transformative purpose, and plaintiffs have proffered no evidence to date that permitting defendants to use a fifteen-second portion of the song for a transformative purpose will usurp the market for licensing the song for traditional uses.

*Lennon,* 2008 U.S. Dist. LEXIS 42489.

## C. Plaintiff's Assertion That The Market For Wish Upon A Star Was Harmed Due To The Allegedly "Offensive Nature" Of Family Guy Song Is Meritless.

Again, in complete disregard of its admissions to the contrary, Plaintiff claims that the market for licensing Wish was harmed due to the association of Wish with the alleged "offensive nature" of the Song. (Pl. Br. 32). This claim is baseless for, at the least, two reasons.

First, the *Campbell* Court and Second Circuit made it abundantly clear that the <u>only</u> harm cognizable under the fourth fair use factor is market substitution; harm claimed because the parody has so exposed the original work to derision or any other kind of "reputational" harm for being associated with a "controversial" or offensive work is simply irrelevant under the market harm analysis – and, indeed, is not cognizable in any aspect of copyright law. *See, e.g., Campbell*, 510 U.S. at 593 ("The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the

like threat to the original market. . . ."); *Leibovitz*, 137 F.3d at 116 n. 7 ("But like market harm caused by a negative book review, *see Campbell*, 510 U.S. at 591-92, 114 S.Ct. at 1177-78; *Fisher v. Dees*, 794 F.2d 432, 437-38 (9th Cir. 1986), any lost revenue Leibovitz might experience due to celebrities' reluctance to be photographed for fear of enduring parodies is not cognizable harm under the fourth fair use factor.").

Second, Plaintiff admits that, despite the Family Guy Episode being nationally telecast and distributed on DVD since 2003, it has not heard of a <u>single</u> complaint or comment about Wish being associated with the Song; nor is it aware of any instance in which a potential licensee refused to license Wish due to the Song, nor is there any evidence of any decline in the licensing revenues for Wish.  (Bourne Dep. 22:16 – 22:24).  Indeed, there is absolutely no evidence that any material portion of the viewing public actually found the Song to be "offensive."[11]

### D. Defendants Have More Than Met Their Burden of Establishing That the Fourth Fair Use Factor Weighs Decisively in Favor of Fair Use.

Plaintiff claims that Defendants have not introduced any "affirmative or rebuttal evidence on the fourth factor . . ." (Pl. Br. 32).  Plaintiff is wrong.

Defendants submit the Song in the Episode, which, due to its manifestly transformative parodic nature, is strong evidence that Defendants' work cannot "usurp the market for" or possibly serve as a market substitute for Wish or any potential derivatives.  *See, e.g.*, *Fisher*, 794 F.2d at 438 ("This is not a case in which commercial substitution is likely.  'When Sunny Gets Blue' is 'a lyrical song concerning or relating to a woman's feelings about lost love and her chance for . . . happiness again.' . . .  By contrast, the parody is a 29-second recording concerning a woman who sniffs glue, which  'ends with noise and laughter mixed into the song.' . . .  We do

---

[11]    While Plaintiff points to several memos written by the FBC's Standards and Practices department regarding the potentially sensitive and offensive content of the script, it must be remembered that these comments were made solely with respect to the draft screenplay without the benefit of seeing the Family Guy Song in the context of the completed Episode.

not believe that consumers desirous of hearing a romantic and nostalgic ballad such as the composers' song would be satisfied to purchase the parody instead. Nor are those fond of parody likely to consider 'When Sunny Gets Blue' a source of satisfaction. The two works do not fulfill the same demand. Consequently, the parody has no cognizable economic effect on the original.").

Defendants then submit the unequivocal testimony (quoted above), from Plaintiff itself, that Song cannot serve as a market substitute and that, other than the fee it believes it should get for Defendants' use (which is not cognizable harm), there is no other cognizable harm to the market for Wish or derivatives. This is precisely the evidence courts have repeatedly held was more than sufficient to show lack of market harm. *See, e.g, Blanch* 467 F.3d at 258; *Leibovitz* 137 F.3d at 116-17.

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

For the reasons set forth above, Defendants have established that they are entitled to summary judgment dismissing the complaint because Defendants' use of Wish is a protected fair use. Defendants have established – even assuming the facts of Plaintiff's opposition to be true – that it has made a fair use here because every factor, except the second factor (which is not given much significance in transformative fair use cases), weighs decisively in favor of a finding of fair use. For these same reasons Plaintiff's cross-motion for summary judgment must also be denied.

Independently, Plaintiff's motion must be denied because it has failed to show the absence of a triable issue of fact in regard to whether Defendants' parody of Wish is a fair use. In order for Plaintiff to prevail on its motion it must establish that after drawing all reasonable inferences in favor or Defendants, no reasonable trier of fact could find in favor of Defendants. *Levinson v. Primedia Inc.*, No. 02 Civ. 2222, 2007 WL 2298406, *4 (S.D.N.Y. Aug. 09, 2007).

Plaintiff's cross-motion ignores the dispositive factual evidence submitted by Defendants establishing that their use of Wish was not infringing pursuant to the Copyright Act. Specifically, Plaintiff wholly ignores (1) the declarations of Defendants establishing that the intent of the Defendants was to parody Wish; (2) the expert report of Lawrence Ferrara establishing that while the Song incorporates a sufficient portion of the musical composition from Wish, there is no wholesale copying; and (3) its own deposition testimony admitting that there is no market harm or market substitution.   While Defendants submit that the legal and factual showing that they have made establishes that their use was a fair use and that summary judgment is warranted, in any event, Defendants establish that there are serious questions of disputed facts going to Plaintiff's motion.  *See generally, Sandoval v. New Line Cinema Corp.*, 973 F.Supp. 409, 414 (S.D.N.Y. 1997); *Leibovitz v. Paramount Pictures Corp.*, 948 F.Supp. 1214, 1226 (S.D.N.Y. 1996) *aff'd by Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998).

## CONCLUSION

For the foregoing reasons, as well as those presented in the accompanying declarations and exhibits, Defendants respectfully submit that (1) they are entitled to summary judgment dismissing the complaint in its entirety because the Family Guy Song is a protected parody–fair use under Section 107 of the Copyright Act; and that (2) Plaintiff's summary judgment motion on liability should be denied.

Dated:  New York, New York
      June 4, 2008

                                    LOEB & LOEB LLP

                                By:___/S/_____
                                    Jonathan Zavin (JZ-1846)
                                    Jacques Rimokh (JR-0745)
                                    Shelly Elimelekh (SE-0597)
                                    345 Park Avenue
                                    New York, New York 10154-1895
                                    (212) 407-4000

                                    Attorneys for Defendants